# Exhibit E

# AWARD

裁决

قرار التحكيم

LAUDO ARBITRAL

SENTENCE ARBITRALE

АРБИТРАЖНОЕ РЕШЕНИЕ



LCIA

Arbitration and ADR worldwide

Arbitration No: 6827

www.lcia.org

**LCIA CASE No 6827**

**BETWEEN:**

### BIPINCHANDRA SHAH

**Claimant**

v

### (1) RLI PARTNERS, LIMITED

### (2) LIMITED LIABILITY COMPANY "INVESTMENT LOTTERY COMPANY"

### (3) LIMITED LIABILITY COMPANY "INVESTMENT FINANCIAL COMPANY 'METROPOL'"

### (4) COMMERCIAL BANK "OBI" EDINENNYI INVESTITSIONNYI BANK" (LIMITED LIABILITY COMPANY)

**Respondents**

### FINAL AWARD
### 7 April 2008

| I. | The Parties |
|---|---|

1.  The Claimant is Bipinchandra Shah ("Mr Shah" or "Claimant") who is an individual and a citizen of the United States of America. Mr Shah's address is 425 East 58th Street, Suite 43H, New York, New York 10022-2300, USA.

2.  The Claimant is represented in this arbitration by Salans, Rockefeller Center, 620 Fifth Avenue, New York, New York 10020-2457, USA (John Hay Esq, Henry Fieldman Esq, Randy Bregman Esq).

3.  The First Respondent is RLI Partners Limited ("RLI" or "1st Respondent") which is a limited liability company organized and existing under the laws of Gibraltar. Its address at the commencement of this arbitration was Suite 23, Portland House, Glacis Road, Gibraltar. On 22 August 2007, the Tribunal received a fax from Mr

Carl A Sax of Strategic Partners Group, Suite 23, Portland House, Glacis Road, Gibraltar in response to its letter of 22 August 2007 sent to RLI at this address and corresponding fax number. This fax stated that this fax number belonged to Strategic Partners Group. By letter of 24 August 2007, Richard Olsen informed the Tribunal that RLI *"no longer utilizes Fiduciary Management Limited in Gibraltar since all operations have been suspended pending new financing"* and that further correspondence should be addressed to Mr Olsen's contact addresses.

4.    The Second Respondent is Investment Lottery Company ("ILC" or "2nd Respondent") which is a limited liability company organized and existing under the laws of the Russian Federation. Its address at the commencement of this arbitration was Attn: Dr Atik Zamman, Yan Raynis Street, 125363 Moscow, Russian Federation. By a letter of 10 June 2007, Richard Olsen informed the Tribunal and the Claimant that Mr Maksim Shkondin of ILC had informed him that ILC had suspended operations and dismissed all its staff. By letter of 24 August 2007 Mr Olsen confirmed he was forwarding all documents to Dr Zamman's assistant.

5.    The 1st and 2nd Respondents are represented in this arbitration by Richard Olsen, Zeller & Associates, 10261 East Bay Harbor Drive, 11th Floor, Bay Harbor Island, Florida 33154, USA.

6.    The Third Respondent is Investment Financial Company Metropol ("Metropol" or "3rd Respondent"), which is a limited liability company organised and existing under the laws of the Russian Federation. Its address is 13 Donskaya Street, Building 1, 119049 Moscow, Russian Federation.

7.    The Fourth Respondent is Ob'edinennyi Investitsionnyi Bank ("ObiBank" or "4th Respondent") which is a commercial bank and a limited liability company organized and existing under the laws of the Russian Federation. Its address is 13 Donskaya Street, Building 1, 119049 Moscow, Russian Federation.

8.    The 3rd and 4th Respondent were represented by Richard Olsen, Zeller & Associates, 10261 East Bay Harbor Drive, 11th Floor, Bay Harbor Island, Florida 33154, USA until 7 August 2007. Mr Olsen described himself as 'interim counsel' pending the appointment of another representative. Since 7 August 2007, the Tribunal received three communications from Ms Natalia Okuneva, 'Legal Advisor' to Metropol and ObiBank, submitted materials in connection with this arbitration. On 24 December 2007, the Tribunal received a letter from Clifford Chance LLP, 10 Upper Bank Street, Canary Wharf, London E14 5JJ (Robert Lambert and Lukasz Rozdeiczer) stated they had just been instructed by the 3rd and 4th Respondents.

9.    The Claimant and all of the Respondents are collectively referred to as the "Parties".

## II.    The Contractual Documents

10.    This arbitration concerns the following contractual documents:

   i)    A Framework Agreement of 29 July 2005 between Mr Shah, RLI, Metropol and ObiBank (the "Framework Agreement");

   ii)   A Loan Agreement of 29 July 2005 between Mr Shah and RLI (the "Loan Agreement");

   iii)  An agreement of 29 July 2005, granting rights to debit the Russian Agreement (the "Withdrawal Agreement") between ILC, ObiBank and Mr Shah;

   iv)   The first Extension and Modification Agreement ("Extension Agreement") between RLI, ILC and Mr Shah of 27 September 2006.

## III.    Commencement of Arbitration

11.    This arbitration was commenced pursuant to Article 6.1(b) of the Framework Agreement (described more fully in §§ 94-101 below) which provides,

   *"Any dispute under this Agreement or any of the Transaction Documents shall be referred to and finally resolved by arbitration in accordance with the Rules of Arbitration ("Rules") of the London Court of International Arbitration ("LCIA") and such Rules are considered as part of this clause. The tribunal shall consist of three arbitrators appointed by LCIA as the nominating authority in accordance with the Rules. The seat of arbitration shall be London. The language of the arbitration proceedings shall be English."*

12.    An identical arbitration clause is contained in Article 9.7(b) of the Loan Agreement and in Section 10.07 of the Withdrawal Agreement.

13.    The Extension Agreement provides that the provisions of the Loan Agreement remain in full force and effect except as modified by the Extension Agreement. (These contracts are described more fully in §§ 112-116 and § 117 below.) The Extension Agreement includes in its Article 5 a dispute resolution clause, which offers the alternative option to submit disputes to the non-exclusive jurisdiction of any state or federal court in New York county, New York, but which leaves the choice of jurisdiction to the Claimant's discretion (this matter is described more fully in § 126 below).

14.    The Claimant's Request for Arbitration, dated 20 September 2006, with Exhibits A - D, was received by the London Court of International Arbitration ("LCIA") on 22

September 2006.

15.    On 27 September 2006, the Claimant submitted an additional copy of the Framework Agreement and two pages that had been missing from the original submission.

16.    On 1 November 2006, the LCIA received a Brief Reply to Claim of Bipinchandra Shah, dated 28 October 2006, from Mr Olsen on behalf of all the Respondents.


### IV.    Appointment of Tribunal


17.    On 10 November 2006, the LCIA notified the parties that, pursuant to Articles 5.4 and 5.5 of the LCIA Rules, the LCIA Court had appointed, as the Tribunal, David Goldberg, (SJ Berwin LLP, 10 Queen Street Place, London EC4R 1BE), Christer Söderlund (Advokatfirman Vinge, PO Box 1703, SE-111 87 Stockholm, Sweden) and Dr Julian D M Lew QC (20 Essex Street, London WC2R 3AL), with Dr Lew as Chairman.

18.    Following this letter of 10 November 2006, the LCIA notified the Parties that unless otherwise agreed or directed by the Tribunal, the Claimant should file a Statement of Case, pursuant to Article 15.2 of the LCIA Rules (or elect to treat the Request for Arbitration as its Statement of Case, pursuant to Article15.3) within 30 days of receipt of this notice.


### V.    Representation of the Respondents


19.    Until 7 August 2007, Mr Olsen represented all four Respondents, but described himself as 'interim counsel' pending the appointment of another representative. By a letter of 7 August 2007, to the Claimant and the Tribunal, Mr Olsen withdrew his representation of the 3rd and 4th Respondents due, in part, to his having *"had little cooperation in my requests for the production of documents for the Arbitration Tribunal"*.

20.    The Tribunal wrote to the Parties on 19 June and 30 July 2007 asking Mr Olsen to produce a duly executed power of attorney.

21.    On 14 August 2007, the Tribunal wrote to the Parties requesting:

    i)      A power of attorney from Mr Olsen confirming his authority to represent the 1st and 2nd Respondents by 21 August 2007;

    ii)     Metropol and ObiBank to provide the Tribunal with the name of their new counsel, with a power-of attorney to follow by 21 August 2007.

22.    On 24 August 2007, Mr Olsen wrote to the Tribunal saying the issue of him being 'interim counsel' was addressed when he notified ObiBank and Metropol that he would no longer represent them. He advised the Tribunal that since he is

> *"Director and Officer of both ILC and RLI, and have represented them from the outset of this Arbitration, I am advising the Tribunal that I have the authority to act in this capacity and believe a power of attorney is unnecessary."*

23.    On 5 September 2007, the Tribunal wrote to the Parties stating that it accepted Mr Olsen's assurance as to his authority as counsel and as a director of the 1st and 2nd Respondents. It noted there was no response from 3rd and 4th Respondents.

24.    On 14 September 2007, the Tribunal received a letter signed by Natalia Okuneva, "Legal Advisor", thanking it for exceptionally allowing ObiBank and Metropol to file relevant documents late. Ms Okuneva advised that *"On August 7, 2007 we unexpectedly received Mr Olsen's withdrawal from representation of ObiBank Ltd, and started looking for a lawyer to represent ObiBank Ltd and IFC 'Metropol'."* Two further letters were received from Ms Okuneva regarding document production and defenses on 21 September and 17 October 2007.

25.    On 18 September 2007, the Tribunal wrote to Ms Okuneva acknowledging her letter, stating that the 3rd and 4th Respondents *"are now significantly out of time and the Tribunal has exceptionally extended the time on several occasions, the last of which expired yesterday."*

26.    On 2 October 2007, Procedural Order No 3 was issued, ordering that by no later than 15 October 2007, Mr Olsen should provide the Tribunal with proof he is an officer of RLI and ILC (Paragraph 5) and that Ms Okuneva should provide the Tribunal and the Parties with a power of attorney confirming she is authorised to represent the 3rd and 4th Respondents. (Paragraph 6). Neither of these orders were complied with.

27.    By letter dated 31 October 2007 and an email on 13 November 2007 addressed to all the parties the Tribunal specifically sought confirmation from Mr Olsen and Ms Okuneva that they would be attending the hearing to represent the 1st and 2nd Respondents and 3rd and 4th Respondents respectively. No replies were received from Mr Olsen or Ms Okuneva and neither attended the hearing.

28.    On 24 December 2007, the Tribunal received a letter from Clifford Chance stating they had just received instructions from the 3rd and 4th Respondents in this matter. This letter expressed concern that Mr Olsen had purported to represent the 3rd and 4th Respondents in his capacity as a member of Zeller & Associates LLC, whilst being a Director of ILC and the Chairman of RLI. The letter stated *"the interests of RLI and ILC are not aligned with those of our clients, neither Mr Olsen nor Zeller & Associates could properly represent our clients in this arbitration."* Clifford Chance further stated that Ms Okuneva is not legal advisor to ObiBank and Metropol and is not authorised to represent them in these proceedings.

29.    The Tribunal considers that the Respondents were given every opportunity to participate fully and submit evidence in this arbitration. They filed legal submissions and documents. Mr Olsen participated in the first procedural hearing on behalf of all the Respondents. Ms Okuneva wrote to the Tribunal on three occasions advising the Tribunal that the 3rd and 4th Respondents would be appointing counsel, thanking the Tribunal for allowing an additional opportunity to file witness statements and submitted both a statement of 3rd and 4th Respondents' position and documents (sent through Mr Olsen because of bank secrecy.)

## VI.    Procedural Arrangements

### i)    The First Procedural Hearing

30.    By a letter of 24 January 2007, the Tribunal scheduled the first Procedural Hearing for 14 March 2007, a date stated to be convenient to the Parties by letter dated 24 January 2007 from Salans and a letter dated 29 January 2007 from Mr Olsen.

31.    On 13 March 2007, Mr Olsen wrote to the Tribunal, saying he had not heard from Moscow

> *"as to whom, if anyone, is going to attend the Conference on March 15th at 2.00 pm. As you have been advised I was acting for all the parties as an interim counsel due to my relationship with RLI. It was my understanding, through Dr Zamman, that counsel for the bank and Metropol would be provided".*

Mr Olsen suggested postponing the conference.

32.    On behalf of the Tribunal, the Chairman sent an email on 13 March 2007 informing Mr Olsen the meeting would go ahead and advised him to call in by telephone. The meeting was attended in person by the Tribunal and counsel for the Claimant. Mr Olsen did not call in, and the Tribunal called him on his mobile phone. Mr Olsen was in Washington D.C. but was able to participate by telephone for the whole meeting.

33.    Following the preliminary hearing on 14 March 2007, the Tribunal prepared and circulated to the Parties a Minute of the Preliminary Hearing on 13 March 2007. The Tribunal also issued Procedural Order No. 1 on 19 March 2007, providing for the timetable and procedure for submissions, document production procedure and fixing the hearing for 26 – 30 November 2007 at the International Dispute Resolution Centre, London.

34.    None of the Parties made any comments with respect to the content of the Minutes of the Preliminary Hearing on 13 March 2007.

### ii)    Document Production

35.    Paragraph 8 of Procedural Order No 1 provided that the Parties should exchange requested documents by 11 May 2007. On 8 May 2007, John Hay of Salans sent Mr

Olsen an email saying he had not received any response from Mr Olsen to his email of 4 May in which he proposed a procedure for exchanging objections and documents in accordance with the Procedural Order. Mr Olsen replied on 10 May explaining he was *"unable to provide you the documents by May 11th. I will forward them as soon as received."*

36.    By letter dated 20 April 2007, Mr Olsen on behalf of the Respondents wrote to the Tribunal seeking document production from the Claimant. This request was premature in light of paragraph 7 of Procedural Order No 1.

37.    On 28 May 2007, Mr Olsen sent to the Tribunal the Respondents' Request for document production, pursuant to paragraph 7 of Procedural Order No 1.

38.    By letter dated 31 May 2007 the Claimant wrote to the Tribunal opposing the Respondent's document production requests. Mr Olsen on behalf of the Respondents responded to the Salans letter by his letter dated 4 June 2007.

39.    On 5 June 2007, Salans submitted a request to the Tribunal for an order compelling the Respondents to produce certain documents by 1 July 2007.

40.    Mr Olsen wrote to the Tribunal on 10 June 2007 responding to Salans' letter of 5 June. Respondents stated that

    i)    *"On April 21, 2007, I eMailed Mr. Maksim Shkondin, my contact in Russia for ILC, Metropol and ObiBank, a copy of Claimant's request for production. My request identified the documents required. What I received has been produced to Claimant in the **"Respondents Response To Claimant's Document Request"** previously filed herein. I determined all of the documents requested were not sent so I, again, called Mr. Shkondin. He advised me more documents would be forth coming but there were delays in translations and Russian holidays were in progress. No one was working. I am still waiting for additional documents from the bank and ILC and will submit them when received."*

    ii)    *The specific documents requested had either been produced to the Claimant or there were none.*

41.    There then followed an exchange of correspondence including letters dated 12, 14 and 18 June 2007 from Salans and 13 and 15 June 2007 from Mr Olsen. Mr Olsen was waiting for documents from 3rd and 4th Respondents and sought an extension of time until 31 August 2007 to complete filings because Dr Zamman of ILC was travelling on government business. This delay was opposed by the Claimant.

42.    On 19 June 2007 the Tribunal wrote to the Parties with its decision on their document production requests, and issued Procedural Order No 2 ordering:

    i)    that the Respondents produce by no later than 15 July 2007 all documents responsive to the Claimant's Document Request in point 1 of Salans' letter of 5 June 2007, namely all documents *"from the files of*

each Respondent, i.e. Mr Olsen, RLI, ObiBank, ILC or Metropol, concerning the Agreements or their negotiation or execution, or related to the various bank accounts referenced in Respondents' defenses".

ii)    that the Claimant produce, by no later than 15 July 2007, "copies of the complaint, Supporting Affidavit of Bipinchandra Shah and any other documents or papers filed or submitted to the Russian Central Bank; Dynamo; the Ministry of Finance or any other Russian Federation Ministry, Governmental Body, quasi governmental body and the Federal Prosecutor, including the names of the parties receiving the documents and the date of submission during the year 2006".

43.    On 24 July 2007, Salans wrote to the Tribunal stating

i)    on 15 July the Respondents had produced certain documents but that they were "in Russian and only included certain overdraft and loan agreements, none of which appear to be referenced in Respondents' Defences";

ii)    the Respondents had not produced any documents from the files of any of the Respondents concerning "the Agreements or their negotiation or execution" in violation of the Procedural Order;

iii)    Mr Olsen had not responded to emails from Salans requesting the missing documents.

Salans requested an order precluding the Respondents from introducing or relying on any documents in response to paragraph 1 of Procedural Order No 2 that were not produced as of 15 July 2007.

44.    On 25 July 2007 Mr Olsen wrote to Salans stating there were no further documents and all relevant documents had been produced. However, Mr Olsen stated that the allegation of Respondents' failure to produce "will be more fully explained at the final hearing in November".

45.    On 30 July 2007 the Tribunal wrote to the Parties stating that it would not order the production of documents which it was advised by the Parties do not exist. The Tribunal further stated that

"the parties cannot expect to rely on documents which they have previously stated do not exist. Accordingly, documents which are not produced to the parties prior to the hearing will not be admitted in to evidence at the hearing or at a later stage in the arbitration without the Tribunal's permission".

iii)    Filing of Documents and Witness Statements

46.    Paragraph 20 of Procedural Order No 1 provided that the Parties were to file and exchange, by no later than 31 July 2007

> *"all documents on which they rely, all arguments of law together with the specific legal texts... which they consider relevant witness evidence in the form of witness statements from each witness and any expert report on which the Parties rely".*

47.  On 9 August 2007, Salans wrote to the Tribunal saying they had not received any documents or statements from the Respondents and attempts to contact the Respondents and Mr Olsen had failed. Salans requested that the Hearing be based solely on the evidentiary submittal made by the Claimant on 31 July 2007.

48.  On 14 August 2007, (following the withdrawal of Mr Olsen from representing the 3rd and 4th Respondents) the Tribunal wrote to the Parties reminding them that none of the Respondents had at any time objected to the timetable in Procedural Order No 1 and that it had been given no explanation by the Respondents for their failure to file as provided for in this Procedural Order. In the circumstances, the Tribunal stated that exceptionally it would allow the Respondents until 21 August 2007 to file witness statements.

49.  On 14 August 2007, Mr Olsen wrote to the Tribunal stating *"the only witness anticipated, on behalf of ILC and RLI is Dr. Zamman and possibly myself."* He also said he did not *"anticipate any additional filings"* of documents since his contact with Dr Zamman had been limited.

50.  On 28 August 2007, Salans wrote to the Tribunal objecting to

> *"any attempt by Respondent to offer any evidence at the hearing since they have not provided any witness statements or documents to Claimant and the Tribunal as mandated by Procedural Order No. 1"*

and requesting the hearing proceed solely upon the Claimant's submittal of 31 July 2007.

51.  On 5 September 2007 the Tribunal wrote to the Parties stating that while it sympathised with Salans, so that there *"can be no complaints about not having an opportunity to present their case"*, it would amend Procedural Order No. 1 and exceptionally allow:

    i)    the Respondents to file any relevant documents and witness statements on which it seeks to rely by 17 September 2007; and

    ii)    the Claimant to file any rebuttal evidence by 1 October 2007.

52.  On 14 September 2007, the Tribunal received a letter from Natalia Okuneva, Legal Advisor to ObiBank and Metropol, stating *"we are in process of preparing the witness statement and are ready to file certain relevant documents for the Tribunal."* Ms Okuneva asked whether the Tribunal had received certain listed documents *"provided by ObiBank Ltd in the beginning of July 2007 to its client 'ILC' upon ILC's request for Arbitration."* She stated that under Russian law, ObiBank could not disclose information considered "bank secrecy" including information concerning its clients. Accordingly, documents concerning ILC's

9

accounts could only by produced by ILC.

53.  On 18 September 2007, the Tribunal wrote to Ms Okuneva giving one final
     extension, until 25 September, for the filing of the 3rd and 4th Respondents' witness
     statements. It also confirmed that the documents listed in her letter of 14 September
     had not been received and asked for them to be sent immediately to all the Parties,
     the Tribunal and the LCIA.

54.  On 21 September 2007, Ms Okuneva wrote to the Tribunal stating that ObiBank
     could not disclose this information but that she had sent the documents to Mr Olsen
     for him to submit them to the Tribunal.

55.  On 22 September 2007, Mr Olsen sent electronic copies of half the documents on
     the list. On 25 September 2007, Mr Olsen sent another email with the remaining
     documents.

56.  On 17 October 2007, the Tribunal received a letter from Ms Okuneva describing
     events relevant to the Claimant's claim and stating the position of the 3rd and 4th
     Respondents.

57.  On 24 December 2007, the Tribunal received a letter from Clifford Chance advising
     that it had just been instructed by the 3rd and 4th Respondents and requesting
     permission to file a post-hearing submission. By letter of 31 December 2007, the
     Tribunal agreed to allow all Respondents to file post-hearing briefs by 11 Jan 2008,
     but no new evidence would be accepted in to the record.

58.  In its letter dated 11 January 2008 submitting the Post-Hearing Brief, Clifford
     Chance stated that had the 3rd and 4th Respondents *"had the benefit of independent
     legal advice regarding the evidence they should submit in support of their
     defence... they would undoubtedly have adduced further documentary and/or
     witness evidence to support their position."* On this basis the Tribunal was asked to
     allow the submission of new evidence by the 3rd and 4th Respondents.

59.  Following receipt from Clifford Chance of the Post-Hearing Brief on behalf of 3rd
     and 4th Respondents on 11 January 2008, the Tribunal received a letter from Salans
     dated 14 January 2008 asking for the right to respond on behalf of the Claimant to
     the Respondents' Post-Hearing Brief.

60.  On 17 January 2008, the Tribunal wrote to the Parties allowing the Claimant and
     the 1st and 2nd Respondents to respond to the 3rd and 4th Respondents' Post-
     Hearing Brief by no later than 31 January 2008. The Tribunal also stated that after
     these submissions *"no further submissions would be accepted by the Tribunal"*. The
     Tribunal further refused the 3rd and 4th Respondents' request to submit new
     evidence.

61.  On 30 January 2008, the Claimant filed its Reply to the 3rd and 4th Respondent's
     Post-Hearing Brief. No response was received from 1st and/or 2nd Respondents.

62.  By letter dated 7 February 2008 Clifford Chance sought to file a response to the
     Claimant's Reply of 30 January and again requested that the Tribunal admit

testimony for Mr Udaltsov.

63. By letter dated 8 February 2008 the Tribunal informed the Parties that it would accept no further submissions and would not reopen the evidence.

    iv)    Witnesses

64. Under paragraph 24 of Procedural Order No 1, every witness and expert from whom a witness statement or expert report was presented would be expected to attend the hearing for examination unless expressly released.

65. By a letter of 9 October 2007, Salans asked the Respondents' counsel to confirm which witnesses they wished to cross-examine. There was no response.

66. By an email of 13 November 2007, Salans informed the Respondents and the Tribunal that one witness, Ms. Barbara Simmons, would not attend the hearing. The Claimant considered that her testimony i.e. that Claimant wired his $3 million loan to the Russian Account as per ObiBank's wire instructions in accordance with the Agreements, could be proved by the documents presented by both Claimant and Respondents.

    v)    The Pre-Hearing Conference

67. On 24 September 2007, the Tribunal wrote to the Parties confirming that the pre-hearing conference would take place on 26 September 2007 by telephone. The Tribunal and Mr Hay and Mr Bregman of Salans participated. Attempts were made to telephone Mr Olsen and Ms Okuneva but neither could be reached.

68. Following the pre-hearing conference, the Tribunal prepared and circulated to the Parties a Minute of the pre-hearing conference on 26 September 2007. The Tribunal also issued Procedural Order No 3 on 2 October 2007 which provided in pertinent part:

    i)    the Claimant may file any further documents in rebuttal by 12 October 2007, but no other evidence would be admitted to the record without the Tribunal's permission in exceptional circumstances.

    ii)    Only 3 days would be required for the hearing, 26-28 November 2007. (By letter of 11 October 2007, Salans requested that this be changed to 27-29 November due to the availability of their expert witness. Mr Olsen and Ms Okuneva did not offer any comment to this request and on 31 October 2007 the Tribunal agreed to the change of dates.)

    iii)    Pre-Hearing submissions to be filed by 19 October 2007.

## VII.  Submissions and Evidence received from the Parties

69.    The following written submissions, witness statements and expert reports were filed
on behalf of the Parties and considered by the Tribunal for the purpose of this
Award

i)      The Claimant's Request for Arbitration dated 20 September 2007.

ii)     The Brief Reply to Claim of Bipin Shah dated 28 October 2006 from Mr
Olsen on behalf of all four Respondents.

iii)    The Claimant's Statement of Case, with Exhibits A-G on 7 December
2006.

iv)     The Claimant's Application to Dismiss Counterclaim on 7 December
2006.

v)      The Respondents' Reply to Claimant (including a withdrawal of the
counterclaim) of 7 January 2007;

vi)     Russian Statutes on which the Respondent Relies were filed on 13
February 2007 in Russian, and a translation was provided on 9 March
2007.

vii)    The Response of ObiBank and Metropol was filed on 9 March 2007;

viii)   The Claimant's Reply to Respondents' Defenses was submitted on 5
April 2007;

ix)     The Claimant filed the following witness statements:

x)      Witness Statement of Claimant Bipinchandra Shah dated 30 July 2007

xi)     Witness Statement of Barbara A. Simmons dated 24 July 2007

xii)    The Claimant filed a Memorandum of Legal Authorities containing
Exhibits C-1 to C-10 on 31 July 2007;

xiii)   On 22 and 25 September 2007, ObiBank filed 13 documents (1) – (13);

xiv)    The Claimant filed an Expert Report of Professor Peter B. Maggs dated
5 October 2007 with Exhibits A, B and C;

xv)     A Letter of Defense from Ms Okuneva on behalf of ObiBank and
Metropol was filed on 17 October 2007;

xvi)    The Claimant filed its Pre-Hearing Memorandum on 19 October 2007.

xvii)   The Claimant filed its Rebuttal Memorandum on 12 November 2007;

xviii)  The Claimant filed its Updated Statement of Amounts Claimed and

Statement of Specific Relief Sought on 7 December 2007.

xix)   The 3rd and 4th Respondents filed their Post-Hearing Brief on 11 January 2008.

xx)    The Client filed a Reply to the 3rd and 4th Respondents' Post-Hearing Brief on 30 July 2008.

xxi)   Letter from Clifford Chance dated 7 February 2008, responding to Claimant's reply. (This letter was submitted notwithstanding the Tribunal instructing the Parties that no further submissions would be accepted by the Tribunal.)

xxii)  Letters dated 10 March 2008 from Salans and Clifford Chance (in respect of Tribunal's letter dated 3 March 2008), advising on the legal costs and expenses of the Claimant and 3rd and 4th Respondents respectively. No statement of costs was received from 1st and 2nd Respondents.

## VIII.   The Hearing

70.   The Hearing took place on 27 November 2007 at the International Dispute Resolution Centre, 70 Fleet Street, London EC4Y 1EU.

71.   The Claimant attended in person together with his counsel, John Hay Esq.

72.   The Respondents did not attend and were not represented.

73.   Accordingly, Mr Hay was invited by the Tribunal to, and did, present the Claimant's case, including answering questions raised by the Tribunal. Mr Shah was asked to and he did formally confirm his witness statement dated 30 July 2007, and that everything in it was true to the best of his knowledge and belief. Mr Shah also answered questions put to him by the Tribunal.

## IX.   Factual Background

74.   There is little dispute on the facts. These are described in the witness statement of Mr Shah, the Respondents' Reply and in the letter of Defense filed by Ms Okuneva on 17 October 2007. (Whilst this is more in the form of a pleading it has not denied the essential facts in this arbitration). The facts as set out in the Statement of Case were, in material part, accepted in the Respondents' Reply to Claimant. These facts are also confirmed in large part in the 3rd and 4th Respondents' Post-Hearing Brief.

75.   Thus the facts appear as follows. Prior to July 2005, the Ministry of Finance of the

Russian Federation issued a license to the State Joint Venture Physical Culture and Sports "Dinamo" ("Dinamo") to be the organiser of the All-Russian Lottery, pursuant to certain lottery laws of the Russian Federation.

76.    Dinamo (through its management company) appointed ILC as the operator of the All-Russian Lottery. To demonstrate to the Ministry and Dinamo that it had sufficient assets to act as operator of the All-Russian Lottery, ILC entered into what was referred to as an unfunded $60 million loan with RLI dated May 27 2005 (and defined in the Framework Agreement as the "Existing Loan").

77.    Mr Shah met Mr Olsen at a friend's party in July 2005. At that party Mr Olsen told Mr Shah about this Russian project and how he was looking to finalise arrangements for the US$60 million Existing Loan.  Mr Olsen explained he was looking for a short term loan of US$5 million to help show Dinamo that RLI and ILC had sufficient assets to act as operator of the All-Russian Lottery.  There then followed various discussions between Mr Olsen and Mr Shah following which Mr Shah agreed to provide the short term loan but for only US$3 million (the Bridge Loan or the Loan).

78.    Essentially Mr Shah and Mr Olsen agreed the following arrangement:

    i)    Mr Shah would make a Bridge Loan of US$3,000,000 for two months; the Loan was to be made on 29 July 2005 and repaid on 27 September 2005.

    ii)    It was agreed that interest would be payable on the Loan calculated at 10% per annum; if repayment was not made on time the interest rate would be increased to 15%.

    iii)    As security for the Bridge Loan, a dedicated account in the name of ILC would be established at ObiBank into which the moneys were deposited. To this end ObiBank would become a party to the arrangement. The account would be blocked so that ILC could not drawdown on the account.  These funds could not be commingled with any other assets, and could not be withdrawn under any circumstances, except by Shah.

    iv)    Metropol, the majority shareholder of ObiBank, agreed to standby and otherwise fulfil the obligations of ObiBank in this transaction.

79.    In the pre-contractual discussions, Mr Olsen made proposals and reached agreement on behalf of RLI, ILC, ObiBank and Metropol.

80.    This arrangement was reflected in three inter-connected agreements concluded between Mr Shah on the one part, and variously RLI, ILC, Metropol and ObiBank on the other part: (i) the Framework Agreement (Mr Shah and all Respondents); the Withdrawal Agreement" (Mr Shah, ILC and ObiBank); and (iii) the Loan Agreement (Mr Shah, RLI and ILC). (The relevant provisions of these agreements are described in greater detail in §§ 94-117 below.)

81.   In accordance with the aforementioned contracts, on 29 July 2005, a dedicated bank account was opened at ObiBank with the number 40702840800061002265 into which Mr Shah wired the US$3 million Loan to ILC.

82.   RLI and ILC did not repay the Loan on or by 27 September 2005.

83.   Subsequently, Mr Shah agreed to extend the Loan until 17 January 2006. This was recorded in the Extension Agreement between Mr Shah, RLI and ILC. In early October 2005, Mr Shah visited Moscow to meet with Respondents' representatives to discuss the status of his Loan and the funds he had deposited with ObiBank.

84.   The effect of the Extension Agreement was that from 27 September 2005 the interest payable on the Loan would be 15% per annum; an additional 3% would become payable on the Loan if the Loan was not repaid by 17 January 2006. RLI and ILC were also to pay 50% of Mr Shah's legal costs incurred in agreeing the overall arrangement and 100% of the legal costs incurred as a result of the default.

85.   RLI and ILC did not repay the Loan and all other outstanding amounts by 17 January 2006, as required by the Extension Agreement.

86.   Thereafter, Mr Shah notified RLI and ILC that they were in default of the Loan Agreement because they had failed to repay the US$3,000,000 plus interest, fees and expenses, and demanded payment thereof. He also notified RLI and ILC of their breaches under the Framework Agreement, the Loan Agreement and the Extension Agreement and demanded immediate payment of the Loan, along with interest, fees and expenses which were all overdue.

87.   In addition, Mr Shah notified Metropol and ObiBank that RLI and ILC were in default on the Loan and that ObiBank was in default of its obligations to pay the amount of the Loan to Mr Shah. He also demanded that ObiBank and Metropol comply with their obligations under the Framework Agreement to immediately pay the Loan amount to it; that ObiBank comply with its obligations under Article 2.3 of the Framework Agreement to provide immediately, a current account statement concerning the Bridge Loan Account; and that ObiBank immediately transfer the Loan amount plus interest and fees from the Loan Account to Mr Shah, as required by Section 6.01 of the Withdrawal Agreement, and immediately provide a statement relating to the Loan Account pursuant to Section 7.07 of the Withdrawal Agreement.

88.   There is dispute as to events following Mr Shah's notification of default to the Respondents. The Claimant alleges the Respondents did not respond to any of the Claimant's requests for repayment of the Loan plus interest and expenses. The Respondents allege that Dr Zamman of ILC was in constant touch with Mr Shah through emails and telephone conversations, during which Mr Shah agreed to accept, in lieu of repayment of the Loan, a secured promissory note and in return the Respondents agreed to promote Mr Shah's business programs in the Russian Federation and allow him to participate in other projects. Mr Shah has denied any such agreement was reached.

89.    It transpires that the Loan amount which was intended to be kept in a separate and unused account was in fact drawn on. From the record (Exhibit C9), from the US$2,999,995 received on 3rd August 2005, the following debits were made to the account:

-    US$900,000 on 5th August 2005;

-    US$50,000 on 8th August 2005;

-    US$725,900 on 16th August 2005;

-    US$1,324,095 on 20th October 2005.

90.    RLI and ILC have failed to repay the Loan. ObiBank failed to keep the Loan Account secure, allowed the US$3,000,000 to be withdrawn from the account by ILC and failed to warn Mr Shah that this money was being withdrawn. Further, ILC has failed to repay the Loan to Mr Shah on demand. ObiBank failed to repay the money deposited with it on the due dates. Metropol has also failed to repay the Loan when requested by Mr Shah.

91.    The Loan and all other outstanding amounts have still not been paid by RLI, ILC, ObiBank or Metropol.

## X.    Summary of Relevant Contracts

92.    As noted above, to give effect to the Loan, the Parties entered into, and this arbitration concerns, four inter-related contracts:

i)    The Framework Agreement.

ii)    The Loan Agreement.

iii)    The Withdrawal Agreement.

iv)    The Extension Agreement.

93.    The provisions of these Agreements as relevant to this arbitration are summarised below.

### i)    The Framework Agreement

94.    The Framework Agreement was executed on 29 July 2005 between the Claimant and all four Respondents. Its purpose was to establish a bridge loan for the 2nd Respondent providing its making arrangements for a three year US$ 60,000,000 loan. This Agreement also set out the rights and obligations of the Parties with respect to the Loan and the supporting transaction documents.

95. The Preamble stated the background to be as follows:

    i)    The 2nd Respondent had been appointed the operator of the All-Russian Lottery and wished to demonstrate to the Russian Ministry of Finance and State Joint Venture Physical Culture and Sports Dinamo that it had sufficient assets to be considered an operator of the lottery.

    ii)    There was *"an existing unfunded US $60 million three-year loan between RLI and ILC"*.

    iii)    The Claimant was willing to provide to RLI a bridge loan of US $3 million *"to be on-lent to ILC to enable ILC to demonstrate its possession of sufficient assets."*

    iv)    To this end a new account would be established in the name of ILC at ObiBank into which the Loan *"would be deposited and not commingled with any other assets and under no circumstances would the funds be withdrawn except by or to the benefit of Shah"*.

96. Article 1.1 provided that Mr Shah would loan $3,000,000 to RLI until 27 September 2005 or such earlier date as provided in the Agreement. This money was to be on-lent to ILC.

97. Article 1.2 defined Events of Default on the occurrence which the Loan was to be automatically repayable to Mr Shah. These included:

    i)    RLI or ILC failing to comply with any of its obligations under the Loan or any other Transaction Document or any other agreement between RLI or ILC and Shah.

    ii)    Any party to a Transaction Document (other than RLI or ILC) failing to comply with any of its obligations under that Transaction Document.

98. Article 1.3 provided that the Bridge Loan Amount would be repaid by 27 September 2005 unless extended by Mr Shah or on the occurrence of certain events.

99. Article 2 established the structure and security for the bank account into which the Loan would be paid. Accordingly:

    i)    it provided for the opening of an expressly numbered bank account (40702840800061002265) for ILC with ObiBank. (Article 2.1) into which Mr Shah was to pay the amount of the Loan.

    ii)    ObiBank, ILC and Mr Shah were to enter into a Withdrawal Agreement entitling Mr Shah to withdraw money from the ILC Account at any time upon submission to ObiBank of a Payment Demand. (Article 2.2)

    iii)    For that purpose ILC was to grant Mr Shah an irrevocable limited power of attorney authorizing Mr Shah to withdraw funds from and receive information in relation to the ILC Account. (Article 2.3)

iv)  ILC was to issue an irrevocable undated standing payment order to ObiBank to pay funds in the ILC account to Mr Shah and, upon a request by ILC to withdraw or transfer from the ILC Account, ObiBank would pay all funds in the ILC Account to Mr Shah. (Article 2.4)

v)  ObiBank was to provide a bank signature card for the ILC Account which required the signature of Mr Shah or his representative for any withdrawal from the ILC Account, except for automatic transfers to an account of Mr Shah. (Article 2.8)

vi)  It was agreed that this ILC Account would maintain a minimum balance equal to the amount of the Loan. (Article 2.9)

100.  Article 3 contained an undertaking from ObiBank and a guarantee from Metropol and ILC to protect the integrity of the Loan. Specifically:

i)  ObiBank undertook to pay to Mr Shah on the earlier of an Event of Default or 27 September 2005 the full amount of the Loan regardless of the amount in the ILC Account. Article 3.1 provided:

> "_ObiBank Undertaking._  _ObiBank undertakes to Shah to automatically wire to the Shah Account the full Bridge Loan Amount regardless of the amount in the ILC Account, without set-off or counterclaim without need of notice or receipt of notice, demand or request ("**ObiBank Undertaking**") on the earlier of:_
>
> _(a)    the date of occurrence of an Event of Default under the Bridge Loan or the termination date under Section 1.5 or;_
>
> _(b)    27 September, 2005 unless the Bridge Loan is extended by Shah under Section 1.4._

ii)  Metropol undertook to fulfil the obligations undertaken by ObiBank if ObiBank failed or defaulted in its obligations. Article 3.2 provided:

> "_In the event of any failure or default on the part of ObiBank in fulfilling its obligations under the ObiBank Undertaking, Metropol (as majority shareholder of ObiBank) will stand by the obligations of ObiBank under the ObiBank Undertaking and will promptly fulfill the obligations of ObiBank under the ObiBank Undertaking._"

iii)  Under Article 3.3 ILC guaranteed to Mr Shah the performance of RLI's obligation under the Loan and that if RLI failed to repay the Loan, ILC promised to wire this amount to Mr Shah within two business days.

iv)  The obligations and undertakings of ILC, ObiBank and Metropol were to survive any breach or invalidity of the provisions of the Framework Agreement or any issue relating to the ILC Account. (Article 3.6)

v)  ObiBank, Metropol and ILC waived any immunity to which they might

have been entitled, including in respect of their assets. (Article 3.7)

vi)   Article 3.8(c) provided that the rights of Mr Shah *"may be waived only in writing and specifically."*

101.   Article 6.1 provided that Metropol, ObiBank, ILC and RLI would *"jointly and severally indemnify and hold Shah harmless against any loss, expense, costs, claims, damages or liability including, without limitation, attorney's fees and costs, which Shah incurs"* due to various events including:

i)   any Event of Default under the Loan Agreement or a breach of the Framework Agreement;

ii)   *"any failure by any of ILC, RLI, Metropol and ObiBank to pay any amount due under a Transaction Document on its due date"* (Article 6.1(b));

iii)   *"any litigation or arbitration due to or arising from any of the Transaction Documents"* (Article 6.1(e)).

ii)   The Withdrawal Agreement

102.   ILC, ObiBank and Mr Shah executed an Agreement Granting Rights to Debit the Russian Account ("the Withdrawal Agreement") dated 29 July 2005. This was done pursuant to Article 2.2 of the Framework Agreement.

103.   The Preamble referred to the Framework and Loan Agreements under which the Parties agreed to operate and maintain a bank account with ObiBank. The Preamble also recorded that ILC

*"has issued a guarantee to the benefit of Shah in respect of RLI's obligation under the Loan Agreement and, therefore, Shah is entitled to claim from the Company [ILC] the funds in the amount of not less than three million US Dollars ($3,000,000) due from RLI to Shah pursuant to the terms and conditions of the Loan Agreement."*

104.   The Agreement provided that until the Loan was repaid, ILC and ObiBank would operate and maintain the Loan Account at ObiBank ("the Account")

*"at all times during the Term in accordance with this Agreement and applicable law"* and obliged ILC to *"make any and all payments required to be made to Shah on the due date of such payment in accordance with the Transaction Documents."*(Article 2.01)

105.   Amounts held in the Account were to earn interest as set by ObiBank. (Article 2.03)

106.   The Agreement provided that the minimum balance in the Account should *"at all times be not less than three million US Dollars"* unless withdrawals were made as provided for under the Agreement. (Article 4.01) Certain withdrawals and transfers

from the Account were prohibited under the Agreement without the prior written consent of Mr Shah. (Article 4.02)

107.  The Agreement provided for ILC to submit to ObiBank an undated payment order instructing ObiBank to withdraw funds in favour of Mr Shah. (Article 4.03(c)) Obibank was to hold this in escrow and perform this order by transferring US $3 million to Mr Shah's account if ILC or any other person attempted to deal with the account in a number of ways, such as attempts to withdraw money. (Article 4.03(e))

108.  The Agreement provided that within one day of the date of the Agreement, ILC should prepare and submit to ObiBank a signature card "*certified by an authorized representative of [ObiBank] and containing the name and the signature of Shah*". Mr Shah was to have the "*sole right of the first signature in respect of any Payment Orders or other instruction to be submitted*" in respect of the Account pursuant to the power of attorney issued pursuant to the Agreement. (Article 5.01)

109.  ILC further agreed to grant Mr Shah a power of attorney "*as its representative and grants to it full authority and rights*" to do all acts which ILC would be otherwise entitled to do in relation to the Account, the money in the Account or the Account agreement and to receive information relating to the Account. (Article 6.02)

110.  Mr Shah was entitled to demand repayment if ILC failed to comply with any payment obligation and ObiBank undertook to comply with any and all payment demands from Mr Shah. (Article 6.01)

111.  The Agreement required:

      i)  ILC to provide Mr Shah with copies of documents relating to and information concerning the Loan Account. (Article 7.01(a)-(e))

      ii)  ObiBank was to notify Mr Shah if various events occurred, including:

            a.  if anyone apart from ILC requests to withdraw or becomes entitled to withdraw funds from the Account, and

            b.  if ILC attempts to amend or terminate any provision of the Bank Account Agreements. (Article 8.02)

      iii)  The Loan Agreement

112.  The Loan Agreement was made between Mr Shah as Lender, and RLI and ILC as Borrower, and sets out the substantive terms of the Loan.

113.  The Preamble stated that:

      i)  RLI and ILC had sought a loan of US$3 million and the Claimant was willing to make such funds available;

ii)    there was "an existing unfunded $60 million three year loan between RLI and ILC on the one part, and ILC on the other part; and

iii)    that there is the Framework Agreement between Mr Shah, RLI, ILC, Metropol and ObiBank.

114.   The Loan was to be made on 29 July 2005. (Article II, 2.2(a))

i)    It was to be repaid in full, with interest, on 27 September 2005 or some earlier date if certain events occurred. (Article V, 1.1 and 2.3(a))

ii)    Interest was to be calculated at 10% per annum with a step up of 5% per annum for amounts not paid when due. (Article 2.3(c))

115.   RLI and ILC were to *"be responsible for all reasonable costs and expenses"* of Mr Shah *"if there is an uncured Event of Default in connection with the administration, modification, amendment, restructuring or enforcement"* of the Loan Agreement. (Article 9.4(b))

116.   Events of Default included the failure of Borrowers to pay any principal or interest or other amount when due or to perform or observe any of various specified terms. (Article 8)

iv)    The Extension Agreement

117.   RLI and ILC on the one part and Mr Shah on the other part executed the First Extension and Modification Agreement dated 27 September 2005. It modified the Loan Agreement in the following ways:

i)   it increased the rate of interest on the Loan to be 15% per annum from 27 September 2005.

ii)   the repayment date was extended to 17 January 2006.

iii)   an additional 3% was to be paid on all amounts due if not repaid by 17 January 2006.

iv)   RLI and ILC were to pay 50% of Mr Shah's attorneys fees incurred to date and paid, and 100% of such fees incurred with respect to the default by RLI and ILC and for the preparation of the Extension Agreement.

v)   RLI and ILC were to provide Mr Shah with proof that ObiBank continued to hold and not commingle with any other assets the US $3,000,000 in a separate account in the name of RLI and ILC.

## XI.    Relief Sought by Parties

118.    The Claimant seeks the following relief[1]:

    i)    Against RLI, ILC, Metropol and ObiBank, jointly and severally, damages of US$5,221,227.25, plus interest of US$1250 per day from 7 December 2007 until the date of payment for breach of the Framework Agreement;

    ii)    Against RLI and ILC, jointly and severally, damages of US$5,650,701.21, plus daily interest of US$1,666.66 per day until the date of payment for breach of the Framework Agreement, Loan Agreement and Extension Agreement;[2]

    iii)    Against ObiBank and Metropol, jointly and severally, damages of US$3,718,333 plus daily interest of US$833.33 from 7 Dec 2007 until the date of payment, for breach of the Withdrawal Agreement.

119.    The Respondents seek the following relief[3]:

    i)    that the Tribunal deny an award against any of the Respondents in this matter and award Respondents such other relief that is just and proper.

120.    In the Post-Hearing Brief the 3rd and 4th Respondents seek the following relief:

    i)    An award dismissing the claim against each of the 3rd and 4th Respondents, and

    ii)    An award of costs against the Claimant to cover the legal fees incurred by the 3rd and 4th respondents in connection with this arbitration.

121.    By way of alternative the 3rd and 4th Respondents contend that their liability should be limited to repayment of the US$1,675,905 being the total Bridge Loan Amount

---

[1]    The Claimant's Statement of Relief dated 7 Dec 2007 pursuant to paragraph 1(a) of Procedural Order No 4. This is an update to relief sought in the Statement of Case § 24 – 32 which was for:
    a.    Against RLI and ILC, damages of US$3,915,092 for breach of the Framework Agreement, the Loan Agreement and the Extension Agreement, plus interest, and costs and expenses of the arbitration.
    b.    Against ILC, damages in excess of US$3,000,000 for ILC's breach of the Withdrawal Agreement, plus interest, and costs and expenses of the arbitration incurred.
    c.    Against ObiBank and Metropol, damages in excess of US$3,000,000 for ObiBank's breach of the Withdrawal Agreement, plus interest, and costs and expenses of the arbitration incurred after 30 June 2006.

[2]    These damages claimed include the legal fees and expenses sought by the Claimant incurred in this arbitration.

[3]    Respondents' Reply to Claimant.

less the amount remaining in the Claimant's deposit as at the effective date of the Extension Agreement, i.e. US$1,324,095 plus interest from 17 January 2006.

## XII.    Preliminary Issues for Tribunal

122.    Before considering the merits of the Claim and the Respondents' defenses for non-repayment of the Loan, the Tribunal has considered four preliminary issues:

> i)    Jurisdiction of the Tribunal in respect of the Claim;
>
> ii)    Applicable law;
>
> iii)   Loan Made; and
>
> iv)   Reopening of the evidentiary record.

> i)    Jurisdiction of the Tribunal in respect of the Claim

123.    The rights and obligations of the Parties to this arbitration are found in the provisions of the various Agreements. The Tribunal has considered whether it has jurisdiction to deal with these issues in view of the different arbitration/jurisdiction clauses.

124.    The Framework Agreement (at Article 9.2) and the Loan Agreement (at Article 9.7( b)) have an arbitration clause of identical wording. This provides for LCIA arbitration, with its seat in London, and for the arbitration to be conducted in the English language. The Extension Agreement contains a jurisdiction clause of different wording.

125.    The Withdrawal Agreement Article 10.07(b) also provided for LCIA arbitration, in London and in the English language. However, this clause does not contain the words *"or any of the Transaction Documents"* found in the Framework and Loan Agreements. The Tribunal considers these words go to the scope of the arbitration and the tribunal's jurisdiction.

126.    The Extension Agreement provided under the heading "Jurisdiction, Venue and Service of Process") (paragraph 5) that "ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY LOAN DOCUMENT SHALL BE BROUGHT, AT LENDER'S (CLAIMANT'S) OPTION, IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN NEW YORK COUNTY, NEW YORK". The 1st and 2nd Respondent irrevocably waived all objection "TO THE LAYING OF VENUE" OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY LOAN DOCUMENT

BROUGHT IN THE COURTS REFERRED TO ABOVE" or to claim that the proceeding have been brought in an inconvenient forum. It is further expressly provided that nothing in the Extension Agreement affects the Claimant's right "TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE BORROWER IN ANY OTHER JURISDICTION".

127.   The arbitration clause in the Framework and Loan Agreements is broad referring to *"any dispute under this Agreement or at any of the Transaction Documents..."*. Transaction Documents are defined as those listed in Exhibit 1 to the Framework Agreement, which includes expressly the Framework Agreement, the Loan Agreement and the Withdrawal Agreement. The purpose of the Extension Agreement was to extend and modify the Loan Agreement under which the *"Borrower was and has been unable to repay"*. In effect, the Tribunal considers that the Extension Agreement was a part of the Loan Agreement and subject to the arbitration clause. The jurisdiction clause in the extension agreement is non-exclusive and does not override the agreement to arbitrate in the other three agreements. Rather, the Tribunal considers that it applies, firstly, to disputes concerning the Extension Agreement itself, and secondly, allows an alternative non-exclusive jurisdiction option for certain issues without affecting the agreement to arbitrate. The arbitration clause remains effective and appropriate where the dispute involves the rights and duties arising out of or in connection with several contracts, i.e. in this case the Transaction Documents.

128.   For these reasons the Tribunal has concluded that it does have jurisdiction to deal with issues which arise out of the Transaction Documents as well as to the Extension Agreement.

129.   Furthermore, and in any event, under Article 23.2 of the LCIA Rules, any challenge to the jurisdiction of the Tribunal by a Respondent must be made by no later than the Statement of Defense. If no challenge is made within this period any right to challenge will have been "irrevocably waived". In this arbitration the Respondents have submitted statements on the substantive aspects of the dispute but have not lodged any objection or challenge to jurisdiction by the Respondents.

      ii)   Applicable law

130.   The Framework Agreement (Article 9.1) and the Loan Agreement (Article 9.7(a)) provide that they are to be *"governed by, construed, interpreted and enforced in accordance with the laws of England"*. The Withdrawal Agreement (Article 10.06) provides that it is to be governed and construed in accordance with the laws of the Russian Federation. The Extension Agreement is silent on this issue.

131.   For the purpose of determining the entitlement of the Claimant to recover the Loan and interest in this arbitration as claimed the Tribunal is concerned primarily with English law. The Tribunal considers that the Extension Agreement is also governed by English law: it extended and modified the Loan Agreement which was governed by English law and therefore is part of the Loan Agreement. To the extent that the

various provisions of Russian law have been raised their application has been considered inapplicable to the issues in this arbitration for the reasons given within this Award.

### iii) Loan Made

132. No challenge has been made as to the money having been advanced by the Claimant to the 3rd Respondent. This is a pre-requisite of any claim for reimbursement. Evidence of proof of payment has been given in the witness statement of Barbara Simmons and the evidence of instruction and receipt of payment is contained in Exhibits C4, R5, R6 and R11. Movements of the money in this account or contained in a statement of account at exhibit C8.

133. In their Post-Hearing Brief the 3rd and 4th Respondents have argued that because only US$2,999,995 was paid by the Claimant, instead of US$3 million, the Loan contemplated by the Agreements was not made and it should not be held liable. It states:

> "As the funds received from Claimant were less than the contracted-for amount of US$ 3 million and because the Claimant and the First and Second Respondents caused those funds to be deposited in an unprotected account ... these funds to not constitute the Bridge Loan or the Bridge Loan Amount, as defined in the Framework Agreement."

134. The Tribunal considers this contention without merit. US$3 million was transferred by Mr Shah. This has not been denied before or during the discussions of the parties after the first or subsequent repayment dates. The fact that the sending or receiving bank – it does not matter which - deducted US$5.00 as a handling charge cannot undermine the nature of the Loan. The money was received in the designated bank account and has been used by the 1st and 2nd Respondents. In any event, US$5.00 in a loan of US$3,000,000 is *de minimis*.

135. The Tribunal is satisfied that the Loan has been made by the Claimant in accordance with the Agreements.

### iv) Reopening of evidentiary record

136. The 3rd and 4th Respondents sought to reopen the evidentiary record after instructing Clifford Chance to advise in later December 2007. They have argued that prior to this time they had not had the benefit of independent legal counsel as to the evidence to submit. This request was made a month after the Hearing when the Tribunal's deliberations were well advanced. The Tribunal allowed the submission of a Post-Hearing Brief by the 3rd and 4th Respondents – which is what was requested in the Clifford Chance letter of 24 December 2007.

137. The Tribunal considers that the late instruction of Clifford Chance by the 3rd and 4th Respondents cannot be the basis to reopen the whole of the arbitration. The 3rd

and 4th Respondents have had full knowledge of this arbitration from the outset and were aware of the filing and hearing dates since the preliminary hearing in March 2007. In fact, the 3rd and 4th Respondents made several submissions in this arbitration, i.e. on 9th March, 22-23rd September and 17th October, in addition to those made jointly with the 1st and 2nd Respondents. At no time did the 3rd or 4th Respondents disavow the defense filed on behalf of the Respondents by Mr Olsen.

138.    Furthermore the Respondents had every opportunity to participate and file evidence in this arbitration. On two occasions the Tribunal "exceptionally" gave the Respondents additional time to file submissions and evidence. This was acknowledged by Ms Okuneva in her email to the Tribunal dated 14th September, which stated that Obibank and Metropol were in the process of pursuing Witness Statements. Ms Okuneva was stated to be the Legal Advisor to the 3rd and 4th Respondents No evidence was received from the 3rd and 4th Respondents despite the further opportunity given by the Tribunal's letter dated 18th September. In addition there were several other communications from Ms Natalia Okuneva on behalf of the 3rd and 4th Respondents (14 and 21 September and 17 October 2007).

139.    The 3rd and 4th Respondents (and the 1st and 2nd Respondents) were given every opportunity to attend the hearing. The date was fixed and they were aware of it in March 2007; the Tribunal invited Respondents comments on the Claimants request for the Hearing starting on the 27th rather than the 26th November, no reply was received from Mr Olsen or Ms Okuneva. Prior to the Hearing on 31 October and 13 November, the Tribunal reminded the Respondents of the Hearing dates and sought confirmation of who would attend and represent the Respondents at the Hearing. Again, no response was received from either Mr Olsen or Ms Okuneva.

140.    The Tribunal does not accept the claim, in Clifford Chance's letter of 24 December 2007, that in the absence of proper legal representation the 3rd and 4th Respondents "were under the impression that it was not necessary for them to attend the hearing in London". The 3rd and 4th Respondents are sophisticated commercial businesses. They had their own in-house counsel, Ms Okuneva, who wrote to the Tribunal that Witness Statements were being prepared and counsel would be appointed. The 3rd and 4th Respondents knew this should be done but for whatever reason it was not done.

141.    The Tribunal considers it would be unfair to now reopen this matter and rehear this arbitration. The instruction of Clifford Chance at this late stage cannot change the process. Furthermore, and in any event, the Tribunal does not consider, on a prima facie basis, that the evidence which the 3rd and 4th Respondents now wish to adduce, as stated in Clifford Chance's letters of 11 January and 7 February 2008, would now change the Tribunal's conclusion on the merits as stated in this Award.

142.    For all these reasons, the Tribunal confirms its decision not to reopen the evidentiary record in this arbitration.

### XIII.    Issues for Determination

143.    The issue for the Tribunal to determine is whether the Loan is repayable now by the Respondents jointly and severally or by any one or more of the Respondents.

144.    The Respondents have offered seven main defenses to justify non-repayment of the Loan:

      i)    oral agreement for non-repayment;

      ii)    entitlement to balance ILC Loan Portfolio;

      iii)    unenforceability of the Agreements;

      iv)    the Loan was not made in accordance with the Framework Agreement;

      v)    the Extension Agreement discharged the 3rd and 4th Respondents' obligations;

      vi)    the Claimant failed to provide an account signature card; and

      vii)    breach of mandatory Russian legislation.

These defenses are dealt with in turn below.

### XIV.    Tribunal's Analysis and Decision

      i)    Oral agreement for non-repayment

145.    In the Respondents' reply to Claimant (but not in the preceding "Brief Reply to Claim of Bipin Shah") the Respondents claim that an agreement had been reached between Mr Shah and Dr Zamman for payout of the Loan by the issuance of a secured promissory note.

146.    The Claimant has denied that any oral agreement, let alone one where he would accept a "secured promissory note" was ever made.

147.    The Respondents have not invoked any evidence to support the allegation that an Oral Agreement was entered into. Being questioned on this matter by the Chairman of the Tribunal at the Hearing, Mr Shah affirmed: *"No, there was no such agreement."*[4]

148.    Based on the above, the Tribunal cannot arrive at any other conclusion than that

---

[4] Transcript, p. 53, line 13

there is no support for the Respondents' allegation that there was an Oral Agreement to amend the terms for the Bridge Loan.

    ii)    Entitlement to balance ILC Loan Portfolio

149.    The 3rd and 4th Respondents have also argued that they are subject to mandatory rules of Russian banking regulations requiring them to use credit balances in accounts belonging to a particular account holder to set off indebtedness in other accounts of such account holders. Mr Peter P Maggs testified - and the Tribunal accepts this testimony in the absence of any testimony to the contrary - there is no such banking regulation. More importantly, if that had been the case, it would still not have served as an excuse for 3rd and 4th Respondents to renege on their repayment obligation under the Framework Agreement.

150.    As Mr Maggs has further testified, if the Respondent had induced the Claimant into believing that the Withdrawal Agreement and actions taken in its implementation were legally binding because Claimant put faith in the Respondents' assurances, there would still be a duty under Russian law (the Withdrawal Agreement is governed by Russian law) on the part of the Respondents to refund the Claimant's US$ 3 million Bridge Loan under Article 178 of the Russian Civil Code.

    iii)    Effectiveness of Agreements

151.    In their Response, the 3rd and 4th Respondents argued that the Framework and Withdrawal Agreements were not valid. There was no challenge to the validity of the Loan Agreement or the Extension Agreement. The effectiveness of the Agreements was challenged due to the

    a.  failure to register the agreements under Russian law; and

    b.  the Withdrawal Agreement signed by the Claimant not having been returned to 3rd and 4th Respondents.

    a.  Failure to Register the Transaction

152.    Respondents assert that they are not liable because the Agreements are not valid or enforceable. They rely on certain Russian bank regulations pursuant to which, they say, agreements involving foreign currency must be registered with the Russian Central Bank to be effective and that the Agreements were not so registered.

153.    Respondents did not present any witness evidence, whether of fact or expert evidence, supporting this alleged defense. Moreover, although Respondents have provided copies of certain Russian statutes and regulations, as Claimant's Russian law expert testifies, and as is apparent from reading these statutes and regulations,

none of them supports the Respondents' contention. According to Mr Maggs, the disclosed extracts from the relevant Russian statutes and regulations provide that failure to file the required forms subjects the bank and the account holder to certain penalties. Such failure, however, appears to have no impact on the validity or enforceability of the loan or underlying transaction. They remain valid and enforceable.

154.   The Withdrawal Agreement requires the 2nd and the 3rd Respondents, not the Claimant, to file with the relevant Russian authorities any required documentation regarding the transaction. (Claimant Exhibit C-3 at Section 6.01(e) and Section 7.01(d)) If Respondents failed to comply with their statutory and contract obligations to file the appropriate documentation, they are prevented under Russian law from relying on their own failures as a means to avoid liability to Shah.

155.   In addition, as the Framework, Loan and Extension Agreements are governed by English law, not Russian law, Respondents' Russian law arguments are irrelevant to the validity and enforceability of those Agreements.

156.   Under English law a party cannot excuse itself from a contractual duty which it has voluntarily accepted by relying on legal impediments of which it was or should have been aware. Accordingly, the 3rd and 4th Respondents cannot invoke their own failure to register the transaction as a reason to avoid their repayment obligations under the Framework, Loan and Extension Agreements.   This principle is also enshrined in Article 401 of the Russian Civil Code.

157.   Any failure in this regard would constitute a breach of contract in its own right, specifically in respect of Article 5.1(b), Representations and Warranties of the Framework Agreement. This provides in pertinent part

> "each Transaction Document has been, or will be, duly authorized and executed by such Party and constitutes, or will, when executed constitute, a valid and legally binding obligation of the Party, enforceable in accordance with its terms;"

158.   In the 3rd and 4th Respondents' Post Hearing Brief the defense based on the failure to register the transaction is not pursued. The requirement to register the transaction is mentioned in the context of a new defense based on the alleged failure by the Claimant, the 1st and the 2nd Respondents to implement the Bridge Loan transaction. The Tribunal deals with this defense in §§ 166-169 below.

159.   In the absence of any expert evidence to the contrary, the Tribunal accepts the evidence provided by Mr Maggs and finds accordingly that the 3rd and 4th Respondents' defense based on the failure to register the transaction with the relevant Russian authorities should fail.

### b.   Failure to provide executed copies of the Withdrawal Agreement

160.   The 3rd and 4th Respondents assert that, although each of the Parties executed the

Withdrawal Agreement and forwarded it to the 2nd Respondent for execution by the other Parties, the Withdrawal Agreement is not enforceable because a fully executed version was not returned to them (Response of 3rd and 4th Respondents, page 3). The 3rd Respondent claims that it asked the 2nd Respondent for the original executed version of the Withdrawal Agreement (12 months after it executed it) but never received it, leading it to believe that the Withdrawal Agreement did not exist. It further alleges that the funds sent by the Claimant were never credited to the Russian Account referenced in the Withdrawal Agreement. Rather, because no Withdrawal Agreement existed, the funds sent by the Claimant were credited to another ILC Loan Agreement, dated 27 May 2004. ObiBank also asserts that it was not required to repay Mr Shah his funds because Mr Shah had failed to execute a signature card for the account.

161.   Respondents have not presented any evidence in support of their assertions, except a copy of the letter from ObiBank to ILC dated 10 August 2006 (more than 12 months after ObiBank and Metropol executed the Withdrawal Agreement) asking for an "original copy" of the Withdrawal Agreement.   The 3rd and the 4th Respondents do not deal with this defense in their Post Hearing Brief of 11 January 2008 but for the sake of good order the Tribunal addresses this defense before proceeding to the defenses raised in the Post Hearing Brief.

162.   As Professor Maggs explains, whether ObiBank had a copy of the Withdrawal Agreement in its files or not is irrelevant to the validity of that agreement under Russian law. Under Russian law, the Withdrawal Agreement is valid and enforceable even if ObiBank never received an executed copy.

163.   Respondents' own documents show that the Claimant performed his obligations under the Withdrawal Agreements and Respondents accepted that performance, thereby acknowledging the existence and enforceability of that agreement, notwithstanding ObiBank's belated claim that it was unaware that any such Agreement existed. Specifically, Respondents' Document 6, the Swift Memo from International Moscow Bank to ObiBank dated 1 August 2005 confirms the transfer of Mr Shah's funds into the Russian Account at ObiBank, account no 40702840800061002265. This is the account number referenced in the Withdrawal Agreement, established by the 20 July 2005 Bank Agreement also referenced in the Withdrawal Agreement.

164.   Claimant's witness Barbara A Simmons testified that Shah's funds were wired to the Russian Account, account number 40702840800061002265, which is the account number referenced in the Withdrawal Agreement. (Simmons Witness Statement at paragraph 2 and Claimant's Exhibit number C-4, and Claimant Exhibit C-3 at pages 1-4) Respondents' Document 6 (the Swift Memo from International Moscow Bank to ObiBank dated 1 August 2005) confirms the transfer of Mr Shah's funds into the Russian Account. Respondents' Document 9 (the Bank Statement for the Russian Account) shows that Shah's funds were credited to the correct account - the Russian Account. Thus, contrary to ObiBank's allegations, the evidence shows that both ILC and ObiBank established the Russian Account and accepted Claimant's funds into that account.

165.   For these reasons, the Tribunal finds that whether the 3rd and 4th Respondents received back the executed copies of the Withdrawal argument is irrelevant and does not provide them with an excuse from their contractual obligations under it.


iv)    The Loan was not made in accordance with the Framework Agreement

166.   In the Post-Hearing Brief the 3rd and 4th Respondents state that

> "... their obligations as Guarantors never accrued, as the Claimant and First and Second Respondent failed to implement the Bridge Loan transaction contemplated by the Framework Agreement and other Transaction Documents. Accordingly, the conditions on which the Third and Fourth Respondents agreed to guarantee repayment of the Bridge Loan -- namely the remittance by the Claimant of a sum of US$ 3 million by way of a Bridge Loan corresponding to the so-called Existing Loan and the deposit of that amount into a specially protected account - - were never fulfilled." (Paragraph 3.6)

167.   The reasons for this contention were the following

i)     the Claimant did not deposit the Bridge loan amount of US$3,000,000 but the lesser sum of US$2,999,995;

ii)    the Claimant did not properly identify in the remittance advice that the funds were related to the Bridge loan or to the Existing Loan;

iii)   when the funds were received by ObiBank, the Claimant and the 1st and/or 2nd Respondents misrepresented that the funds related to a different transaction;

iv)    the 1st and 2nd Respondents took none of the steps necessary to isolate and protect the funds.


168.   The Tribunal considers that these arguments are without merit. None of them could possibly exempt the 3rd and 4th Respondents from their obligations under the Framework Agreement. In response to the above 4 points

(i)    As noted in §164 above, the US$3 million was received by ObiBank from the Claimant. In fact the money was sent to the special purpose ILC Account established by ObiBank under Article 2.1 of the Framework Agreement.

(ii)   There was no reason for the Claimant to have stated the purpose of the money. ObiBank knew the purpose of this account: Article 2.1 states expressly that this money should *"be considered to be an advance from RLI to ILC under the Existing Loan"*. For what other

reason could Mr Shah have paid this money in to the ILC Account — this was the Bridge Loan account.

(iii)    There is no evidence whatsoever of any representation by the Claimant, 1st or 2nd Respondents that the funds were for anything other than in respect of the Loan.

(iv)    Once the funds were received into the ILC account the 3rd and 4th Respondents knew that it was to remain at a minimum balance of US\$3 million.  The preamble to the Framework Agreement was clear: the intent was that the funds in the new account would not be *"commingled with any other assets and under no circumstances would the funds be withdrawn except by or to the benefit of Shah"*. If documents were required for the account ObiBank should have ensured that such documents were completed and not allowed any movement on the account until this was completed.

169.    As noted below (§§177-178) the Tribunal considers that the additional documents which the 3rd and 4th Respondents contend should have been and were not completed cannot exempt ObiBank from its obligations with respect to the money deposited by Mr Shah.    If they were not available, the Tribunal would have expected the 3rd and 4th Respondents to seek their completion.  The Tribunal notes that Exhibit 1 to the Framework Agreement indicates that none of these documents were pending -- which Claimant contends indicates that they had been prepared and executed.

        v)    <u>The Extension Agreement discharged the 3rd and 4th Respondents' obligations</u>

170.    The 3rd and 4th Respondents contend (as an alternative defense) that they are discharged from any obligation to repay the Loan amount to Mr Shah due to the delay of the repayment date under the Extension Agreement.  The argument is based on the 3rd and 4th Respondents being guarantors and the terms of their surety having been changed significantly by the Extension Agreement to which they are not a party and to which they did not agree.

171.    On the basis of the evidence in the record the 3rd and 4th Respondents did consent to the extension of time for repayment.  Certainly, the Loan was not repaid by ILC on 27 September 2005 and they did not repay it in accordance with their undertakings under Articles 3.1 and 3.2 of the Framework Agreement.  Furthermore Mr Shah stated that he went to Moscow from 2 -5 October 2005 where he met with representatives of the Respondents including Dr Zamman and Mr Udaltsov, the Chairman of Metropol, to discuss the status and repayment of the Loan.  He was assured the loan was safe in its special account, it was intact and not used or touched by anyone "and that they consented to the short extension of the Bridge Loan, under terms to be agreed between Dr Zamman, as representative for all the

Respondents, and myself." (Shah witness statement, paragraph 20)    Mr Shah confirmed this at the Hearing.[5]

172.    On the basis of this conclusion there is no need to address here the legal question whether the obligation was a guarantee or indemnity and whether the repayment obligation was automatically discharged by the Extension Agreement. However, the Tribunal would note that in any event, the Extension Agreement did not prejudice the 3rd and 4th Respondents.  At worst, it delayed the time when they could be expected to repay the Loan for ILC.  Under Article 3.1 ObiBank had an absolute obligation to automatically wire to Mr Shah, the Loan amount, i.e. US$3 million, *"regardless of the amount in the ILC account"* on 27 September 2005 or some other date at which the Loan repayment may have been extended.  Under Article 3.2 Metropol undertook that if ObiBank failed or defaulted on its undertaking to repay the Loan amount to Mr Shah it would *"promptly fulfil the obligations of ObiBank under the ObiBank undertaking"*.  Clearly the possibility of an extension was considered in advance, or at least provision was made for it, and yet there was no requirement in the Framework Agreement that such extension be subject to the consent of the 3rd and 4th Respondents.  The undertaking to repay the Loan in Articles 3.1 and 3.2 took effect when ILC failed to repay the Loan, first on 27th October 2005 and then on 17 January 2006.

173.    Additionally, the Framework Agreement, in its Article 1.4 foresaw the possibility that the Bridge Loan Amount might be extended by Mr Shah, so such an event, when it actually transpired, cannot cause any discharge of the guarantees given by the 3rd and 4th Respondents.  The Tribunal finds that there is no basis for the suggestion that by signing the Extension Agreement the Claimant waived the Guarantee under the Framework Agreement.

174.    For these reasons the Tribunal rejects the argument that the 3rd and 4th Respondents are discharged from their repayment undertakings to the Claimant.

vi)    Absence of an account signature card.

175.    ObiBank and Metropol have also argued that the Framework Agreement and the Withdrawal Agreement are invalid as a consequence of the failure of the Claimant to complete the ObiBank Account Signature Card.  This they contend is one of the very essential documents, granting the right to manage and sign on the account (as a person, supposed to manage the account)".

176.    On the matter of the Account Signature Card, the Claimant gave the following testimony on the occasion of the Final Hearing (excerpt).[6]

> *"The Chairman: I have one or two questions. Did you ever sign a bank signature card with ObiBank?*

---

[5] Transcript, pages 55-56, lines 5-3.

[6] Transcript, pages 52-53 lines 12-5

*A. Yes.*

*The Chairman: And how did you get that?*

*A. I signed it when I was in Moscow in early days of October.*

*The Chairman: In October?*

*A. 2005.*

*The Chairman: So they have your signature?*

*A. Yes, and prior to that, in fact just before 29th July agreement that was signed, they had asked me to provide my passport pages with my signature and my name to – in lieu of the signature card, because the transaction had to be done by 29th July, so they needed the funds, so I provided them, faxed them with the copies of my passport pages with my signature.. That was satisfactory to them in lieu of the signature card until my visit to Russia."*

177.   In the materials before the Tribunal there were no documents indicating that the Claimant had, or would have if requested, failed to fulfill any formal or procedural requirement that would have been necessitated by Russian banking regulations. Quite the contrary, the Claimant's evidence that it received certain instructions from the Respondents before the Framework Agreement and the Withdrawal Agreement were signed is uncontroverted. These Agreements were subsequently signed by all of the Respondents and the Claimant transferred the funds as required.

178.   For this reason the Tribunal has found that there was no failure on the part of the Claimant in completing the account signature card or any other requirement which it was requested to provide. There is no impediment of a formal nature justifying the Respondent's failure to comply with the reimbursement obligations in Articles 3.1 and 3.2 of the Framework Agreement.

vii)   Mandatory Russian banking regulations[7]

179.   The 3rd and 4th Respondents argue that for reasons of mandatory Russian law and banking and currency regulations, ObiBank has not been at liberty to effect any payment in favour of the Claimant.

180.   In this regard, the 3rd and 4th Respondents invoke, firstly, Article 845 of Part II of

---

[7]   This matter was raised in the letter dated 17 October 2007 to the Tribunal from Ms Okuneva on behalf of the 3rd and 4th Respondents.

the Russian Civil Code. This they contend obliges the Bank to carry out dispositions in respect of a bank account in strict compliance with instructions from the account holder only; in this case, ILC. Any payment authorized by the Bank to the Claimant would therefore constitute a violation of Russian law.

181.    Furthermore, under Article 20 of the Russian Federal law No. 173-FZ dated 12 December 2003 "On currency regulation and currency control" and Article 3.3 of the Instruction of the Central Bank of the Russian Federation No 117-I dated June 15, 1004, each contract (credit contract) between residents (Russian legal entities) and non-residents (foreign legal entities) must be recorded in a Transaction Passport.

182.    Consistent with these requirements, the Russian "resident", i.e. ILC, submitted to ObiBank a "Currency Operations Certificate" dated 3 August 2005 for Transaction Passport 05030001/3185/0000/6/0. This provided:

> "From total amount of currency receipts 2999995.0
> USD Two million nine hundred and ninety nine thousand nine hundred ninety five 00 cent
> Under the transaction, conducted in accordance with following documents:
> Contract          N without number          dated May 27, 2004
> Transaction passport N 05030001/3185/0000/6 dated March 15, 2005

183.    As a consequence of this situation, ObiBank contends that it was not in a situation where it controlled in what manner ILC disposed of its funds. In this regard reference was made to Article 845(3) of the Russian Civil Code, which reads as follows:

> "Article 845. Contract of bank account
>
> [---]
>
> 3. The bank does not have the right to determine and control directions of usage of the client's money funds and to establish limitations of the client's right to dispose of money funds at his discretion other than stipulated in law or in the contract of bank account.
>
> [---]"

184.    As a consequence, Respondents argue there was no obligation of ObiBank to effect any payment to the Claimant, neither was there any standby obligation of Metropol to cover any purported failing of ObiBank to indemnify the Claimant.

185.    The Tribunal accepts that even though the Framework Agreement and the Loan Agreement expressly provide that they are governed by English law (Article 9.1 and

9.7(a), respectively), the law and the regulatory regime at the place where the bank operates may be relevant for the assessment of the matter brought to arbitration. In such case, the local law – here Russian law – may play a role as part of the factual framework that may have to be considered by the Tribunal.

186.    Accordingly, the Tribunal has given serious consideration to the 3rd and 4th Respondents' arguments on the basis of Russian law and regulations briefly summarized above. For the reasons below the Tribunal has determined that they must fail.

187.    The Tribunal accepts, with respect to Article 845 of the Russian Civil Code, the general proposition (in Russia and elsewhere), that the bank cannot interfere in the dispositions undertaken by the account holder. Nor can it, on its own initiative, undertake dispositions with respect to any balance existing in the client's account. In this case, however, this question becomes quite academic as documentation in the form of records of movements on the relevant bank account – provided by the bank itself – shows that there was not – at the relevant times, i.e. beginning of October 2005 and later – any funds available on the account which could have been the object of any dispositions by anyone.

188.    Moreover, the 3rd and 4th Respondents fail to take into account the terms of the Framework Agreement according to which there are specific undertakings from these parties in Articles 3.1 (ObiBank) and 3.2 (Metropol). ObiBank undertook to automatically wire

> " to the Shah Account the full Bridge Loan Amount regardless of the amount in the ILC Account, without set-off or counterclaim without need of notice or receipt of notice, demand or request ("**ObiBank Undertaking**") on the earlier of:
>
> (a)      the date of occurrence of an Event of Default under the Bridge Loan or the termination date under Section 1.5 or;
> (b)      27 September, 2005 unless the Bridge Loan is extended by Shah under Section 1.4.
>
> [---]
>
> 3.2 <u>Metropol undertaking</u>. In the event of any failure of default on the part of ObiBank in fulfilling its obligations under the ObiBank Undertaking, Metropol (as majority shareholder of ObiBank) will stand by the obligations of ObiBank under the ObiBank Undertaking and will promptly fulfill the obligations of ObiBank under the ObiBank Undertaking".

189.    These undertakings have nothing to do with the Bank's obligations vis-à-vis its accounts holders. They also do not concern this matter. There are contractual undertakings directed to the Claimant  which do not involve or compromise the Bank's relationship to its accounts holders or encroach on any mandatory provision

of Russian banking regulations.

190.    There is no argument offered by the Respondents based on Russian (or, for that matter, English) law that would vitiate their undertakings to the Claimant pursuant to the Framework Agreement. The Tribunal cannot derive any legal or contractual bar based on those sources against enforcing the Framework Agreement according to its terms, whether the undertakings of ObiBank or, as a consequence, Metropol.

191.    Although superfluous for the purpose of reaching a conclusion in this matter, the Tribunal notes the allegation of the 3rd and 4th Respondents that the amount transferred by the Claimant had – by the machinations of ILC – been allocated to a loan dated 27 May 2004 between ILC (as borrower) and RLI (as lenders) is not supported by the evidence.

192.    On the basis of the documentation available to the Tribunal the Respondents' factual assertions are not correct.

   a.  First, the bank account opened for the purpose of the Framework Agreement was allotted the account no. 4070 2840 8000 6100 2265 (Article 2.1 of the Framework Agreement). This account number was reiterated in the Withdrawal Agreement (Article 1.01, Definitions), where it was defined as the "Dollar Account" (which in its turn was defined as the "Russian Account" [sic!]).
   b.  Second, according to a wire transfer debit advice issued by Citigroup, the amount of US$ 3,000,000 was wired on 29 July 2005 to account no. 4070 2840 8000 6100 2265.
   c.  Third, this was done in careful observation of instructions given by ObiBank in an undated notice (exhibited as C-4 in the arbitration), also identifying this particular account number.
   d.  Fourth, consistent with these measures, there is also a statement of account provided by the bank that the US$ 3,000,000 (less five dollars) was credited to the account no. 4070 2840 8000 6100 2265 on 3 August 2005.
   e.  Last, it appears from the statement that various amounts have been withdrawn from this account at intermittent intervals – the first withdrawal taking place already on 5 August 2005, leaving the account empty by 20 October 2005.[8]

193.    In any event, in the Tribunal's view, the fact whether or not the funds were properly credited to the ILC Account (as defined in the Framework Agreement), does not

---

[8]    Mr Richard Olsen, whether on behalf of all of the Respondents or some of them, assured the Claimant in an email of 21 December 2005 that "the money is there".

affect the obligation of the 3rd and 4th Respondents to return the US$ 3,000,000 loan (with interests and costs) to the Claimant as they agreed to do under the Agreements.

## XV.    Claimant's Entitlement to Relief Sought

194.    In light of the Tribunal's conclusion as to liability on the part of the Respondents as determined above, the Tribunal turns now to the relief sought by the Claimant.

### i)    Amount of the Loan

195.    The Loan was for US$3,000,000. It was not repaid on the due dates: on 27 September 2005 under the Loan Agreement or by 17 January 2006 under the Extension Agreement. As at the date of this Award it still has not been paid and is overdue.

196.    As stated in §§134-135 above the argument of the 3rd and 4th Respondents that because US$2,999,995 rather than US$3,000,000 was received the Loan was not made is rejected.

197.    Accordingly, the Tribunal finds that this US$3,000,000 is due and payable and the Respondents shall repay this amount of capital to Claimant forthwith. It should have been repaid by the 1st and 2nd Respondents; it was not. The Loan amount should have been "automatically wired" by the 4th Respondent on 17 January 2006 and it was not. It should also have been paid by the 3rd Respondent as guarantor; it was not. The Tribunal considers the Respondents jointly and severally liable for this amount. This was expressly agreed in Article 6.1 of the Framework Agreement.

### ii)    Interest on the Loan

198.    Under the Loan Agreement interest was to accrue at 10% per annum (the "**Base Rate**") and was to be paid when the Loan was to be repaid on 27 September 2005 (Article 2.3(b)). However, if the Loan or any interest was not paid when due, such overdue amount was to bear interest at 5% above the agreed 10% rate. Article 2.3(c) provided:

> "If all or a portion of the principal amount of the Loan or any interest payable thereon shall not be paid when due (whether at stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to five (5%) percent above the Base Rate."

199.    The Extension Agreement increased the Base Rate of 15% per annum for the period

28 September 2005 to 17 January 2006. That would be the basis for calculating interest to be paid on the outstanding US $3,000,000 on 17 January 2006 and the interest outstanding since 27 September 2005. Accordingly, in accordance with the Loan Agreement that rate also increased by 5% if the Loan Agreement or any interest due was not paid when due, i.e. on 17 January 2006.

200.   The Tribunal has decided that interest is due and payable on the amount outstanding. The calculation of interest is as follows:

    i)    <u>29 July – 27 September 2005:</u>

        (US$ 3,000,000 x 10% x 61/365)    =    $50,136.99

    ii)    <u>28 September 2005 – 17 January 2006:</u>

        (US$ 3,000,000 x 15% x 112/365)    =    $138,082.19

    iii)    <u>18 January 2006 – 7 April 2008:</u>

        (US$ 3,000,000 x 20% x 811/365)    =    $1,333,150.68

201.   The 3rd and 4th Respondents are not party to the Extension Agreement. Their liability for interest on late repayment of the Loan from 18 January 2006 at 15% under the Framework Agreement, is US$999,863.01 (i.e. US$3,000,000 x 15% x 811/365).

202.   Accordingly, the Tribunal has decided that interest payable to the Claimant is :

    a.  by all the Respondents jointly and severally:    US$ 1,188,082.19

        and

    b.  by 1st and 2nd Respondents jointly and severally: US$333,287.67

    iii)    <u>Additional Fee</u>

203.   Under the Extension Agreement, the 1st and 2nd Respondents agreed that if the Loan and outstanding interest were not repaid on 17 January 2006, they would pay an additional 3% on all these outstandings i.e. US$ 3,188,219.18 made up of US$3,000,000 plus interest of US$ 50,136.99 and US $138,082.19.

204.   The Loan and interest was not repaid on the due date and remains unpaid. Accordingly, the 1st and 2nd Respondents are jointly and severally to pay to the Claimant and additional fee of US $ 95,646.57.

    iv)    <u>Attorney's fees regarding negotiation of the initial agreements and the Extension Agreement.</u>

205.    Under Article 9.4 of the Loan Agreement, RLI and ILC were to *"be responsible for all reasonable costs and expenses of [Mr Shah] ... if there is an uncured Event of Default in connection with the administration, modification, amendment, restructuring or enforcement...of this Agreement".*

206.    This was amended by Article 2(a)(iii) of the Extension Agreement under which RLI and ILC undertook to pay within 10 days of the Extension Agreement, an amount equal to 50% of the legal fees incurred and paid by the Claimant and 100% of the fees *"(approximately US$5,000) incurred with respect to default by Borrower and the drafting, preparation and revision"* of the Extension Agreement.

207.    In this respect the Claimant seeks:

>    i)    US $15,395.65, being 50% of the fees paid to Salans and to Loeb & Loeb in connection with the negotiation of the initial agreements; and

>    ii)    US $83,997.24, being the legal fees paid to Salans and Loeb & Loeb in connection with the Extension Agreement.

208.    The Tribunal considers the first amount to be due and reasonable. The Tribunal only awards the Claimant US$5,000 in respect of the second head as this amount is expressly stated to be the Parties' expectation in Article 2(a)(iii). Accordingly the Tribunal orders that US$20,395.65 is due and payable by the 1st and 2nd Respondents to the Claimant.

> v)    Costs and expenses of collection and arbitration

209.    The Claimant has sought to recover its legal costs and expenses and costs incurred seeking to enforce repayment of the Loan and in this arbitration. In accordance with paragraph 1(b) of Procedural Order No 4, the Claimant submitted a statement of its legal fees and costs by letter dated 12 December 2007 from Salans. These amount to US$ 1,116,418.25 (including US$ 18,317.68 expert witness, transcription, hearing room and travel expenses, and US$ 220,162.85 paid to the LCIA).

210.    Following the submission of the Post Hearing Brief and the Claimants Reply, on 3 March 2008 the Tribunal invited the Parties to advise as to their additional costs. By letters dated 10 March 2008 (i) Salans, on behalf of the Claimant, sought an additional US$ 72,985.62 for costs and disbursements (respectively US$ 70, 595 and 2,390.62), and (ii) Clifford Chance, on behalf of the 3rd and 4th Respondents, sought GB£ 47,500 in respect of its legal fees.

211.    The total amount of the costs of the arbitration, i.e. the arbitrators fees and the LCIA up to the date of this Award, have been determined by the LCIA Court, pursuant to Article 28.1 of the LCIA Rules, to be as follows:

>    Registration fee:              £      1,500.00

| | | |
|---|---|---|
| LCIA's administrative charges | £ | 8,633.99 |
| Tribunal's fees and expenses | £ | 112,865.01 |
| Total costs of arbitration | £ | 122,999.00 |

212.   Under Article 28.3 of the LCIA Rules, the Tribunal is Tribunal is  empowered to order, in its Award, that all or part of the legal or other costs incurred by a party be paid by another party to the arbitration unless the parties agree otherwise. (Article 28.3).   The LCIA Rules further provide that, except where the parties agree otherwise, the Tribunal's decision on arbitration and legal costs should follow *"the general principle that costs should reflect the parties' relative success and failure in the award or arbitration, except when it appears to the Arbitral Tribunal that in the particular circumstances this general approach is inappropriate."* (Article 28.4)

213.   The Claimant has been successful in this arbitration. Accordingly, the Tribunal considers that the Respondents should reimburse the Claimant for all the legal and related costs it has incurred in connection with this arbitration. The Tribunal considers these costs to be reasonable. There are no mitigating factors to justify a reduction in the amount of costs to be reimbursed. The Tribunal notes that the conduct of this arbitration became more time consuming due to the failure of the Respondents to respond to Tribunal orders and requests on a timely basis, or at all, and to participate in the hearing or at least to advise of its non-attendance at the hearing. The Claimant, his counsel and one of the arbitrators travelled to London for the hearing as scheduled; all three arbitrators rearranged their timetables to be available for the agreed hearing dates.  The late intervention of Clifford Chance on behalf of the 3rd and 4th Respondents also added significantly to the costs of this arbitration.

214.   Accordingly the Tribunal finds that Respondents are jointly and severally liable to pay to Claimant US$969,241.02  in respect of its legal fees and expenses, and to reimburse it for the sums paid to the LCIA in the amount of GB£107,840.05.

## XVI.    Final Award

215.   For the reasons given above, the Tribunal has decided and makes the following Final Award:

i.    The Respondents shall pay to the Claimant, on a joint and several basis, the Loan amount of US$ 3,000,000.

ii.   The Respondents shall pay to the Claimant, on a joint and several basis, an amount of accrued interest on the Loan amount as per the date of this Award of US$1,188,082.19.

iii.  The 1st and 2nd Respondents shall pay to the Claimant, on a joint and several basis, an additional amount of accrued interest on the Loan amount as per the date of this Award of US$333,287.67.

iv.   The Respondents shall pay to the Claimant, on a joint and several basis, interest on the Loan amount of US$ 3,000,000 at a rate of 15% per annum from 8 April 2008 until full payment is effected

v.    The 1st and 2nd Respondents shall pay the Claimant, on a joint and several basis, additional interest on the Loan amount of USD 3,000,000 at a rate of 5% per annum from 8 April 2008 until full payment is effected.

vi.   The 1st and 2nd Respondents shall also pay to the Claimant, on a joint and several basis, US$116,042.22.[9]

vii.  The Respondents shall also pay to the Claimant, on a joint and several basis, US$969,241.02 and GB£107,840.05 in respect of legal fees and the costs of this arbitration.

viii. Interest shall accrue on the items under sub-paragraphs vi and vii of this dispositive part of the Award at 6% per annum.[10]

Date    7 April 2008

David Goldberg          Julian D M Lew QC          Christer Söderlund

---

[9]   US$95,646.57 Additional Fee + US$20,395.65 attorneys' fees for negotiation of Agreements.
[10]  This interest rate is fixed by the Tribunal under its powers under Article 26(6) of the LCIA Rules at 6% which the Tribunal considers to be reasonable in the circumstances.