UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BIPINCHANDRA SHAH,

                Petitioner,

    - against -

RLI PARTNERS, LIMITED, LIMITED
LIABILITY COMPANY "INVESTMENT
LOTTERY COMPANY", LIMITED LIABILITY
COMPANY "INVESTMENT FINANCIAL
COMPANY 'METROPOL'", and COMMERCIAL
BANK "OBI'EDINENNYI INVESTITSIONNYI
BANK" (LIMITED LIABILITY COMPANY),

                Respondents.

Civil Action No.: 08 Civ. 4446 (JES)

**NOTICE OF MOTION
FOR SUMMARY JUDGMENT
AND FOR ORDER
DIRECTING PAYMENT**

---

        PLEASE TAKE NOTICE that, upon the accompanying Affidavit of John J. Hay, sworn to on August 20, 2008, Petitioner's Memorandum of Law in Support of Motion for Summary Judgment, Petitioner's Rule 56.1 Statement of Undisputed Facts, the Proposed Orders, and all prior pleadings and proceedings herein, Petitioner Bipinchandra Shah will move before the Honorable John E. Sprizzo, United States District Judge, at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, Courtroom 14C, New York, New York 10007, pursuant to the Scheduling Order of the Court dated August 12, 2008 (the "Scheduling Order") for an Order granting Petitioner's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure confirming the Foreign Arbitral Award rendered in Petitioner's favor against Respondents and entering judgment on the award. Further, Petitioner will move the Court for an order directing Garnishee Citibank, N.A., to pay to Petitioner without delay, all funds held by it belonging to Respondent ObiBank pursuant to the Order of Attachment entered in this case.

        PLEASE TAKE FURTHER NOTICE that pursuant to the Scheduling Order any opposing affidavits and answering memorandum of law shall be served on or by September 10, 2008.

Dated: New York, New York
      August 20, 2008

                      SALANS

                      By: _____
                         John J. Hay
                         Christopher A. Blackwell

Rockefeller Center
620 Fifth Avenue
New York, New York 10020
Tel. (212) 632-5500
Fax. (212) 632-5555
*Attorneys for Petitioner Bipinchandra Shah*

TO:    (By Federal Express)

Richard H. Olsen, Esq.
10261 E. Bay Harbor Drive, 11th Floor
Bay Harbor Island, FL 33154

RLI Partners, Limited
Attention: Richard H. Olsen
Suite 23, Portland House
Glacis Road, Gibraltar

Limited Liability Company "Investment Financial Company 'Metropol'"
(Attn: Alexander Valentinovich Udaltsov)
13 Donskaya Street, Building 1
119049 Moscow, Russia

Commercial Bank "Ob'edinennyi Investitsionnyi Bank" (Limited Liability Company)
(Attn:   Alexei Vladimirovich Kichaev)
13 Donskaya Street, Building 1
119049 Moscow, Russia

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BIPINCHANDRA SHAH, | |
| Petitioner, | |
| - against - | Civil Action No.: 08 Civ. 4446 (JES) |
| RLI PARTNERS, LIMITED, LIMITED LIABILITY COMPANY "INVESTMENT LOTTERY COMPANY", LIMITED LIABILITY COMPANY "INVESTMENT FINANCIAL COMPANY 'METROPOL'", and COMMERCIAL BANK "OBI'EDINENNYI INVESTITSIONNYI BANK" (LIMITED LIABILITY COMPANY), | |
| Respondents. | |

### AFFIDAVIT OF JOHN J. HAY, ESQ. IN SUPPORT OF PETITIONER'S MOTION FOR SUMMARY JUDGMENT AND FOR AN ORDER DIRECTING PAYMENT OF FUNDS TO PETITIONER

JOHN J. HAY, ESQ., being duly sworn, deposes and says:

1.    I am a partner at Salans, attorneys for Petitioner Bipinchandra Shah ("Petitioner" or "Shah"). I submit this affidavit in support of Shah's Motion for Summary Judgment against Respondents RLI Partners, Limited ("RLI"), Limited Liability Company "Investment Financial Company 'Metropol'" ("IFC Metropol"), and Commercial Bank "Obi'edinennyi Investitsionnyi Bank" (Limited Liability Bank) ("ObiBank") (RLI, IFC Metropol and ObiBank hereafter referred to as "Served Respondents") and his motion seeking an order directing payment to Shah of certain funds held by Garnishee Citibank, N.A. ("Citibank") pursuant to an Order of Attachment entered and served in this matter.

2.     Shah's motion for summary judgment confirming the arbitral award rendered in his favor and against Served Respondents and entering judgment against Served Respondents based upon that award should be in all respects granted:

     (a)     Respondents RLI, IFC Metropol and ObiBank have been duly served with the Notice of Petition, Petition and supporting documentation; they have failed to answer or otherwise respond thereto; and are in default.

     (b)     No material fact is in dispute and Shah has established that he is entitled to confirmation of the foreign arbitral award and judgment against Respondents based on that award.

3.     Shah's request for an order directing that certain funds held pursuant to an Order of Attachment be paid to him should also be granted. Those funds were attached while in an account in the name of Respondent ObiBank, located at Citibank. Since summary judgment should be awarded Shah against ObiBank, it is appropriate that the attached funds belonging to ObiBank be paid to Shah as partial satisfaction of that judgment.

A.     <u>Facts Concerning The Summary Judgment Motion</u>

4.     In this action, Shah seeks to confirm and enforce a foreign arbitral award, pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), and its implementing legislation, 9 U.S.C. § 201 <u>et seq.</u> Complete, true and correct copies of the Petition to Confirm Foreign Arbitral Award ("Petition") and the Declaration of Petitioner Bipinchandra Shah (the "Shah Declaration") in support of the Petition (with exhibits), are annexed hereto as Exhibit 1 and Exhibit 2, respectively.

5.     On or about April 7, 2008, an arbitral award was rendered in favor of Shah and against each of the Respondents herein, by a duly constituted arbitral Tribunal established under the rules and procedures of the London Court of International Arbitration ("LCIA"). I represented Shah in the arbitration. The arbitration took place in London, England. Each of the

Respondents participated in the arbitration. A certified copy of this Award is annexed as Exhibit E to the Shah Declaration, which is annexed as Exhibit 2 hereto.

6.    The arbitration was held pursuant to the written arbitration agreements executed by the parties as described in the Shah Declaration. (See Exhibit 2 hereof, Shah Declaration at ¶¶ 3-4 and Exhibits A, B and C thereof.) The arbitration arose based upon Respondents' breaches of contract with respect to a bridge loan in the amount of (USD) $3 million[1] made by Shah to Respondents.

7.    The Award was in favor of Shah and against the Served Respondents and Limited Liability Company "Investment Lottery Company" ("ILC"), in the amount of $5,371,447.12, plus interest on a per diem basis from April 7, 2008 until payment at the rate of $1,447.23 per day. (See Exhibit 2 hereto, Shah Declaration at ¶¶ 9-10 and Exhibit E thereof.) The Award also held Respondents RLI and ILC jointly and severally liable to Mr. Shah for an additional amount of $449,329.89 as of April 7, 2008, plus additional interest on a per diem bases from April 7, 2008 until payment at the rate of 436.01 per day. (Id.)

8.    Shah commenced this action by filing the Petition and his supporting documentation with the Court on May 12, 2008.

9.    Shah was only able to serve three of the Respondents in this action with Notice of the Petition, the Petition and the Shah Declaration. As described more specifically below, Petitioner served Respondents RLI, IFC Metropol and ObiBank, but not Respondent ILC.

10.    On June 6, 2008, Shah properly served Respondent RLI with copies of the Notice of Petition, Petition and Shah Declaration by sending copies of those papers by Federal Express,

---

[1] All references to currency used throughout this Affidavit refer to United States Dollars.

an international courier, to the address for notice purposes contained in the contractual

agreements between the parties. (See Exhibit 2 hereof, Shah Declaration at Exhibit A at § 8.1

and Exhibit B § 9.2.) The documents were signed for at that location and not returned. A copy

of the Affidavit of Service of RLI is annexed hereto as Exhibit 3. As demonstrated in the

accompanying Petitioner's Memorandum Of Law In Support of Motion For Summary Judgment

(the "Memorandum of Law") at pp. 6-8, this is proper service under the Hague Convention and

the Federal Rules of Civil Procedure.

     11.    On June 23, 2008, Shah properly served Respondents IFC Metropol and ObiBank

with copies of the Notice of Petition, Petition and Shah Declaration by hand-delivering those

papers to those Respondents at their registered offices in Moscow as permitted under the Russian

Civil Code, Article 113.1. Attached as Exhibit 4 hereto is the Declaration of Armine G.

Manassyan ("Manassyan Declaration"), an attorney in Salans' Moscow office who personally

delivered the Notice of Petition, Petition and Shah Declaration to Respondents IFC Metropol and

ObiBank at their registered offices. (Exhibit 4 at ¶ 5.) Both Respondents accepted service as

indicated by the signatures of their representatives in Exhibit A to the Manassyan Declaration.

Further, Ms. Manassyan affirms that the Russian Civil Procedural Code permits service by hand-

delivery in its courts of general jurisdiction. (See Exhibit 4 at ¶¶ 3 and 7.) This constitutes

proper service of Respondents IFC Metropol and ObiBank under the Federal Rules.

(Memorandum of Law at pp. 8-9.)

     12.    Shah could not serve Respondent ILC because, upon information and belief, ILC

is no longer an operating entity. In view of this fact, on August 18, 2008, Shah served and filed a

Notice of Dismissal without prejudice with respect to Respondent ILC. (See Exhibit 5 hereto,

which is a true, correct and complete copy of such Notice of Dismissal.)

B.    Shah's Motion For Summary Judgment Should Be Granted

13.    The time for the Served Respondents to respond to the Petition has expired and those Respondents have not appeared, answered or otherwise responded.  They are in default and the Court Clerk has issued a certificate to that effect.  (See Exhibit 6 hereto.)

14.    Further, by his Petition and Declaration, Shah has demonstrated that he is entitled to have the award confirmed and judgment entered against the Served Respondents.  His action to confirm is timely, since it was brought well within three years of the Award.  He has presented certified copies of the arbitration agreement and the Award.  (See Exhibit 1 and Exhibit 2, Shah Declaration at ¶¶ 3 and 10 and Exhibits A, B, C and E.)  The Award is a valid award against Respondents.  The Award falls under the New York Convention in that it was made in the United Kingdom, arising out of a commercial legal relationship and is not between citizens of the United States.  No cognizable ground for refusing to recognize an enforcement has been alleged, nor does any exist.

15.    Accordingly, summary judgment should be granted confirming the award and granting judgment in favor of Shah against Respondents RLI, IFC Metropol and ObiBank, jointly and severally, based on the Award in the amount of $5,566,823.17.  In addition, Shah is entitled to an additional judgment against Respondent RLI in the amount of $508,191.24.  These amounts are calculated as follows:

| | | |
|---|---|---|
| (a) | Amount of Award against Respondents RLI, IFC Metropol and ObiBank | $5,371,447.12 |
| (b) | Interest at $1,447.23 per day from April 8, 2008 to August 20, 2008 (135 days) | $195,376.05 |
| | | $5,566,823.17 |
| (c) | Additional Amount of Award Against Respondent RLI | $449,329.89 |

- 5 -

(d)  Interest at $436.01 per day from April 8, 2008 to
     August 20, 2008 (135 days)                          $58,861.35
                                                        $508,191.24

C.  Voluntary Withdrawal Of Claim For Attorneys Fees Without Prejudice

16.    Shah hereby respectfully withdraws, without prejudice, his request in the Petition

for attorneys' fees with respect to this action.  Shah withdraws this claim because he has

additional claims for attorneys' fees relating to actions to enforce the Arbitral Award, including

actions outside of New York, and as a matter of efficiency, judicial economy and convenience, it

makes more sense to bring those claims at one time.

D.  Shah's Request For An Order Directing Payment Should Be Granted

17.    In addition to granting summary judgment, it is respectfully submitted that an

order shall be entered directing immediate payment to Shah of the funds currently held by

Citibank pursuant to the Order of Attachment.  The facts concerning these funds are as follows.

18.    On or about May 13, 2008, Shah moved the Court for an ex parte order of

attachment pursuant to Rule 64 of the Federal Rules of Civil Procedure and CPLR 6211,

ordering certain garnishee banks to attach all assets of Respondents IFC Metropol and ObiBank.

An Order of Attachment was signed by your Honor on May 15, 2008 and was filed on May 28,

2008.  The Order of Attachment was served on Respondents and on the identified Garnishees.

19.    Citibank is the only Garnishee to identify any funds being held in name of

Respondents.  Specifically, Citibank has stated that it is holding $1,150,946.37 in an account in

the name of ObiBank.  (Attached hereto as Exhibit 7 is a true, complete and correct copy of an

email from Citibank indicating the amount of ObiBank's funds held by Citibank.)

20.     On or about July 7, 2008, by order to show cause, Shah moved the Court to confirm and modify the order of attachment. By that motion, Shah sought to direct Citibank or any garnishee to deposit any funds or property held in the name of Respondents in the Court Registry. The Court by order dated July 10, 2008, gave Respondents until August 8, 2008 to respond to Shah's motion. Respondents failed to respond to the motion to confirm and modify. While the Court has indicated it intends to enter an order confirming the Order of Attachment and directing payment of the Citibank funds to the Court Registry, as of today, no such order has been entered.

21.     As discussed above, Shah is entitled to judgment against Respondent ObiBank for in excess of $5.5 million (supra at ¶ 15). Given this judgment, the funds currently held by Citibank should be paid to Shah as partial payment of the judgment. There no longer is a need for Citibank to pay the funds into the Court Registry. Accordingly, Shah respectfully requests that the Court enter the proposed order included with these motion papers, directing payment by Citibank of the attached funds to Shah. (Attached hereto as Exhibit 8 is a Proposed Order Granting Summary Judgment to Petitioner. Attached hereto as Exhibit 9 is a Proposed Order Directing Payment directing Citibank to pay all funds belonging to ObiBank under Citibank's possession or control to Petitioner.)

_____
John J. Ray, Esq.

Sworn to before me this 20th day
of August, 2008

_____
Notary Public

MARIANNE S. GUNN
Notary Public, State of New York
No. 01GU6703715
Qualified in New York County
Commission Expires 10/31/ 2010

- 7 -

# EXHIBIT 1

**TO AFFIDAVIT OF JOHN J. HAY**
**DATED AUGUST 20, 2008**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BIPINCHANDRA SHAH,

                Petitioner,

-against-

RLI PARTNERS, LIMITED, LIMITED
LIABILITY COMPANY "INVESTMENT
LOTTERY COMPANY", LIMITED LIABILITY
COMPANY "INVESTMENT FINANCIAL
COMPANY 'METROPOL'", and COMMERCIAL
BANK "OBI'EDINENNYI INVESTITSIONNYI
BANK" (LIMITED LIABILITY COMPANY),

                Respondents.

JUDGE SPRIZZO

Civil Action No.:

CIV 4446

PETITION TO CONFIRM
FOREIGN ARBITRAL AWARD


RECEIVED
MAY 12 2008
U.S.D.C. S.D.N.Y.
CASHIERS

       Petitioner Bipinchandra Shah ("Shah"), by and through his attorneys, Salans,

respectfully alleges as and for his Petition against Respondents, RLI Partners, Limited ("RLI"),

Limited Liability Company "Investment Lottery Company" ("ILC"), Limited Liability Company

"Investment Financial Company 'Metropol'" ("IFC Metropol"), and Commercial Bank

"Obi'edinennyi Investitsionnyi Bank" (Limited Liability Company) ("ObiBank"), as follows:

## INTRODUCTION

     1.     This is an action for confirmation and enforcement of a foreign arbitral

award pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral

Awards (the "New York Convention"), and its implementing legislation 9 U.S.C. § 201 et seq.

On or about April 7, 2008, an arbitral award was rendered in favor of Shah by an arbitral tribunal

established under the rules and procedures of the London Court of International Arbitration

("LCIA")

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over the subject matter of this action pursuant to 9 U.S.C. § 201, et seq., in that this is an action for confirmation and enforcement of a foreign arbitral award subject to the New York Convention.

3.    Venue is proper in this Court pursuant to 9 U.S.C. § 204.

## PARTIES

4.    Petitioner Shah is an individual and resident of New York, New York. He is a citizen of the United States of America.

5.    Respondent RLI is a limited liability company organized and existing under the laws of Gibraltar.

6.    Respondent ILC is a limited liability company organized and existing under the laws of the Russian Federation.

7.    Respondent IFC Metropol is a limited liability company organized and existing under the laws of the Russian Federation.

8.    Respondent ObiBank is a limited liability company organized and existing under the laws of the Russian Federation.

9.    All Respondents are proper parties to this proceeding to confirm pursuant to Fed. R. Civ. P. 4(k).

## THE AGREEMENT TO ARBITRATE AND THE
## ARBITRAL AWARD

10.    In July 2005, Shah (as creditor) and Respondents (as either borrowers or indemnifiers/guarantors) entered into three agreements concerning a loan of $3,000,000 by Shah to RLI and ILC. These agreements were a Framework Agreement, Loan Agreement, and

Withdrawal Agreement (hereinafter the "Initial Agreements"). A complete, true and correct copy of each of the Initial Agreements is annexed as Exhibits A, B and C, respectively, to the accompanying Declaration of Shah (the "Shah Declaration").

11.    Each Initial Agreement contains an identical arbitration clause, which provides:

> "Any dispute under this Agreement or any of the Transaction Documents shall be referred to and finally resolved by arbitration in accordance with the Rules of Arbitration ("Rules") of the London Court of International Arbitration ("LCIA") and such Rules are considered as part of this clause. The tribunal shall consist of three arbitrators appointed by LCIA as the nominating authority in accordance with the Rules. The seat of arbitration shall be London. The language of the arbitration proceedings shall be English."[1]

12.    After the Initial Agreements were executed, Shah fully performed his obligations, including paying his $3 million loan. For their part, Respondents breached numerous respective obligations, including failing to timely repay the loan. At Respondents' request, Shah agreed to enter into a fourth agreement with Respondents RLI and ILC, the Extension and Modification Agreement ("Extension Agreement"), which extended the repayment date of the loan. A complete, true and correct copy of the Extension Agreement is annexed as Exhibit D to the Shah Declaration. The Initial Agreements and Extension Agreement hereafter are collectively referred to as the "Transaction Documents."

13.    Shortly thereafter, RLI and ILC breached their respective obligations under the Extension Agreement, by once again failing to timely repay the loan. Each Respondent breached the Initial Agreements by failing and refusing to repay the loan, plus interest, and to indemnify Shah for his losses associated with the loan.

---

[1] Article 6.1(b), Framework Agreement; Article 9.7(b), Loan Agreement; Section 10.07, Withdrawal Agreement.

14.    On or about September 20, 2006, pursuant to the terms of the Initial Agreements, Shah commenced an arbitration before the LCIA. An arbitral tribunal was thereafter duly constituted in London. Respondents were given notice of the arbitral proceedings, formally responded to the claims, asserted numerous defenses, and participated in both pre-hearing and post-hearing procedures.

15.    In accordance with the rules of the LCIA, the arbitral tribunal proceeded with the arbitration and on or about April 7, 2008, issued its final award (the "Award"). A certified copy of the Award is annexed as Exhibit E to the Shah Declaration.

16.    In the Award, the arbitral tribunal determined that Respondents breached numerous obligations under the Transaction Documents and awarded Shah the following amounts:

   i.    against all Respondents, jointly and severally, the amount of $5,371,447.12 (US); and

   ii.   against Respondents RLI and ILC, jointly and severally, an additional amount of $449,329.89 (US).

17.    Additionally, the tribunal awarded Shah interest at the following per diem amounts for each and every day beyond April 7, 2008 until payment:

   i.    against all Respondents, jointly and severally, the amount of $1,447.23 (US) per day; and

   ii.   against Respondents RLI and ILC, jointly and severally, an additional amount of $436.01 (US) per day.

18.    The Framework and Loan Agreements further provide that Shah is entitled to be reimbursed by Respondents, the attorneys' fees and costs he incurs in any litigation or

arbitration arising out of the Transaction Documents, including any such fees or costs associated with collecting the amounts due him.[2]

19.    The Award falls under the New York Convention pursuant to 9 U.S.C. § 202, in that it was made in the United Kingdom, arises out of a commercial legal relationship and is not entirely between citizens of the United States.

20.    Pursuant to 9 U.S.C. § 207, Shah is entitled to confirmation of the Award, in that this Petition is timely made and no cognizable grounds for refusing recognition or enforcement of the Award exist.

WHEREFORE, Petitioner Shah respectfully requests that this Court, pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and its implementing legislation, 9 U.S.C. §§ 201 et seq., enter an Order:

1.    Confirming the afore-mentioned Award and granting judgment in favor of Shah against Respondents in the following amounts:

    i.    against all Respondents, jointly and severally, in the amount of $5,371,447.12 (US); and

    ii.    against Respondents RLI and ILC, jointly and severally, in an additional amount of $449,329.89 (US); and

    iii.    against all Respondents, jointly and severally, in the amount of $1,447.23 (US) per day from April 7, 2008 until full payment; and

    iv.    against Respondents RLI and ILC, jointly and severally, in an additional amount of $436.01 (US) per day from April 7, 2008 until full payment.

---

[2] See Article 6.1(e), Framework Agreement; Article 9.4(c), Loan Agreement.

2.    Awarding Shah his costs, including attorneys' fees, in this proceeding as agreed upon by the parties in the Transaction Documents, and such other and further relief as the Court may deem to be just and proper.

Dated: New York, New York
       May 12, 2008

SALANS

By: _____
    John J. Hay
    Christopher A. Blackwell
Rockefeller Center
620 Fifth Avenue
New York, New York 10020
Tel. (212) 632-5500
Fax. (212) 632-5555
*Attorneys for Petitioner*
*Bipinchandra Shah*

# EXHIBIT 2

**TO AFFIDAVIT OF JOHN J. HAY**
**DATED AUGUST 20, 2008**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BIPINCHANDRA SHAH,

                    Petitioner,

        -against-

RLI PARTNERS, LIMITED, LIMITED
LIABILITY COMPANY "INVESTMENT
LOTTERY COMPANY", LIMITED LIABILITY
COMPANY "INVESTMENT FINANCIAL
COMPANY 'METROPOL'", and COMMERCIAL
BANK "OBI'EDINENNYI INVESTITSIONNYI
BANK" (LIMITED LIABILITY COMPANY),

                    Respondents.

Civil Action No.:

## DECLARATION OF BIPINCHANDRA SHAH IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRATION AWARD

Bipinchandra Shah declares as follows:

1.      I am Bipinchandra Shah ("Shah"), Petitioner in this Action.  I am fully familiar with the facts set forth herein, and submit this declaration in support of my petition for confirmation of a foreign arbitral award.

2.      This action arises from a foreign arbitration award rendered in my favor, awarding me in excess of $5 million (US) against Respondents RLI Partners, Limited ("RLI"), Limited Liability Company "Investment Lottery Company" ("ILC"), Limited Liability Company "Investment Financial Company 'Metropol'" ("IFC Metropol") and Commercial Bank "Obi'edinennyi Investitsionnyi Bank (Limited Liability Company) ("ObiBank").

3.    On July 29, 2005, I entered into three agreements concerning a bridge loan (the "Bridge Loan") in the amount of $3,000,000, made by me as lender to RLI and ILC as borrowers.  These agreements were: the Framework Agreement, which was entered into among myself and each of the Respondents; the Loan Agreement, entered into among myself and RLI and ILC; and the Withdrawal Agreement, entered into among myself, ILC and ObiBank.  These three agreements are hereafter collectively referred to as the "Initial Agreements."  True, correct and complete copies of the Framework Agreement, the Loan Agreement and the Withdrawal Agreement are annexed hereto as Exhibits A, B and C, respectively.

4.    Each of the Initial Agreements contains the identical arbitration clause, which I certify and affirm to be as follows:

> "Any dispute under this Agreement or any of the Transaction Documents shall be referred to and finally resolved by arbitration in accordance with the Rules of Arbitration ("Rules") of the London Court of International Arbitration ("LCIA") and such Rules are considered as part of this clause. The tribunal shall consist of three arbitrators appointed by LCIA as the nominating authority in accordance with the Rules.  The seat of arbitration shall be London.  The language of the arbitration proceedings shall be English."[1]

5.    On July 29, 2005, I arranged for my $3 million loan to be deposited in ObiBank's bank account maintained by it in the Bank of New York here in New York City.  Pursuant to the terms of the Initial Agreements, Respondents were obligated to repay me my loan, plus interest, within sixty (60) days by wiring such funds to my account at Citibank in New York.  In addition, IFC Metropol and ObiBank contractually agreed to, among other things, guarantee the loan and indemnify me for any losses or damages I sustained in connection with the Bridge Loan.

---

[1] Article 6.1(b), Framework Agreement; Article 9.7(b), Loan Agreement; Section 10.07, Withdrawal Agreement.

6.    On or about September 27, 2006, RLI and ILC (as borrowers) and I entered into the First Extension and Modification Agreement, extending the date for repayment of the loan (the "Extension Agreement"). A true, correct and complete copy of which is annexed hereto as Exhibit D.

7.    Respondents failed to repay the Bridge Loan when due and breached their obligations under the Initial Agreements and the Extension Agreement. Additionally, ObiBank and IFC Metropol failed to repay the loan and reimburse me for my losses.

8.    On or about September 20, 2006, pursuant to the terms of the Initial Agreements, I commenced an arbitration before the LCIA. Each Respondent appeared in the arbitration, responded to my claims, asserted numerous defenses, and participated in the arbitration's pre-hearing and post-hearing proceedings.

9.    On or about April 7, 2008, the Tribunal decided in my favor and awarded the following amounts:

>    i.    against all Respondents, joint and severally, the amount of $5,371,447.12 (US), as of April 7, 2008; and
>
>    ii.    against Respondents RLI and ILC, joint and severally, an additional amount of $449,329.89 (US), as of April 7, 2008.

10.    Additionally, the Tribunal directed that Respondents pay the following per diem amounts for each and every day beyond April 7, 2008 until payment is received:

>    i.    all Respondents, joint and severally, the amount of $1,447.23 (US) per day; and
>
>    ii.    Respondents RLI and ILC, joint and severally, an additional amount of $436.01 (US) per day.

A certified copy of the Final Award is annexed hereto as Exhibit E.

11.    To date, all Respondents have refused to voluntarily pay the Award, and I have thus far collected nothing from Respondents.

- 3 -

12.    No prior application for the relief requested herein has been made to this or any Court.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Bipinchandra Shah

Sworn to before me this 12th day
of May, 2008

_____
Notary Public

**GWYNETH NARDI**
Notary Public, State of New York
No. 01NA6120988
Qualified in New York County
My Commission Expires January 3, 2009

- 4 -

Exhibit A

29 July, 2005

FRAMEWORK AGREEMENT

RELATING TO THE BRIDGE FINANCING OF THE ALL-RUSSIA LOTTERY

BETWEEN

BIPINCHANDRA SHAH

RLI PARTNERS, LIMITED

LIMITED LIABILITY COMPANY "INVESTMENT LOTTERY COMPANY"

LIMITED LIABILITY COMPANY "INVESTMENT FINANCIAL COMPANY
'METROPOL'"

AND

COMMERCIAL BANK "OB'EDINENNYI INVESTITSIONNYI BANK" (LIMITED
LIABILITY COMPANY)

THIS FRAMEWORK AGREEMENT (the "Framework Agreement") is executed as a deed on 29 July, 2005 between:

(i)   Bipinchandra Shah, individually, having an office at 425 East 58th Street, Suite 43H, New York, New York, United States of America ("SHAH");

(ii)  RLI Partners, Limited, a limited liability company organized and existing under the laws of Gibraltar, having its registered office at Suite 23, Portland house, Glacis Road, Gibraltar ("RLI");

(iii) Limited Liability Company "Investment Lottery company", a limited liability company organized and existing under the laws of the Russian Federation, having its registered office at Yana Rainisa Boulevard, Building 1, Moscow 125363, the Russian Federation ("ILC");

(iv)  Limited Liability Company "Investment Financial Company 'Metropol'", a limited liability company organized and existing under the laws of the Russian Federation, with an office at 13 Donskaya Street, Building 1, Moscow 119049, the Russian Federation ("Metropol"); and

(v)   Commercial Bank "Ob'edinennyi Investitsionnyi Bank" (limited liability company), a limited liability company organized and existing under the laws of the Russian Federation, having its registered office at 13 Donskaya Street, Building 1, Moscow 119049, the Russian Federation ("ObiBank"),

each of the above referred to individually as a "Party" and collectively as the "Parties".

**WHEREAS**

(A)   The Ministry of Finance of the Russian Federation ("MinFin") has issued a permission ("MinFin Permission") (aka "License") to the State Joint Venture Physical Culture and Sports "Dinamo" ("Dinamo") to be the organizer of an All-Russia Lottery ("ARL") (as contemplated under the "Law on Lotteries" of the Russian Federation).

(B)   Dinamo (through its management company) has appointed ILC as the operator ("Operator") of the ARL.

(C)   ILC desires to demonstrate to MinFin and Dinamo that ILC possesses sufficient assets in order to be considered as the Operator of the ARL.

(D)   There is an existing unfunded $60 million three-year loan between RLI and ILC dated 27 May 2005 ("Existing Loan").

(E)   Shah wishes to provide a bridge loan to RLI ("Bridge Loan") in the amount of $3 million (the "Bridge Loan Amount") to provide funding for the Existing Loan, to be on-lent to ILC to enable ILC to demonstrate its possession of sufficient assets.

(F)   The Parties desire to create a new US dollar bank account in the name of ILC at ObiBank into which the Bridge Loan funds would be deposited and not commingled with any other assets and under no circumstances would the funds be withdrawn except by or to the benefit of Shah.

(G)     Metropol is the majority shareholder of ObiBank. ObiBank has certain responsibilities to MinFin to ensure the smooth implementation of ILC's participation in the ARL.

(H)     The Parties have entered into this Framework Agreement to establish the rights and obligations of the Parties with respect to the Bridge Loan funds and to agree to enter into the transaction documents as set forth in Exhibit "A". (the "**Transaction Documents**").

NOW THIS DEED WITNESSES as follows.

1.     **Bridge Loan Financing Terms**

1.1     <u>Amount and Purpose</u>.  Shah will loan the Bridge Loan Amount to RLI until 27, September, 2005 or such earlier date as provided herein to on-lend to ILC under the Existing Loan for the purposes described in Recital (C).

1.2     <u>Events of Default</u>.  It is an event of default under the Bridge Loan ("**Event of Default**"), and the Bridge Loan is automatically repayable to Shah, if:

   (a)     the funding of the $60,000,000 Existing Loan to ILC is not completed within sixty (60) days from the effective date of this Agreement

   (b)     there is an insolvency event of ILC or RLI;

   (c)     RLI or ILC fails to comply with any of its obligations under the Bridge Loan or any other Transaction Document or any other agreement between RLI or ILC and Shah;

   (d)     any party to a Transaction Document (other than RLI or ILC) fails to comply with any of its obligations under that Transaction Document;

   (e)     any representation or warranty under this Framework Agreement or any other Transaction Document is found to be incorrect; or

   (f)     ILC instructs ObiBank to transfer to any party other than Shah or withdraw any amount from the ILC Account unless paid to Shah.

1.3     <u>Repayment</u>.  The Bridge Loan will be repaid on the earlier of:

   (a)     the date of occurrence of an Event of Default pursuant to Section 1.2; or

   (b)     ten (10) days after written notice of such termination pursuant to Section 1.5; or

   (b)     27 September 2005.

1.4     <u>Extension</u>.  Shah may exclusively (by notice to the Parties) but shall not be obligated to, extend the term of the Bridge Loan to any other date chosen by Shah.

1.5     <u>Termination</u>.  The Bridge Loan may be terminated immediately by Shah upon an Event of Default pursuant to Section 1.2 or ten (10) days after written notice of termination to RLI by Shah given at any time prior to 27 September 2005 for any

reason.

1.6    <u>Shah Account</u>.  Any repayment under Sections 1.3 and 1.5 above shall be made to the following account:   Citibank N.A., 666 Fifth Avenue, 6th floor, New York, N.Y. 10103, ABA#: 021000089, Swift: CITIUS33, For Credit to A/C# 94353105, Name of Bipin Shah, Attn: Barbara Simmons (212-559-9536).

2.    ILC Account

2.1    <u>New Bank Account</u>.  ILC and ObiBank shall enter into a Bank Account Agreement ("**Bank Account Agreement**") to establish a new account at ObiBank in the name of ILC with number 40702840800061002265 ("**ILC Account**") and the Bridge Loan Amount will be wired from Shah directly into the ILC Account. The Bridge Loan Amount so wired shall be considered to be an advance from RLI to ILC under the Existing Loan.

2.2    <u>Withdrawal Agreement</u>.  ObiBank, ILC and Shah shall enter into a Withdrawal Agreement ("**Withdrawal Agreement**") entitling Shah to withdraw money from the ILC Account at any time upon submission to ObiBank of a Payment Demand ("**Payment Demand**"), the form of which is attached to the Withdrawal Agreement.

2.3    <u>Power of Attorney</u>.  ILC shall grant to Shah an irrevocable limited power of attorney authorizing Shah to withdraw funds from, and receive information in relation to the ILC Account, the form of which shall be attached to the Withdrawal Agreement.

2.4    <u>Standing Payment Order</u>.  ILC shall issue an irrevocable undated standing payment order to ObiBank to pay funds in the ILC Account to Shah ("**Payment Order**"). Upon a request by ILC to withdraw or transfer funds from the ILC Account, ObiBank shall pay all funds in the ILC Account to Shah prior to execution of the ILC request.

2.5    <u>Currency Certificate for Payment Demand</u>.  ILC shall issue an executed, undated currency certificate in the amount of the Bridge Loan Amount to Shah ("**Currency Certificate for Payment Demand**"). On the date of the withdrawal of funds from the ILC Account pursuant to a Payment Demand under the Withdrawal Agreement Shah shall complete the date and amount and deliver it to ObiBank, and ObiBank shall promptly release the funds from ILC Account to Shah without further instrument or action of any kind by any party.

2.6    <u>Currency Certificate for Payment Order</u>.  ILC shall issue an executed, undated currency certificate in the amount of the Bridge Loan Amount to ObiBank ("**Currency Certificate for Payment Order**"). On the date of the withdrawal of funds from the ILC Account pursuant to the Payment Order ObiBank shall complete the date and amount, and ObiBank shall promptly release the funds from ILC Account to Shah without further instrument or action of any kind by any party.

2.7    <u>Instruction to Date</u>.  ILC shall issue a letter to ObiBank, which ObiBank will acknowledge, instructing ObiBank to date the Payment Order and the Currency Certificate for Payment Order on the date of the withdrawal of funds from the ILC Account.

2.8    <u>Bank Signature Card</u>.  ObiBank will provide a bank signature card for the ILC

4

Account into which the Bridge Loan Amount will be paid, such that the signature of Shah or his representative is required for any withdrawal from the ILC Account except for automatic transfers to an account of Shah under the Transaction Documents.

2.9     Minimum Balance. The ILC Account shall have a minimum balance equal to the Bridge Loan Amount ("Minimum Balance").

3.     ObiBank Undertaking and Metropol Guarantee

3.1    ObiBank Undertaking. ObiBank undertakes to Shah to automatically wire to the Shah Account the full Bridge Loan Amount regardless of the amount in the ILC Account, without set-off or counterclaim without need of notice or receipt of notice, demand or request ("ObiBank Undertaking") on the earlier of:

(a)     the date of occurrence of an Event of Default under the Bridge Loan or the termination date under Section 1.5 or;

(b)     27 September, 2005 unless the Bridge Loan is extended by Shah under Section 1.4.

3.2    Metropol Undertaking. In the event of any failure or default on the part of ObiBank in fulfilling its obligations under the ObiBank Undertaking, Metropol (as majority shareholder of ObiBank) will stand by the obligations of ObiBank under the ObiBank Undertaking and will promptly fulfill the obligations of ObiBank under the ObiBank Undertaking.

3.3    ILC Guarantee. ILC guarantees to Shah the performance of RLI's obligations under the Bridge Loan. Should RLI fail to repay Shah the Bridge Loan Amount, ILC shall wire the Bridge Loan Amount to the Shah Account within two business days (in Moscow and New York).

3.4    The Bridge Loan Amount wired to the Shah Account pursuant to this Section 3 and receipt of such funds by Shah shall constitute repayment of the Bridge Loan.

3.5    The date in Section 3.1(b) may be extended by Shah by notice to the other Parties.

3.6    The obligations, undertakings, and guarantees of ObiBank, Metropol and ILC under this Section 3 shall apply regardless of (i) any breach by any Party of any other provision of this Framework Agreement or other Transaction Document, (ii) any invalidity of any provision of this Framework Agreement or other Transaction Document; or (iii) any issue relating to the ILC Account.

3.7    Waiver of Immunity. ObiBank, Metropol and ILC irrevocably and unconditionally:

(a)     agree not to claim any immunity from proceedings brought by Shah against it in relation to this Section 3 and to ensure that no such claim is made on its behalf;

(b)     consents generally to the giving of any relief or the issue of any process in connection with those proceedings; and

(c)     waives all rights of immunity in respect of it or its assets.

3.8     <u>Waivers and Remedies Cumulative</u>.  The rights of Shah under this Section 3:

(a)     may be exercised as often as necessary;

(b)     are cumulative and not exclusive of its rights in general;

(c)     may be waived only in writing and specifically.

Delay in exercising or non-exercise of any such right is not a waiver of that right.

3.9     <u>Letter Agreement</u>.  RLI, ILC and Shah shall enter into a letter agreement ("Letter Agreement") with regard to the ILC Account, which shall provide that RLI shall undertake to use best endeavours to prevent ILC from withdrawing funds from the ILC Account and from bringing a claim against ObiBank for paying funds from the ILC Account to Shah, and (in the event of such a claim) shall take all necessary corporate actions to ensure the revocation and cessation of such a claim.

4.      **Corporate Approval.** Each of ILC, RLI, ObiBank and Metropol shall promptly provide to Shah the approval of their respective Board of Directors and shareholders of the Transaction Documents, if required under applicable law.

5.      **Representations, Warranties, and Covenants**

5.1     <u>Representation and Warranties</u>.  Each Party represents and warrants to the other Parties that:

(a)     the entry and performance by the Party, and the transactions contemplated by, the Transaction Documents do not and will not conflict with the terms of any relevant agreement or document currently in existence which is binding on it and/or any of its affiliates;

(b)     each Transaction Document has been, or will be, duly authorized and executed by such Party and constitutes, or will, when executed constitute, a valid and legally binding obligation of the Party, enforceable in accordance with its terms;

5.2     <u>Representation and Warranties by ILC and RLI</u>.  Each of ILC and RLI represents and warrants to Shah that, except in the case of ILC under the Existing Loan and certain other loans from RLI to ILC (all of which shall be subordinate to the Bridge Loan), there is no outstanding lien on any of its assets and no contracts or arrangements, conditional or unconditional, exist for the creation of a lien.

5.3     <u>Negotiations</u>.  The Parties agree and shall use their best endeavours to negotiate the Transaction Documents in good faith.

6.      **Indemnities**

6.1     Metropol, ObiBank, ILC and RLI jointly and severally shall indemnify and hold Shah harmless against any loss, expense, costs, claims, damages or liability including, without limitation, attorneys' fees and costs, which Shah incurs as a consequence of:

(a)     the occurrence of any Event of Default under the Bridge Loan or a breach of this Framework Agreement;

(b)     any failure by any of ILC, RLI, Metropol and ObiBank to pay any amount due under a Transaction Document on its due date;

(c)     any loss or liability incurred by the Shah as a result of investigating any event which Shah reasonably believes to be an Event of Default or a breach of the Framework Agreement;

(d)     acting or relying on any notice which Shah reasonably believes to be genuine, correct and appropriately authorised; or

(e)     any litigation or arbitration due to or arising from any of the Transaction Documents.

7.     **Timing**

7.1     <u>Transaction Document Timetable</u>.  The Parties agree that within one week from the date of this Framework Agreement, the Parties shall finalize and enter into Transaction Documents indicated as "pending documents" in Exhibit 1 (the "**Pending Documents**").  If the Pending Documents have not been entered into by such date, ObiBank shall automatically wire the Bridge Loan Amount to the Shah Account.

8.     **Notices**

8.1     <u>Notices</u>.  Any notice or request required or permitted to be given or made under the terms of this Framework Agreement shall be in writing.  Such notice or request shall be deemed to have been duly given or made when it shall be delivered by hand, mail or telefax to the party to which it is required or permitted to be given or made at such party s address specified below or at such other address as such party shall have designated by notice to the party giving such notice or making such request.

For Shah:

Bipinchandra Shah
425 East 58th Street
Suite 43H
New York, New York 10022
United States of America
Tel: (212) 832-5252
Fax: (212) 832-5333

with a copy to:
Salans
620 Fifth Avenue
Rockefeller Center
New York, NY 10020-2457
United States of America
Attention: Randy Bregman, Esq.

Tel: (212) 632-5500
Fax: (212) 632-5555

For Limited Liability Company "Investment Lottery company":

Investment Lottery Company
Attention: Dr. Atik Zamman
1 Yan Raynis Street
125363 Moscow, Russia
Fax:    +7 095 787 5221

For RLI Partners, Limited:

RLI Partners, Limited
Attention: Richard H. Olsen
Suite 23, Portland House
Glacis Road, Gibraltar


and

Richard H. Olsen
10261 East Bay Harbor Drive,
11th Floor
Bay Harbor, Florida 33154 USA
Fax:    +1 (305) 866 8658

For Limited Liability Company "Investment Financial Company 'Metropol'":

Limited Liability Company "Investment Financial Company 'Metropol'"
Attention: Alexander Valentinovich Udalzov
13 Donskaya Street, Building 1
119049 Moscow, Russia
Fax:    7 095 933-3300

For Commercial Bank "Ob'edinennyi Investitsionnyi Bank" (limited liability company):

ObiBank
Attention: Alexei Vladimirovich Kichaev
13 Donskaya Street, Building 1
119049 Moscow, Russia
Fax:    +7 095 933-4873

9.    Governing Law and Arbitration

9.1    <u>Governing law.</u>    This Framework Agreement shall be governed by, construed,
interpreted and enforced in accordance with the laws of England.

9.2    <u>Arbitration.</u>    Any dispute under this Framework Agreement or any of the Transaction
Documents shall be referred to and finally resolved by arbitration in accordance with
the Rules of Arbitration ("Rules") of the London Court of International Arbitration
("LCIA"), and such Rules are considered as part of this clause.    The tribunal shall

consist of three arbitrators appointed by LCIA as the nominating authority in accordance with the Rules. The seat of arbitration shall be London. The language of the arbitration proceedings shall be English.

10.    Third Party Rights

10.1    <u>No Third Party Rights</u>.  A person who is not a Party to this Framework Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement, but this does not affect any right or remedy of a third party which exists or is available apart from that Act.

11.    Severability

11.1    If for any reason whatever any provision of this Framework Agreement is or becomes or is declared by any court of competent jurisdiction to be invalid, illegal or unenforceable, the remainder of this Framework Agreement shall be unaffected without prejudice to the validity of such provisions and the Parties shall negotiate in good faith with a view to agreeing one or more provisions to be substituted therefor which are not invalid, illegal or unenforceable and produce as nearly as is practicable in all the circumstances the appropriate balance of commercial interests of the Parties.

12.    English Language

12.1    This Framework Agreement has been made in both the English and Russian languages.  In the event of a conflict in meaning between the English and Russian versions of the executed copy of this Framework Agreement, the English version of the executed copy of this Framework Agreement shall prevail, and such English version shall be the only version considered by any court or arbitration tribunal.

13.    Counterparts

13.1    This Framework Agreement may be executed in several counterparts, each of which is an original, but all of which together constitute one and the same agreement.

IN WITNESS WHEREOF, the Parties have executed and delivered this Framework Agreement as a deed as of the date first above written.

| | |
|---|---|
| **EXECUTED as a DEED** | ) |
| and **DELIVERD,** | ) |
| **BIPINCHANDRA SHAH** | ) |
| 423 East 58th Street | ) |
| Suite 43H | ) |
| New York, New York 10022 | ) |
| United States of America | ) |

................................................
Name: Bipinchandra Shah
Title: Lender

EXECUTED as a **DEED**                          )
and **DELIVERED** on behalf of                  )
**RLI PARTNERS, LIMITED,**                      )
a company incorporated in                       )
Gibraltar                                       )
and Richard H. Olsen                            )
being a person who, in accordance               )
with the laws of that territory,                )
is acting under the authority                   )
of RLI Partners, Limited                        )

Name: Richard H. Olsen
Title:  Chairman

languages.   In the event of a conflict in meaning between the English and Russian versions of the executed copy of this Framework Agreement, the English version of the executed copy of this Framework Agreement shall prevail, and such English version shall be the only version considered by any court or arbitration tribunal.

13.    **Counterparts**

13.1    This Framework Agreement may be executed in several counterparts, each of which is an original, but all of which together constitute one and the same agreement.

**IN WITNESS WHEREOF,** the Parties have executed and delivered this Framework Agreement as a deed as of the date first above written.

| | |
|---|---|
| **EXECUTED as a DEED** )<br>and **DELIVERD,** )<br>**BIPIN SHAH** )<br>423 East 58th Street )<br>Suite 43 H )<br>New York, New York 10022 )<br>United States of America ) | |

Name: Bipin Shah
Title:   Lender

**EXECUTED** as a **DEED** )
and **DELIVERED** on behalf of )
**RLI PARTNERS, LIMITED,** )
a company incorporated in )
Gibraltar )
and Richard H. Olsen )
being a person who, in accordance )
with the laws of that territory, )
is acting under the authority )
of RLI Partners, Limited )

Name: Richard H. Olsen
Title:   Chairman

EXECUTED as a DEED      )
and DELIVERED on behalf of   )
LIMITED LIABILITY COMPANY  )
"INVESTMENT LOTTERY COMPANY" )
a company incorporated in      )
the Russian Federation        )
and Dr. Atik Zamman       )
being a person who, in accordance )
with the laws of that territory,   )
is acting under the authority    )
of Limited Liability Company   )
"Investment Lottery company"   )................................

Name: Dr. Atik Zamman

Title:

EXECUTED and DELIVERED    )
as a DEED by LIMITED LIABILITY )
COMPANY "INVESTMENT FINANCIAL )
COMPANY 'METROPOL'"      )
a company incorporated in      )
the Russian Federation        )
and A. V. Udalzov         )
being a person who, in accordance )
with the laws of that territory,   )
is acting under the authority    )
of Metropol             )................................

Name: A. V. Udalzov

Title: Chairman of the Board of Directors

EXECUTED and DELIVERED    )
as a DEED by COMMERCIAL BANK )
"OB'EDINENNYI INVESTITSIONNYI BANK")
(LIMITED LIABILITY COMPANY)  )
a company incorporated in      )
the Russian Federation        )
and A. V. Kichaev         )
being a person who, in accordance )
with the laws of that territory,   )
is acting under the authority    )
of ObiBank

Name: A. V. Kichaev

Title: Chairman of the Management Board

EXHIBIT 1

TRANSACTION DOCUMENTS

| | Agreement | Parties | Pending Documents |
|---|---|---|---|
| 1. | Framework Agreement | Shah<br>RLI<br>ILC<br>Metropol<br>ObiBank | No |
| 2. | Existing Loan | RLI<br>ILC | N/A |
| 2A. | Amendment to Existing Loan | RLI<br>ILC | No |
| 3. | Bridge Loan Agreement | Shah<br>RLI | No |
| 4. | Standing Payment Order | ILC | No |
| 5. | Letter Agreement | Shah<br>RLI<br>ILC | Yes |
| 6. | Bank Account Agreement | ObiBank<br>ILC | No |
| 7. | Withdrawal Agreement | ObiBank<br>ILC<br>Shah | No |
| 8. | Power of Attorney relating to Bank Account | ILC | No |
| 9. | Power of Attorney relating to the Bank's Signature Card | ILC | No |
| 10. | Currency Certificate for Payment Order | ILC | No |
| 11. | Currency Certificate for Payment Demand | ILC | No |
| 12. | Bank signature card | ILC | No |

| | Agreement | Parties | Pending Documents |
|---|---|---|---|
| 13. | Instruction Letter to ObiBank regarding dating Payment Order and Currency Certificate | ILC | No |
| 14. | Board and shareholder approval of bridge financing agreements <br><br> a.  Board Resolution | ILC | Yes (if required) |
| 15. | Board and shareholder approval of bridge financing agreements <br><br> a.  Board Resolution | Metropol | Yes (if required) |
| 16. | Board and shareholder approval of bridge financing agreements | ObiBank | Yes (if required) |
| 17. | Board and shareholder approval of bridge financing agreements | RLI | Yes (if required) |
| 18. | Power of Attorney from Shah | Shah | No |

Exhibit B

## Loan Agreement

This Loan Agreement (this "Agreement") is made as of 29 July, 2005 between: **Bipinchandra Shah**, having his office at 425 E. 58th St, Suite 43H, New York, N.Y. 10022, United States ("**Lender**"), and **RLI Partners, Limited**, having its registered office at Suite 23, Portland House, Glacis Road, Gibraltar, Attention: Richard H. Olsen, Chairman and Limited Liability Company, "Investment Lottery Company", a limited liability company organized and existing under the laws of the Russian Federation, having its registered office at Yana Rainisa Boulevard, Builidng 1, Moscow, 125363, the Russian Federation ("**ILC**") (RLI Partners, and ILC, collectively, "**Borrower**").

### .Witnesseth:

Whereas, Borrower has requested that Lender make a loan of USD $3,000,000 for the purposes hereinafter specified; and

Whereas, Lender is willing to make funds available for such purposes upon the terms and subject to the conditions set forth herein;

Whereas, there is an existing unfunded $60 million three-year loan between the Borrower and Limited Liability Company "Investment Lottery Company", dated 27 May 2005 ("**Existing Loan**");

Whereas, there is a Framework Agreement (the "**Framework Agreement**") dated as a deed on 29 July 2005 between the Lender, the Borrower, Limited Liability Company "Investment Lottery company" ("**ILC**"), Limited Liability Company "**Investment Financial Company 'Metropol'**" and Commercial Bank "Ob'edinennyi Investitsionnyi Bank" (limited liability company), a bank organized and existing under the laws of the Russian Federation, having its registered office at 13 Donskaya Street, Building 1, Moscow 119049, the Russian Federation ("**ObiBank**").

Now, therefore, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

### Article I
### Definitions and Accounting Terms

1.1    **Defined Terms.**

Any capitalized term not defined in this Agreement shall incorporate the defined terms in the Framework Agreement. As used in this Agreement, the following terms have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Affiliate" means, as to any Person, any shareholder of such Person, any Subsidiary of such Person and any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person and includes each officer or director or general partner of such Person. For the purposes of this definition, "control" means the possession of the power to direct or cause the direction of management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Loan Agreement, together with all Exhibits and Schedules hereto, if any, as the same may be amended, supplemented or otherwise modified from time to time.

"Base Rate" means interest payable by Borrower at the rate of ten (10%) percent/annum.

"Business Day" means a day of the year on which banks are not required or authorized to close in Moscow, Russian Federation.

"Closing Date" means the date on which the Loan is made pursuant to Article II.

"Contingent Obligation" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of such Person with respect to any Indebtedness or Contractual Obligation of another Person. Contingent Obligations of a Person include, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of an obligation of another Person, and (b) any liability of such Person for an obligation of another Person through any agreement (contingent or otherwise) (i) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of a loan, advance, stock purchase, capital contribution or otherwise), (ii) to maintain the solvency or any balance sheet item, level of income or financial condition of another Person, (iii) to make take or pay or similar payments, if required, regardless of non performance by any other party or parties to an agreement, (iv) to purchase, sell or lease (as lessor or lessee) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such obligation or to assure the holder of such obligation against loss, or (v) to supply funds to or in any other manner invest in such other Person (including, without limitation, to pay for property or services irrespective of whether such property is received or such services are rendered). The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported.

"Contractual Obligation" of any Person means any obligation, agreement, undertaking or similar provision of any security issued by such Person or of any agreement, undertaking, contract, lease, indenture, mortgage, deed of trust or other instrument (excluding a Loan Document) to which such Person is a party or by which it or any of its property is bound or to which any of its properties is subject.

"Default" means any event which with the passing of time or the giving of notice or both would become an Event of Default.

"Dollars" and the sign "USD" mean the lawful money of the United States of America.

"Early Termination Date" means any date at the option of Lender to terminate this Agreement upon notice to the Borrower.

"Event of Default" has the meaning specified in Section 8.1.

"GAAP" means generally accepted accounting principles as in effect from time to time set forth in the opinions and pronouncements, or in such other statements as may be in general use by significant segments of the accounting profession, which are applicable to the circumstances as of the date hereof.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Indebtedness" of any Person means (i) all indebtedness of such Person for borrowed money (including, without limitation, reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured) or for the deferred purchase price of property or services, (ii) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments, (iii) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (iv) all Contingent Obligations of such Person, (v) all obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any Stock or Stock Equivalents of such Person, valued, in the case of redeemable preferred stock, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (vi) all Indebtedness referred to in clause (i), (ii), (iii), (iv) or (v) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including, without limitation, accounts and general intangibles) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, and (vii) in the case of Borrower, the Obligations.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), security interest or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever intended to assure payment of any Indebtedness or other obligation, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement naming the owner of the asset to which such Lien relates as debtor.

"Loan" means the loan made by Lender to Borrower pursuant to Article II.

"Loan Documents" means, collectively, this Agreement, and each certificate, agreement or document executed by Borrower and delivered to Lender in connection with or pursuant to any of the foregoing.

"Material Adverse Change" means a material adverse change in any of (i) the condition (financial or otherwise), business, performance, operations or properties of Borrower, (ii) the legality, validity or enforceability of any Loan Document, (iii) the ability of Borrower to repay the Obligations and (iv) the rights and remedies of Lender under the Loan Documents.

"Material Adverse Effect" means an effect that results in or causes, or would result in or cause, a Material Adverse Change.

"Obligations" means the Loan and all other advances, debts, liabilities, obligations, covenants and duties owing by Borrower to Lender, any Affiliate of either of them or any Indemnitee, of every type and description, present or future, whether or not evidenced by any note or other instrument, arising under this Agreement or under any other Loan Document, whether or not for the payment of money, whether arising by reason of an extension of credit, loan indemnification foreign exchange transaction or in any other manner whether di

indirect (including, without limitation, those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired. The term "Obligations" includes, without limitation, all interest, charges, expenses, fees, attorneys' fees and disbursements and any other sum chargeable to Borrower under this Agreement or any other Loan Document.

"Permitted Affiliate Transaction" has the meaning specified in Section 7.6.

"Person" means an individual, partnership, corporation (including, without limitation, a business trust), joint stock company, trust, unincorporated association, joint venture or other entity, or a Governmental Authority.

"Requirement of Law" means, as to any Person, the charter and by laws or other organizational or governing documents of such Person, and all federal, state, local and foreign laws, rules and regulations, and all orders, judgments, decrees or other determinations of any Governmental Authority or arbitrator, applicable to or binding upon such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"Responsible Officer" means, with respect to any Person, any of the principal executive officers or managing directors of such Person.

"Solvent" means, with respect to any Person, that, on the date of determination, the value of the assets of such person (both at fair value and present fair saleable value) is greater than the total amount of liabilities (including, without limitation, contingent and unliquidated liabilities) of such Person as of such date and that such Person is able to pay all liabilities of such Person as such liabilities mature. In making such determination, Borrower can take into account  its assessment as to the likelihood that any financing will be closed in a timely manner.

"Stock" means common shares and shares of capital stock, beneficial or partnership interests, participations or other equivalents (regardless of how designated) of or in a corporation or equivalent entity, whether voting or nonvoting, and includes, without limitation, common stock and preferred stock.

"Stock Equivalents" means all securities convertible into or exchangeable for Stock and all warrants, options or other rights to purchase or subscribe for any stock, whether or not presently convertible, exchangeable or exercisable.

"Subsidiary" means, with respect to any Person, any corporation, partnership or other business entity of which an aggregate of fifty (50%) percent or more of the outstanding Stock having ordinary voting power to elect a majority of the board of directors, managers, trustees or other controlling persons, is, at the time, directly or indirectly, owned or controlled by such Person and/or one or more Subsidiaries of such Person (irrespective of whether, at the time, Stock of any other class or classes of such entity shall have or might have voting power by reason of the happening of any contingency) or any corporation, partnership or other business entity over which such Person has management control pursuant to any agreement, arrangement or otherwise.

"Termination Date" means September 27th, 2005 or any date, if extended at Lender's option.

1.2    **Computation of Time Periods.**

In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from" and including" and the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including".

1.3    **Certain Terms.**

The words "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole, and not to any particular Article, Section, subsection or clause in this Agreement. References herein to an Exhibit, Schedule, Article, Section, subsection or clause refer to the appropriate Exhibit or Schedule to, or Article, Section, subsection or clause in this Agreement.

## Article II
## Amounts and Terms of the Loan

2.1    **The Loan.**

On the terms and subject to the conditions contained in this Agreement, Lender agrees to make the Loan to Borrower.

2.2    **Making the Loan.**

(a)    The Closing Date for the Loan shall be July 29th 2005.

(b)    Lender shall upon fulfillment of the applicable conditions set forth in Article III, make such funds available to Borrower.

2.3    **Payments, Interest and Computations.**

(a)    Borrower shall repay the entire principal amount of the Loan with interest thereon at the Base Rate, on the Termination Date or Early Termination Date not later than 11:00 A.M. (Moscow time), in Dollars, to Lender in immediately available funds without set off or counterclaim using the following wire instructions provided by Lender to Borrower for Lender's account at Citibank N.A., 666 Fifth Avenue, 6th floor, New York, N.Y. 10103, ABA#: 021000089, Swift: CITIUS33, For Credit to A/C# 94353105, Name of Bipin Shah, Attn: Barbara Simmons (212-559-9536). Payment received by Lender after 11:00 A.M. (Moscow time) shall be deemed to be received on the next Business Day.

(b)    Borrower shall pay interest at the Base Rate on the unpaid principal amount of the Loan from the date to maturity at the time of repayment of the principal.

(c)    If all or a portion of the principal amount of the Loan or any interest payable thereon shall not be paid when due (whether at stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to five (5%) percent above the Base Rate.

2.4    **Taxes.**

All payments made by Borrower under this Agreement or any Loan Document shall be made free and clear of, and without reduction or withholding for or on account of, any present of future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority excluding such taxes (including income and franchise taxes) as are imposed on or measured by Lender's net income or receipts (all such non excluded taxes, levies, imposts, deductions, charges or withholdings being hereinafter called "Taxes"). If any Taxes are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement. Whenever any Taxes are payable by Borrower, as promptly as possible thereafter, Borrower shall send to Lender a certified copy of an original official receipt received by Borrower showing payment thereof. If Borrower fails to pay any Taxes when due to the appropriate taxing authority or fails to remit Lender the required receipts or other required documentary evidence, Borrower shall indemnify Lender for any incremental taxes, interest or penalties that may become payable by Lender as a result of any such failure.

2.5    **Termination by Lender.**

Lender shall have the sole and exclusive option to terminate this Agreement and to declare the Loan immediately due and payable, including, without limitation, all interest, fees and other charges and Obligations payable under this Agreement, upon giving at least ten (10) days notice to Borrower of such option, whereupon this Loan, all of such interest and all such other amounts and Obligations shall become and be forthwith due and payable, without presentment, demand, protest or further notice or action of any kind, all of which are hereby expressly waived by Borrower.

**Article III**
**Intentionally Omitted**

**Article IV**
**Conditions of Lending**

4.    **Conditions Precedent.**

The obligation of Lender to make the Loan is subject to the conditions precedent that, on the Closing Date:

(a)    All necessary governmental and third party approvals required to be obtained by Borrower in connection with the transactions contemplated hereby shall have been obtained and remain in effect;

(b)    There shall exist no claim, action, suit, investigation or proceeding pending or, to the knowledge of Borrower, threatened in any court or before any arbitrator or Governmental Authority which, if adversely determined, would have a Material Adverse Effect on the repayment of the Loan by Borrower; and

(c)    All costs and accrued and unpaid fees and expenses (including, without limitation, legal fees and expenses) required to be paid to Lender on or before the Closing Date, including those referred to in Section 9.4(a) shall have been paid.

## Article V
## Representations and Warranties

To induce Lender to enter into this Agreement, Borrower hereby represents and warrants to Lender that:

5.1    **Corporate Existence: Compliance with Law.**

Borrower (i) is a company duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation; (ii) has all requisite corporate power and authority and the legal right to own, pledge, mortgage, operate and conduct its business as now or currently proposed to be conducted; (iii) is in compliance with its Articles and Memorandum of Association; (iv) is in compliance with all other applicable Requirements of Law except for such non compliances as in the aggregate have no Material Adverse Effect; and (v) has all necessary licenses, permits, consents or approvals from or by, has made all necessary filings with, and has given all necessary notices to, each Governmental Authority having jurisdiction, to the extent required for such ownership, operation and conduct, except for licenses, permits, consents or approvals which can be obtained by the taking of ministerial action to secure the grant or transfer thereof or failures which in the aggregate have no Material Adverse Effect.

5.2    **Corporate Power: Authorization: Enforceable Obligations.**

(a)    The execution, delivery and performance by Borrower of the Loan Documents and the consummation of the transactions related to the financing contemplated hereby:

(i)    are within Borrower's corporate powers;

(ii)    have been duly authorized by all necessary corporate action, including, without limitation, the consent of shareholders where required;

(iii)    do not and will not (A) contravene Borrower's Articles or Memorandum of Association or other comparable governing documents, (B) violate any other applicable Requirement of Law, or any order or decree of any Governmental Authority or arbitrator, (C) conflict with or result in the breach of, or constitute a default under, or result in or permit the termination or acceleration of, any Contractual Obligation of Borrower, or (D) result in the creation or imposition of any Lien upon any of the property of Borrower; and

(iv)    do not require the consent of, authorization by, approval of, notice to, or filing or registration with, any Governmental Authority or any other Person, other than those which have been obtained or made and copies of which have been or will be delivered to Lender pursuant to Section 3.1, and each of which on the Closing Date will be in full force and effect.

(b)    This Agreement has been, and each of the other Loan Documents upon delivery thereof pursuant to Section 3.1 will have been, duly executed and delivered by Borrower. This Agreement is, and the other Loan Documents will be, when delivered hereunder, the legal, valid and binding obligations of Borrower, enforceable against it in accordance with its terms.

5.3    **Taxes.**

All federal, state, local and foreign tax returns, reports and statements (collectively, the "Tax Returns") required to be filed by Borrower have been filed with the appropriate governmental agencies in all jurisdictions in which such Tax Returns are required to be filed, all such Tax Returns are true and correct in all material respects, and all taxes, charges and other impositions due and payable have been timely paid prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for non payment thereof, except where contested in good faith and by appropriate proceedings if (i) adequate reserves therefor have been established on the books of Borrower in conformity with GAAP and (ii) all such non payments in the aggregate have no Material Adverse Effect. Proper and accurate amounts have been withheld by Borrower from its employees for all periods in full and complete compliance with the tax, social security and unemployment withholding provisions of applicable federal, state, local and foreign law and such withholdings have been timely paid to the respective Governmental Authorities.

5.4    **Full Disclosure.**

No written statement prepared or furnished by or on behalf of Borrower in connection with any of the Loan Documents or the consummation of the transactions contemplated thereby, and no financial statement delivered pursuant hereto or thereto, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading. All facts known to Borrower which are material to an understanding of the financial condition, business, properties or prospects of Borrower have been disclosed to Lender.

5.4    **Litigation.**

There are no pending or, to the knowledge of Borrower, threatened actions, investigations or proceedings affecting Borrower, before any court, Governmental Authority or arbitrator, other than those that in the aggregate, if adversely determined, would have no Material Adverse Effect.

5.5    **Ownership of Borrower, Subsidiaries.**

(a)    All of the outstanding Stock of Borrower has been duly authorized, and is validly issued, fully paid and non-assessable. No issued or unissued shares of Stock of Borrower are subject to any Stock Equivalents outstanding on the date hereof. There are no agreements or understandings with respect to the voting, sale or transfer of any shares of Stock of Borrower. There are no preemptive or similar rights applicable to the issuance of shares of stock by Borrower.

(b)    Borrower has one subsidiary, International Lottery Company, Limited (ILC)

5.6    **Liens.**

There are no Liens of any nature whatsoever on any properties or assets of Borrower.

5.7    **No Burdensome Restrictions, No Defaults.**

(a)    Borrower is not (i) a party to any Contractual Obligation the compliance with which would have a Material Adverse Effect or the performance of which, either unconditionally or upon the happening of an event, will result in the creation of a Lien on the property or assets of Borrower, or (ii) subject to any charter or corporate restriction which has a Material Adverse Effect.

(b)    Borrower is not in default under or with respect to any Contractual Obligation owed by it and, to the knowledge of Borrower, no other party is in default under or with respect to any Contractual Obligation owed to it.

## Article VI
## Affirmative Covenants

As long as any of the Obligations remains outstanding, Borrower agrees with Lender:

6.1    **Compliance with Laws.**

Borrower shall comply in all material respects with all Requirements of Law, Contractual Obligations, commitments, instruments, licenses, permits and franchises, including, without limitation, all Permits.

6.2    **Conduct of Business.**

Borrower shall (i) conduct its business in the ordinary course and consistent with past practice; (ii) use its reasonable efforts, in the ordinary course and consistent with past practice, to (1) preserve its business and the goodwill and business of the customers advertisers, suppliers and others having business relations with Borrower, and (2) keep available the services and goodwill of its present employees; (iii) have no powers of attorney or other documents enforce allowing authority to do business without the approval of the Board of Directors; (iv) preserve all registered patents, trademarks, trade names, copyrights and service marks with respect to its business; and (v) perform and observe all the terms, covenants and conditions required to be performed and observed by it under its Contractual Obligations (including, without limitation, to pay all rent and other charges payable under any lease and all debts and other obligations as the same become due), and do all things necessary to preserve and to keep unimpaired its rights under such Contractual Obligations.

6.3    **Payment of Taxes.**

Borrower shall pay and discharge before the same shall become delinquent, all lawful governmental claims, taxes, assessments, charges and levies, except where contested in good faith, by proper proceedings, if adequate reserves therefor have been established on the books of Borrower in conformity with GAAP.

6.4    **Maintenance of Insurance.**

Borrower shall maintain insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses in which Borrower operates.

6.5     **Preservation of Corporate Existence.**

Borrower shall preserve and maintain its corporate existence, rights (charter and statutory) and franchises.

6.6     **Access.**

Borrower shall, at any reasonable time and from time to time, permit Lender, or any agents or representatives thereof, to (a) examine and make copies of and abstracts from the records and books of account of Borrower, (b) visit the properties of Borrower, (c) discuss the affairs, finances and accounts of Borrower with any of its officers or directors, and (d) communicate directly with Borrower's independent certified public accountants. Borrower shall authorize its independent certified public accountants to disclose to Lender any and all financial statements and other information of any kind, including, without limitation, copies of any management letter, or the substance of any oral information that such accountants may have with respect to the business, financial condition, results of operations or other affairs of Borrower.

6.7     **Books of Record and Account.**

Borrower shall keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of Borrower.

6.8     **Maintenance of Properties.**

Borrower shall maintain and preserve (i) all of its properties which are used or useful or necessary in the conduct of its business in good working order and condition, and (ii) all rights, permits, licenses, approvals and privileges which are used or useful or necessary in the conduct of its business.

6.9     **Performance and Compliance with Other Covenants.**

Borrower shall perform and comply with each of the covenants and agreements set forth under each other Contractual Obligation to which it is a party.

6.10    **Use of Proceeds.**

Borrower shall use the proceeds of the Loan as described in the Framework Agreement.

6.11    **Reporting Requirements.**

Borrower shall furnish to Lender:

(a)     promptly after the commencement thereof, notice of all actions, suits and proceedings before any domestic or foreign Governmental Authority or arbitrator, affecting Borrower;

(b)     promptly and in any event within two (2) Business Days after Borrower becomes aware of the existence of (i) any Default or Event of Default, (ii) any breach or nonperformance of, or any default under any Contractual Obligation which is material to the business, operations

or financial condition of Borrower and (iii) any Material Adverse Change or any event, development or other circumstance which has any reasonable likelihood of causing or resulting in a Material Adverse Change, telephonic or telegraphic notice in reasonable detail specifying the nature of the Default, Event of Default, breach, nonperformance, default, event, development or circumstance, including, without limitation, the anticipated effect thereof, which notice shall be promptly confirmed in writing within five (5) days;

(c)    promptly following their preparation, copies of all notices and minutes of meetings of the Board of Directors or Members of Borrower; and

(d)    such other information regarding the business, properties, condition, financial or otherwise, or operations of Borrower as any lender may from time to time reasonably request.

## Article VII
## Negative Covenants

As long as any of the Obligations remain outstanding, Borrower agrees with Lender that:

7.1    **Liens.**

Borrower shall not create or suffer to exist any Lien upon its properties, whether now owned or hereafter acquired, or assign any right to receive income, except for:

(a)    Liens arising by operation of law in favor of materialmen, mechanics, warehousemen, carriers, lessors or other similar Persons incurred by Borrower in the ordinary course of business which secure its obligations to such Person; provided, however, that (i) Borrower is not in default with respect to such payment obligation to such Person, (ii) Borrower is in good faith and by appropriate proceedings diligently contesting such obligation and adequate provision is made for the payment thereof, or (iii) all such failures in the aggregate have no Material Adverse Effect;

(b)    Liens securing taxes, assessments or governmental charges or levies; provided, however, that (i) Borrower is not in default in respect of any payment obligation with respect thereto unless Borrower is in good faith and by appropriate proceedings diligently contesting such obligation and adequate provision is made for the payment thereof, and (ii) all such failures in the aggregate have no Material Adverse Effect;

(c)    Liens incurred or pledges and deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance, old age pensions and other social security benefits;

(d)    Liens by non Affiliates securing the performance of bids, tenders, leases, contracts (other than for the repayment of borrowed money), statutory obligations, surety and appeal bonds and other obligations of like nature, incurred as an incident to and in the ordinary course of business, and judgment liens; provided, however, that all such Liens (i) in the aggregate have no Material Adverse Effect and (ii) do not secure directly or indirectly amounts or judgments in excess of USD50,000 for any single Lien or USD250,000 for all Liens in the aggregate;

(e)    Zoning restrictions, easements, licenses, reservations, restrictions on the use of real property or minor irregularities incident thereto which do not in the aggregate materially detract from the value or use of the property or assets of Borrower or impair, in any material manner, the use of such property for the purposes for which such property is held by Borrower; and

(f)    Liens existing on the date of this Agreement and disclosed herein.

## 7.2    Restricted Payments.

Borrower shall not (i) declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account or in respect of its Stock or Stock Equivalents, (ii) purchase, redeem, prepay, defease or otherwise acquire for value or make any payment on account or in respect of, any Stock, Stock Equivalent or any Indebtedness for borrowed money, now or hereafter outstanding, except pursuant to the terms of this Agreement or (iii) pay any amount or transfer any property or assets to an Affiliate or related party of Borrower except as may be approved by Lender.

## 7.3    Mergers, Stock Issuance, Sale of Assets.

Borrower shall not (i) merge with or into any Person, (ii) consolidate with any Person, (iii) acquire any of the assets of any Person or any of the assets constituting the business of a division, branch or other unit operation of any Person, (iv) enter into any joint venture or partnership with any Person, or (v) sell, lease, transfer or otherwise dispose of, whether in one transaction or in a series of transactions, any of its assets in an amount, for any single transaction, of USD50,000 or more or, for any series of transactions, of USD250,000 or more.

## 7.4    Investments in Other Persons.

Borrower shall not, directly or indirectly, make or maintain any loan or advance to any Person or own, purchase or otherwise acquire any Stock, Stock Equivalents, other equity interest, obligations or other securities of, or any assets constituting the purchase of a business or line of business, or make or maintain any capital contribution to, or otherwise invest in, any Person (any such transaction being an "Investment").

## 7.5    Accounting Changes.

Borrower shall not make any change in accounting treatment and reporting practices except as required by GAAP and disclosed to Lender.

## 7.6    Transactions with Affiliates.

Borrower shall not, except as otherwise expressly permitted herein, to do any of the following: (i) make any Investment in an Affiliate of Borrower unless permitted by Section 6.5; (ii) transfer, sell, lease, assign or otherwise dispose of any asset to any Affiliate; (iii) merge into or consolidate with or purchase or acquire assets from any Affiliate of Borrower; (iv) repay any Indebtedness to any Affiliate of Borrower; or (v) enter into any other transaction directly or indirectly with or for the benefit of any Affiliate of Borrower (including, without limitation,

guaranties and assumptions of obligations of any such Affiliate) except for the payment of salaries and other employee compensation to officers or directors of Borrower (a "Permitted Affiliate Transaction"). Notwithstanding anything contained in this Section 7.6 to the contrary (i) any Indebtedness incurred by Borrower in a Permitted Affiliate Transaction shall be subordinated to the Loan.

## 7.7    Capital Structure.

Borrower shall not make any change in its capital structure (including, without limitation, the terms of its outstanding Stock or Stock Equivalents).

## 7.8    Contingent Obligations, Contractual Obligations.

Borrower shall not create or suffer to exist any Contingent Obligations or Contractual Obligations (i) not requiring aggregate payments or advances of less than USD50,000 for any single Contractual Obligation or USD250,000 for all Contractual Obligations in the aggregate and (ii) not requiring a significant commitment of time or services by management of Borrower. Borrower shall not amend, modify, terminate or assign any of its existing or new Contractual Obligations or enter into any new Contractual Obligations without the consent of Lender.

## Article VIII
## Events of Default

### 8.1    Events of Default.

Each of the following events shall be an Event of Default:

(a)    Borrower shall fail to pay any principal or interest or any other amount or Obligation due on any Loan when due; or

(b)    Any representation or warranty made or deemed made by Borrower in any Loan Document or in connection with any Loan Document shall prove to have been incorrect in any material respect when made or deemed made; or

(c)    Borrower shall fail to perform or observe any term, covenant or agreement contained in Article VI; or

(d)    Borrower shall fail to perform or observe any other term, covenant or agreement contained in this Agreement or in any other Loan Document if such failure shall remain unremedied for fifteen (15) days after the earlier of the date on which (A) a Responsible Officer of Borrower becomes aware of such failure or (B) written notice thereof shall have been given to Borrower by Lender, provided that such failure will not be an Event of Default if Borrower has taken substantial steps to cure such failure within such fifteen (15) day period and there is a reasonable likelihood, in the judgment of Lender, that such failure will be cured within an additional fifteen (15) days; or

(e)    Borrower shall fail to pay any principal of or premium or interest on any single instrument of Indebtedness of Borrower having a principal amount of USD50,000 or more or on all instruments of Indebtedness of Borrower having an aggregate principal amount of USD250,000 or more (excluding Indebtedness under this Loan), when the same becomes due

RLI Partners, Limited
Suite 23, Portland House
Glacis Road, Gibraltar
Attention: Richard H. Olsen, Esq.
Tel: (1-305) 861-3434
Fax: (1-978) 383-2559

(b)    All such notices and communications shall, when mailed, telegraphed, telexed, telecopied, cabled or delivered, be effective when deposited in the mails, delivered to the telegraph company, confirmed by telex answerback, telecopied with confirmation of receipt, delivered to the cable company or delivered by hand to the addressee or its agent, respectively, except that notices and communications to Lender shall not be effective until received by Lender.

9.3    **No Waiver, Remedies.**

No failure on the part of Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

9.4    **Costs, Expenses, Indemnities.**

(a)    Borrower and Lender agree to negotiate payment of all reasonable costs and expenses of Lender in connection with the preparation, execution and delivery of this Agreement, each of the other Loan Documents, and each of the other documents to be delivered hereunder and thereunder, including, without limitation, the fees and out of pocket expenses of counsel, and

(b)    Borrower shall be responsible for all reasonable costs and expenses of Lender (including, without limitation, the fees and out of pocket expenses of counsel) if there is an uncured Event of Default in connection with the administration, modification, amendment, restructuring or enforcement (whether through negotiation, legal proceedings or otherwise) of this Agreement and the other Loan Documents. Borrower also agrees to pay all stamp taxes and duties, excise taxes, transfer taxes or similar taxes or duties otherwise payable by Lender in connection with the execution, delivery, performance and enforcement of the Loan Documents.

(c)    Borrower agrees to indemnify and hold harmless Lender from and against any and all claims, damages, liabilities, obligations, losses, penalties, actions, judgments, suits, costs, disbursements and expenses of any kind or nature arising from this Agreement.

9.5    **Binding Effect, Assignment.**

This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, except that Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender. Lender shall be entitled, in its sole discretion, to assign its rights and obligations under the Loan, or any interest therein, to any of its Affiliates if such Affiliate confirms in writing to Borrower that such Affiliate assumes the obligations assigned pursuant thereto.

9.6     **Severability.**

Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

9.7     **Governing Law and Arbitration.**

(a)     Governing law. This Agreement shall be governed by, construed, interpreted and enforced in accordance with the laws of England.

(b)     Arbitration.   Any dispute under this Agreement or any of the Transaction Documents shall be referred to and finally resolved by arbitration in accordance with the Rules of Arbitration ("**Rules**") of the London Court of International Arbitration ("**LCIA**"), and such Rules are considered as part of this clause.   The tribunal shall consist of three arbitrators appointed by LCIA as the nominating authority in accordance with the Rules.   The seat of arbitration shall be London. The language of the arbitration proceedings shall be English.

9.8     **Section Titles.**

The Section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

9.9     **Execution in Counterparts.**

This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

9.10     **Entire Agreement, No Further Obligations.**

This Agreement, together with all of the other Loan Documents and all certificates and documents delivered hereunder or thereunder, embody the entire agreement of the parties and supersedes all prior agreements and understandings (whether written or oral) relating to the subject matter hereof. Without limiting the foregoing, it is expressly understood and agreed that Lender has not made any agreement, commitment or undertaking to provide any additional financing to, or to arrange additional financing for, Borrower. No agreement, commitment or undertaking (whether written or oral) by Lender to provide any additional financing to, or to arrange additional financing for, Borrower, will be enforceable unless and until it is documented by a written agreement signed by a duly authorized officer or director of Lender.

9.11     **No Public Releases.**

Neither Borrower nor Lender shall make any public announcement regarding any matter related hereto without the prior written consent of the other, except as required by law. Each party shall be entitled to review and comment on any such public announcement prior to its release.

9.12    **Further Assurances.**

Borrower will, at its sole cost and expense, do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all such further acts, conveyances, notes, and assurances as Lender shall from time to time require or deem advisable to carry into effect the purposes of this Agreement and for the better assuring and confirming of all of Lender's rights, powers and remedies hereunder.  Upon any failure by Borrower to do so, Lender may make, execute and record any and all such instruments and documents for and in the name of Borrower, and Borrower hereby irrevocably appoints (which appointment is coupled with an interest and with full power of substitution) Lender the agent and attorney-in-fact of Borrower to do so, and Borrower shall reimburse Lender, on demand, for all costs and expenses (including attorneys' fees) incurred by Lender in connection therewith.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written

Bipinchandra Shah

**BORROWER:**

**RLI PARTNERS, LIMITED**

By: _____
Name: Richard H. Olsen
Title: Chairman

**LIMITED LIABILITY COMPANY,
"INVESTMENT LOTTERY
COMPANY"**

By: _____
Name: Dr. Atik Zamman
Title:  Director General

Exhibit C

| | |
|---|---|
| AGREEMENT GRANTING RIGHTS TO DEBIT THE RUSSIAN ACCOUNT | ДОГОВОР О ПРЕДОСТАВЛЕНИИ ПРАВА БЕЗАКЦЕПТНОГО СПИСАНИЯ С РОССИЙСКОГО СЧЕТА |
| BETWEEN | МЕЖДУ |
| LIMITED LIABILITY COMPANY "INVESTMENT LOTTERY COMPANY" | ОБЩЕСТВОМ С ОГРАНИЧЕННОЙ ОТВЕТСТВЕННОСТЬЮ "ИНВЕСТИЦИОННАЯ ЛОТЕРЕЙНАЯ КОМПАНИЯ" |
| AND | И |
| COMMERCIAL BANK "OB'EDINENNYI INVESTITSIONNYI BANK" (LIMITED LIABILITY COMPANY) | ОБЩЕСТВОМ С ОГРАНИЧЕННОЙ ОТВЕТСТВЕННОСТЬЮ КОММЕРЧЕСКИМ БАНКОМ "ОБЪЕДИНЕННЫЙ ИНВЕСТИЦИОННЫЙ БАНК" |
| in its capacity as Passport Bank | в качестве Паспортного Банка |
| AND | И |
| Bipinchandra Shah (a/k/a BIPIN SHAH) | Бипинчандра Шах (известный также как БИПИН ШАХ) |
| 29 July 2005 | 29 июля 2005 года |

AGREEMENT GRANTING RIGHTS TO DEBIT THE RUSSIAN ACCOUNT

ДОГОВОР О ПРЕДОСТАВЛЕНИИ ПРАВА БЕЗАКЦЕПТНОГО СПИСАНИЯ С РОССИЙСКОГО СЧЕТА

PREAMBLE:

ПРЕАМБУЛА:

This AGREEMENT GRANTING RIGHTS TO DEBIT THE RUSSIAN ACCOUNT (this Agreement) is made on 29 July 2005 between:

Настоящий ДОГОВОР О ПРЕДОСТАВЛЕНИИ ПРАВА БЕЗАКЦЕПТНОГО СПИСАНИЯ С РОССИЙСКОГО СЧЕТА (настоящий Договор) заключен 29 июля 2005 года между:

(1) Limited Liability Company ""Investment Lottery company"", a limited liability company organized and existing under the laws of the Russian Federation, whose registered office is at Yana Rainisa Boulevard, Building 1, Moscow 125363, the Russian Federation (the "Company")

(1) Обществом с ограниченной ответственностью "Инвестиционная Лотерейная компания", обществом с ограниченной ответственностью, организованным и существующим в соответствии с законодательством Российской Федерации, с зарегистрированным офисом по адресу: Российская Федерация, г. Москва, 125363, бульвар Яна Райниса, д. 1 ("Общество").

(2) Commercial Bank "Ob'edinennyi Investitsionnyi Bank" (limited liability company), a bank organized and existing under the laws of the Russian Federation in the form of a limited liability company, whose registered office is at 13 Donskaya Street, Building 1, Moscow 119049, the Russian Federation (the "Passport Bank"); and

(2) Обществом с ограниченной ответственностью Коммерческим банком "Объединенный инвестиционный банк", банком, организованным и существующим в соответствии с законодательством Российской Федерации в форме общества с ограниченной ответственностью, с зарегистрированным офисом по адресу: Российская Федерация, г. Москва, 119049, улица Донская, дом 13, строение 1 ("Паспортный Банк"); и

(3) BIPIN SHAH, with offices at 425 East 58th Street, Suite 43H, New York, New York 10022, United States of America

(3) БИПИН ШАХ, с зарегистрированным офисом по адресу 425 East 58th Street, Suite 43H, New York, New York 10022, United States of America (Нью-Йорк, Соединенные Штаты Америки)

THE PARTIES HAVE AGREED AS FOLLOWS:

СТОРОНЫ ПРИШЛИ К НИЖЕСЛЕДУЮЩЕЙ ДОГОВОРЕННОСТИ:

BACKGROUND OF THIS AGREEMENT (RECITALS):

(A)    The Company, the Passport Bank, Shah, RLI and Metropol have entered into the Framework Agreement Relating to the Bridge Financing of the All-Russia Lottery, dated 29 July 2005 (the "**Framework Agreement**"), pursuant to which the Company has agreed, among other things, to operate and maintain a certain bank account with the Passport Bank in accordance with this Agreement, the Framework Agreement and applicable law.

(B)    Shah and RLI have entered into the Loan Agreement dated 29 July 2005 (the "**Loan Agreement**"), pursuant to which Shah has agreed to make available to RLI a term loan facility on the terms and subject to the conditions of the Loan Agreement.

(C)    Pursuant to the Framework Agreement, the Company has issued a guarantee to the benefit of Shah in respect of RLI's obligations under the Loan Agreement and, therefore, Shah is entitled to claim from the Company the funds in the amount of not less than three million US Dollars ($3,000,000) due from RLI to Shah pursuant to the terms and conditions of the Loan Agreement.

## ARTICLE I - DEFINITIONS AND INTERPRETATION

### Section 1.01.    Definitions

(a)    Capitalized terms used in this Agreement without definition have the meanings specified in the Framework Agreement.

(b)    In addition, whenever used in this Agreement the following terms have the meanings specified opposite them.

ПРЕДИСТОРИЯ ЗАКЛЮЧЕНИЯ НАСТОЯЩЕГО ДОГОВОРА (ВСТУПИТЕЛЬНАЯ ЧАСТЬ):

(А)    Компания, Паспортный Банк, Шах, RLI и Метрополь заключили Рамочный Договор в связи с промежуточным финансированием Всероссийской лотереи, датированный 29 июля 2005 года ("**Рамочный Договор**"), по условиям которого Общество согласилось, помимо прочего, оперировать и поддерживать определенный банковский счет в Паспортном Банке в соответствии с настоящим Договором, Рамочным Договором и применимым правом.

(В)    Шах и RLI заключили Договор Займа, датированный 29 июля 2005 года ("**Договор Займа**"), по условиям которого Шах согласилось предоставить RLI срочный кредит на условиях и положениях Договора Займа.

(С)    В соответствии с Рамочным Договором, Общество предоставило в пользу Шах гарантию исполнения обязательств RLI по Договору Займа, вследствие чего Шах вправе требовать от Общества сумму в размере не менее 3 000 000 (Трех миллионов) долларов США, подлежащую возврату от RLI в пользу Шах в соответствии с положениями и условиями Договора Займа.

## СТАТЬЯ I – ОПРЕДЕЛЕНИЯ И ТОЛКОВАНИЕ

### Раздел 1.01.  Определения

(а)    Термины, приводимые в настоящем Договоре с заглавной буквы без определения, имеют значения, указанные в Рамочном Договоре.

(b)    Кроме того, при любом использовании в настоящем Договоре следующие термины имеют значения, указанные напротив них.

"Agreement" has the meaning given to that term in the Preamble.

"Authority" means an official or governmental body to which the Passport Bank is obliged by applicable law to provide information.

"Bank Account Agreement" means the following agreement between the Company and the Passport Bank pursuant to which the Russian Account has been opened and is maintained:

(i) Bank Account Agreement No. 1221 (in foreign currency), dated July 20, 2005 between the Company and the Passport Bank (the **"Bank Account Agreement in respect of the Dollar Account"**); and

(ii) Additional Agreement No. 1 to the Bank Account Agreement in respect of the Dollar Account, dated July 29, 2005, between the Company and the Passport Bank in respect of the System "Client-Obibank".

**"Currency Certificate for Standing Payment Order"** has the meaning given to that term in Section 4.03(d).

**"Currency Certificate for Payment Demand"** has the meaning given to that term in Section 6.01(c).

**"Dollar Account"** means current Dollar account No. 40702840800061002265 of the Company held in the Russian Federation with the Passport Bank.

**"Encumbrance"** means any type of security interest in assets or rights, including any mortgage, pledge, charge, security assignment, title retention, and any other types of encumbrances or the granting of rights in assets to third parties, including any trust agreements or nominee holder

"Договор" имеет значение, присвоенное этому термину в Преамбуле.

"Орган" означает официальный или государственный орган, которому Паспортный Банк в силу применимого законодательства обязан предоставлять сведения.

"Договор Банковского Счета" означает следующий договор между Обществом и Паспортным Банком, в соответствии с которым открыт и ведется Российский Счет:

(i) Договор банковского счета № _____ (в иностранной валюте) от 20 июля 2005 года между Обществом и Паспортным Банком (**"Договор Банковского Счета в отношении Долларового Счета"**); и

(ii) Дополнительное Соглашение №1 к Договору Банковского Счета в отношении Долларового Счета от 29 июля 2005 года, между Обществом и Паспортным Банком в отношении системы "Клиент-Обибанк".

**"Справка о Валютных Операциях для Резервного Платежного Поручения"** имеет значение, данное этому термину в Разделе 4.03(d).

**"Справка о Валютных Операциях для Платежного Требования"** имеет значение, данное этому термину в Разделе 6.01(c).

**"Долларовый Счет"** означает текущий счет в долларах США № 40702840800061002265 Общества, открытый в Паспортном Банке в Российской Федерации.

**"Обременение"** означает любой вид обеспечения в отношении имущества или прав, включая ипотеку, залог, заклад, обеспечительную уступку, удержание права и любой иной вид обременения или предоставления прав на имущество третьи лицам, включая любые договоры

arrangements.

"Existing Loan Agreement" means a loan agreement dated 27 May 2005, between RLI and the Company.

"Framework Agreement" has the meaning given to that term in Recital (A).

"Loan Agreement" has the meaning given to that term in Recital (B).

"Metropol" means Limited Liability Company "Investment Financial Company 'Metropol'" organized and existing under the laws of the Russian Federation, with an office at 13 Donskaya Street, Building 1, Moscow 119049, the Russian Federation.

"Moscow Business Day" means a day (other than a Saturday or Sunday) on which commercial banks are open for the transaction of general business (including dealings in foreign exchange and foreign currency deposits) in Moscow, the Russian Federation.

"Payment Demand" means a written notice given to the Passport Bank by Shah pursuant to Section 6.01 in the form as provided by applicable law or, if such form is not provided thereby, in the form of Schedule 1 (*platezhnoe trebovanie*).

"Payment Order" means any request given to the Passport Bank under this Agreement by : on behalf of the Company for withdrawals, payments, conversions or transfers from, or any other dealings in respect of, any of the Russian Accounts in the form of a written instruction to be prepared in the form as provided by applicable law or, if such form is not provided by applicable law, in accordance

держателе.

"Существующий Договор Займа" означает договор займа от 27 мая 2005 года, между RLI и Обществом.

"Рамочный Договор" имеет значение, данное этому термину в Введении (А).

"Кредитный Договор" имеет значение, данное этому термину во Вступительной части (В).

"Метрополь" означает Общество с ограниченной ответственностью "Инвестиционная финансовая компания 'Метрополь'", организованное и существующее в соответствии с законодательством Российской Федерации, с офисом по адресу: улица Донская 13, Строение 1, Москва, 119049, Россия.

"Московский Рабочий День" означает любой день (кроме субботы и воскресенья), в который коммерческие банки открыты для ведения общей коммерческой деятельности (включая сделки в иностранной валюте и валютные депозиты) в г. Москве, Российская Федерация.

"Платежное Требование" означает письменное уведомление, направленное Паспортному Банку от Шах согласно Разделу 6.01 по форме, предусмотренной применимым законодательством либо, если такая форма не предусмотрена применимым законодательством, по форме Приложения 1 (*платежное требование*).

"Платежное Поручение" означает любой запрос, направленный Паспортному Банку по настоящему Договору Обществом или от имени Общества на снятие денежных средств, выплаты, конвертации или переводы с любого из Российских Счетов либо на любые иные действия в отношении любого из Российских Счетов в форме письменного

with the form agreed with the Passport Bank.

предусмотренной применимым законодательством либо, если такая форма не предусмотрена применимым законодательством, по форме, согласованной с Паспортным Банком.

"**RLI**" means RLI Partners, Limited, a limited liability company organized and existing under the laws of Gibraltar, having its registered office at Suite 23, Portland house, Glacis Road, Gibraltar.

"**RLI**" означает RLI Partners, Limited, компанию с ограниченной ответственностью, организованную и существующую в соответствии с законодательством Гибралтара, с зарегистрированным офисом по адресу: Suite 23, Portland house, Glacis Road, Gibraltar.

"**Russian Account**" means the Dollar Account.

"**Российский Счет**" означает Долларовый Счет.

"**Signature Card**" has the meaning given to that term in Section 5.01(b).

"**Карточка Образцов Подписей**" имеет значение, данное этому термину в Разделе 5.01(b).

"**Standing Payment Order**" has the meaning given to that term in Section 4.03(c).

"**Платежное Поручение о Постоянных Платежах**" имеет значение, данное этому термину в Разделе 4.03(c).

"**Term**" means the period commencing on the date of this Agreement and ending on the date when any and all claims which Shah may have against the Company under the Transaction Documents have been irrevocably paid and discharged in full.

"**Срок**" означает период, начинающийся в дату подписания настоящего Договора и заканчивающийся в дату, на которую все и всяческие требования, которые могут иметься у Шах против Общества согласно Документам о Транзакциях, будут безотзывно оплачены и погашены полностью.

**Section 1.02.    Interpretation**

**Раздел 1.02.    Толкование**

In this Agreement, unless the context otherwise requires:

В настоящем Договоре, если контекст не требует иного:

(a)    words denoting the singular include the plural and *vice versa*, words denoting persons include any person, firm, company, corporation, government, state or agency of a state or any association or partnership (whether or not having separate legal personality) of two or more of the foregoing, and references to a person include its successors and permitted assigns;

(a)    слова в единственном числе включают такие слова во множественном числе, и *наоборот*, слова, означающие лиц, включают любое физическое лицо, фирму, компанию, корпорацию, правительство, государство или государственный орган либо любое объединение или товарищество (вне зависимости от того, является ли оно самостоятельным юридическим лицом) в

составе двух или нескольких из вышеуказанных лиц, а ссылки на лицо включают ссылки на его правопреемников и разрешенных правопреемников;

(b) a reference to a specified Section or Schedule shall be construed as a reference to that specified Section of, or Schedule to, this Agreement;

(b) ссылка на конкретный Раздел или Приложение истолковывается как ссылка на указанный Раздел или Приложение настоящего Договора;

(c) a reference to the parties shall be construed as a reference to the parties of this Agreement;

(c) ссылка на стороны истолковывается как ссылка на стороны настоящего Договора;

(d) a reference to an agreement shall be construed as a reference to such agreement as it may be amended, varied, supplemented, novated or assigned from time to time but disregarding any amendment, supplement, replacement or novation made in breach of this Agreement; and

(d) ссылка на какой-либо договор истолковывается как ссылка на такой договор с возможными поправками, изменениями, дополнениями, новациями или периодическими уступками, но без учета каких-либо поправок, дополнений, замен или новаций, совершенных в нарушение настоящего Договора; а также

(e) the headings are inserted for convenience of reference only and shall not affect the interpretation of this Agreement.

(e) заголовки приводятся лишь для удобства ссылок и не сказываются на толковании настоящего Договора.

## ARTICLE II - THE RUSSIAN ACCOUNTS

## СТАТЬЯ II – РОССИЙСКИЕ СЧЕТА

**Section 2.01. Establishment and Operation of the Russian Account**

**Раздел 2.01. Открытие и ведение Российского Счета**

(a) The Company shall throughout the Term operate and maintain the Russian Account in its sole name at the Passport Bank's principal office in Moscow, the Russian Federation, or at such other place as the Company, the Passport Bank and Shah may agree in writing. Each of the Company and the Passport Bank agree and undertake to operate the Russian Account at all times during the Term in accordance with this Agreement and applicable law.'

(a) В течение всего Срока Общество должно оперировать и поддерживать Российский Счет исключительно от своего имени в головном офисе Паспортного Банка в г. Москве, Российская Федерация, или в таком ином месте, которое может быть в письменной форме согласовано Обществом, Паспортным Банком и Шах. Общество и Паспортный Банк выражают согласие и обязуются осуществлять операции по Российскому Счету в течение всего Срока в соответствии с настоящим Договором и применимым законодательством.

(b) Notwithstanding any restriction contained in this Agreement on the withdrawal of funds from the Russian

(b) Вне зависимости от какого-либо ограничения, установленного настоящим

Account, the Company shall be obliged to make any and all payments required to be made to Shah on the due date of such payment in accordance with the Transaction Documents.

Российского Счета, Общество обязано совершать все и всяческие платежи, причитающиеся Шах в надлежащую дату такого платежа в соответствии с Документами о Транзакциях.

**Section 2.02.    Rules    Governing    the Russian Account**

**Раздел 2.02. Правила, регулирующие Российский Счет**

(a)    With effect from the date of this Agreement, the Bank Account Agreements shall be supplemented, amended and modified by the terms and conditions set forth in this Agreement and all terms and conditions set forth herein shall be deemed to be an integral part of the Bank Account Agreements as if stated therein.

(a)    С даты подписания настоящего Договора в Договоры Банковских Счетов вносятся дополнения, поправки и изменения в соответствии с условиями и положениями, изложенными в настоящем Договоре, и все условия и положения, изложенные в настоящем Договоре, считаются неотъемлемой частью Договоров Банковского Счета, как если бы они были в них изложены.

(b)    Except as provided in this Agreement, and save as supplemented, amended or modified by this Agreement, the provisions of the Bank Account Agreements shall continue in full force and effect. In the event of any conflicts or discrepancies between the terms hereof and the terms and conditions of the Bank Account Agreements, the provisions of this Agreement shall prevail.    For the avoidance of doubt, the following provisions of the Bank Account Agreement in respect of the Dollar Account are hereby repealed and shall not apply:

(b)    За исключением того, что предусмотрено в настоящем Договоре и дополнено, изменено или модифицировано в силу настоящего Договора, положения Договоров Банковского Счета продолжают оставаться полностью в силе. В случае любых противоречий или расхождений между условиями настоящего Договора и условиями и положениями Договоров Банковского Счета определяющую силу имеют положения настоящего Договора. Во избежание сомнений, следующие положения Договора Банковского Счета в отношении Долларового Счета теряют силу и не подлежат применению:

(i)    Article 2.2;

(i)    Статья 2.2;

(ii)    Paragraphs (a), (б), (г) and (д) of Article 3.2.3;

(ii)    Параграфы (а), (б), (г) и (д) Статьи 3.2.3;

(ii)    Article 4.4; and

(iii)    Статья 4.4; и

(iv)    Article 6.2.

(iv)    Статья 6.2.

(c)    The parties hereto agree that the Bank Account Agreements may not be modified, amended, terminated or replaced without the

(c)    Стороны настоящего Договора выражают согласие с тем, что в Договоры Банковского Счета не могут вноситься

the extent the Passport Bank is mandatorily obliged by applicable law to modify the terms of the Bank Account Agreements unilaterally.

может быть прекращено, а также они не могут быть заменены без предварительного письменного согласия Шах, если только и в той степени, в которой Паспортный Банк не обязан в силу применимого законодательства изменять условия Договоров Банковского Счета в одностороннем порядке.

### Section 2.03.    Interest

Amounts held in the Dollar Account shall earn interest at such rate(s) as may be applied by the Passport Bank from time to time pursuant to separate agreement(s) entered into by the Passport Bank and the Company which agreement(s) shall constitute an integral part of the Bank Account Agreements.    All interest earned on amounts held in the Dollar Account shall be credited to the Dollar Account.

### Раздел 2.03.   Проценты

На суммы, находящиеся на Долларовом Счете, проценты начисляются по таким ставкам, которые периодически могут применяться Паспортным Банком в соответствии с отдельным(и) договором(договорами), заключенным(и) между Паспортным Банком и Обществом, каковой(-ые) договор(ы) представляет(ют) собой неотъемлемую часть Договоров Банковского Счета. Все проценты, начисленные на суммы, находящиеся на Долларовом Счете, начисляются на Долларовый Счет.

### ARTICLE III - INTENTIONALLY DELETED

### ARTICLE IV - WITHDRAWALS FROM THE RUSSIAN ACCOUNT

### Section 4.01.    Permitted Withdrawals

### СТАТЬЯ III – НАМЕРЕННО УДАЛЕНА

### СТАТЬЯ IV – СНЯТИЯ СРЕДСТВ С РОССИЙСКОГО СЧЕТА

### Раздел 4.01.  Разрешенные снятия средств

(a)    The minimum balance standing to the credit of the Dollar Account shall at all times be not less than three million US Dollars ($3,000,000) (the "Minimum Balance"), except that the Minimum Balance requirement shall not apply if withdrawals from the Dollar Account are made pursuant to the Standing Payment Order as provided in Section 4.03 (c) or by Shah as permitted by Section 6.01 (a). For the avoidance of doubt, y and all funds standing to the credit of the ⌐ollar Account may be withdrawn pursuant to the Standing Payment Order as provided in Section 4.03 (c) or by Shah as permitted by Section 6.01 (a).

(a)    Минимальный баланс остатка средств на Долларовом Счете при любых обстоятельствах должен составлять не менее 3 000 000 (Трех миллионов) долларов США ("Минимальный Баланс"), за исключением случаев, когда требование о Минимальном Балансе не применяется, если снятие средств с Долларового Счета осуществляется на основании Платежного Поручения о Постоянных Платежах в соответствии с Разделом 4.03 (с) или снятие средств с Долларового Счета осуществляется Шах в соответствии с Разделом 6.01 (а). Во избежание сомнений, любые и все средства, находящиеся на Долларовом Счете могут быть сняты на основании

Платежах в соответствии с Разделом 4.03 (с) или сняты Шах в соответствии с Разделом 6.01 (а).

(b)    Without the prior written consent of Shah the Company shall not withdraw any moneys from the Dollar Account or otherwise dispose thereof during the Term, except for transfers of funds to the accounts opened in the name of Shah.

(b)    Общество не вправе снимать средства с Долларового Счета или иным образом распоряжаться ими в течение Срока без предварительного письменного согласия Шах, за исключением случаев, когда переводы средств происходят на счета, открытые на имя Шах.

**Section 4.02.    Prohibited Transactions**

**Раздел 4.02.  Запрещенные сделки**

The Company shall not at any time during the Term, without the prior written consent of Shah:

В течение всего Срока, без предварительного письменного согласия Шах, Общество не должно:

(a)    close the Russian Account;

(a)    закрывать Российский Счет;

(b)    withdraw or transfer any amount .anding to the credit of the Russian Account to another account held in its own name or to the account of any other person otherwise than as permitted by Section 4.01;

(b)    снимать или переводить любую сумму, находящуюся на Российском Счете, на другой счет, открытый на имя Общества, или на счет любого иного лица за исключением случаев, предусмотренных Разделом 4.01;

(c)    withdraw, amend or replace the Signature Card or the Standing Payment Order;

(c)    отзывать, изменять или заменять Карточку Образцов Подписей или Платежное Поручение о Постоянных Платежах;

(d)    amend or close the transaction passport opened with the Passport Bank in respect of the Existing Loan Agreement or transfer it to any other bank;

(с)    изменять или закрывать паспорт сделки, открытый в Паспортном Банке в отношении Существующего Договора Займа, или переводить его в любой другой банк;

(e)    create or permit to exist any encumbrance in relation to, or otherwise encumber, the Russian Account, moneys at any time standing to the credit thereof, or the Company's rights under the Bank Account Agreement or this Agreement; or

(d)    создавать или допускать существование какого-либо обременения или создавать иное обременение в отношении Российского Счета, средств, находящихся на нем на любой момент, или прав Общества по Договору Банковского Счета или настоящему Договору; или

(f)    do any act, or omit to do any act, if that act or omission would adversely affect the rights of Shah under this Agreement.

(e)    совершать никаких действий и не допускать никакого бездействия, если такое действие или бездействие может неблагоприятно сказаться на правах Шах

по настоящему Договору.

**Section 4.03.    Withdrawals Procedure**

(a)    All requests to be given to the Passport Bank under this Agreement by the Company for withdrawals, payments, conversions or transfers from, or any other dealings in respect of, the Russian Account, shall be in the form of the Payment Order.

(b)    Subject to Russian law requirements for the order of priority relating to the withdrawal of funds from a bank account, the Company hereby instructs the Passport Bank to execute Payment Orders and Payment Demands submitted the same day in the following order: (i) first, Payment Demands submitted by Shah pursuant to Section 6.01 (ii) second, the Standing Payment Order ; and (iii) third, other Payment Orders submitted by the Company. The Company shall not instruct the Passport Bank to execute Payment Orders or Payments Demands in an order of priority different from the one described in this Section 4.03(b) without the prior written consent of Shah.

(c)    On the date of the signing of this Agreement, the Company shall submit to the Passport Bank an undated Payment Order instructing the Passport Bank to withdraw from the Dollar Account in favor of Shah the funds in the amount of three million US Dollars    ($3,000,000)    (the    "**Standing Payment Order**"). The Standing Payment Order shall be made in the form attached hereto as Schedule 3 and shall be properly executed by the Company.

**Раздел 4.03.  Порядок снятия средств**

(a)    Все запросы, подлежащие подаче в Паспортный Банк по настоящему Договору со стороны Общества в отношении снятия средств, выплат, конвертаций или переводов с, или любых иных операций в отношении Российского Счета, составляются в форме Платежного Поручения.

(b)    С учетом требований законодательства Российской Федерации к очередности списания денежных средств с банковского счета Общество настоящим дает указания Паспортному Банку исполнять Платежные Поручения и Платежные Требования, поданные в один и тот же день, в следующем порядке: (i) в первую очередь, Платежные Требования, поданные Шах согласно Разделу 6.01; (ii) во вторую очередь, Резервные Платежные Поручение, и (iii) в третью очередь, иные Платежные Поручения, поданные Обществом. Общество обязуется не давать Паспортному Банку инструкций об исполнении Платежных Требований или Платежных Поручений в нарушение порядка приоритетности их исполнения, предусмотренного настоящим Разделом 4.03(b), без предварительного письменного согласия на то Шах.

(c)    В дату подписания настоящего Договора Общество должно передать Паспортному Банку Платежное Поручение без проставленной даты, поручающее Паспортному Банку снять с Долларового Счета в пользу Шах средства в размере трех миллионов (3 000 000) долларов США ("**Платежное Поручение о Постоянных Платежах**"). Платежное Поручение о Постоянных Платежах должно быть составлено по форме, прилагаемой к настоящему Договору в качестве Приложения 3, и должно быть должным образом исполнено Обществом.

Agreement, the Company shall also submit to the Passport Bank a duly executed but undated currency operation certificate in respect of a transfer of funds envisaged by the Standing Payment Order in the form required by law (the "**Currency Certificate for Standing Payment Order**").

Договора Общество также должно передать Паспортному Банку должным образом исполненную, но без проставленной даты, справку о валютных операциях в отношении перевода средств, предусмотренного Платежным Поручением о Постоянных Платежах в форме, предусмотренной законодательством ("**Справка о Валютных Операциях для Платежного Поручения о Постоянных Платежах**").

(e)    The Passport Bank shall hold the Standing Payment Order and the Currency Certificate for Standing Payment Order in escrow and shall date both documents and perform the Standing Payment Order by transferring three million US Dollars ($3,000,000) standing to the credit of the Dollar Account to the account of Shah immediately (no later than on the same Moscow Business Day) upon the occurrence of any of the following events:

(e)    Паспортный Банк обязуется держать Платежное Поручение о Постоянных Платежах и Справку о Валютных Операциях для Платежного Поручения о Постоянных Платежах у себя на хранении, и вписать даты в оба документа и немедленно (не позднее чем в тот же Московский Рабочий День) исполнить Платежное Поручение о Постоянных Платежах путем перевода трех миллионов (3 000 000) долларов США с Долларового Счета на счет Шах в случае наступления любого из следующих событий:

(i)    the Company attempts to amend in any way any provision of, or terminate the Bank Account Agreements, or close any of the Russian Accounts;

(i)    Общество пытается каким-либо образом изменить любое из положений Договоров Банковского Счета, или прекратить их действие, либо закрыть любые из Российских Счетов;

(ii)    the Company attempts to withdraw, modify, terminate or replace any of the Standing Payment Order, the Currency Certificate for Standing Payment Order, the Currency Certificate for Payment Demand or the Signature Card;

(ii)    Общество пытается отозвать, изменить, заменить или прекратить действие Платежного Поручения о Постоянных Платежах, Справки о Валютных Операциях для Платежного Поручения о Постоянных Платежах, Справки о Валютных Операциях для Платежного Требования или Карточки Образцов Подписей;

(iii)    the Company attempts to withdraw or transfer any amount standing to the credit of the Dollar Account to another account held in its own name or to the

(iii)    Общество пытается снять или перевести любую сумму, находящуюся на Долларовом Счете, на другой счет, открытый

account of any other person;

другого лица;

(iv) the Company attempts to close or transfer the transaction passport opened in respect of the Existing Loan Agreement with the Passport Bank to any other bank;

(iv) Общество пытается закрыть или перевести паспорт сделки, открытый в отношении Существующего Договора Займа в Паспортном Банке, в любой другой банк;

(v) any person other than the Company (including state authorities) submits to the Passport Bank a request for a withdrawal, or becomes entitled to withdraw, any moneys standing to the credit of the Dollar Account pursuant to any debt authority, payments instruction, withdrawal agreement, enforcement order, court judgment, arbitration award or otherwise; or

(v) любое лицо, отличное от Общества (включая государственные органы), представляет в Паспортный Банк запрос на списание, либо же приобретает право на списание любых средств, находящихся на Долларовом Счете, согласно любому решению о взыскании задолженности, платежному поручению, договору о снятии средств, приказу о принудительном осуществлении в судебном порядке, решению суда, арбитражному решению или на ином основании; или

(vi) the Company submits to the Passport Bank any other instructions, letters or Payment Orders not mentioned in items (i) – (iv) above in violation of any terms of this Agreement.

(vi) Общество направляет Паспортному Банку любые другие инструкции, письма или Платежные Поручения, не предусмотренные выше в подпунктах (i) – (iv) в нарушение условий настоящего Договора.

(f) Should the moneys standing to the credit of the Dollar Account be insufficient to comply with the Standing Payment Order to make a payment in full, the Passport Bank shall continue to utilize moneys transferred to the Dollar Account at a later date to comply with the Standing Payment Order until the time it has been satisfied in full.

(f) Если денежных средств, зачисленных на Долларовый Счет, недостаточно для выполнения Платежного Поручения о Постоянных Платежах полностью, Паспортный Банк обязуется продолжать использовать денежные средства, переведенные на Долларовый Счет в более поздние даты, для выполнения соответствующего Платежного Поручения о Постоянных Платежах до тех пор, пока оно не будет выполнено полностью.

(g) The Company hereby authorizes the Passport Bank to do all actions and to execute all documents and instructions (including, but not limited to, currency operation certificates)

(g) Настоящим Общество уполномочивает Паспортный Банк выполнять любые действия и оформлять любые документы и инструкции

the Passport Bank to perform the Standing Payment Order as described in this Section 4.03 and, on the date of the signing of this Agreement, shall submit to the Passport Bank a letter in the form set out in Schedule 4.

## ARTICLE V - SIGNATURE CARD

### Section 5.01.    Preparation and Operation of the Signature Card

(a)    The Russian Accounts shall be operated in accordance with the Signature Card on the terms and conditions as defined in this Section 5.01, which Signature Card shall be prepared in compliance with the requirements of applicable legislation and the requirements of the Passport Bank.

(b)    The Company shall within one (1) calendar day from the date of this Agreement prepare and submit to the Passport Bank a signature card (the "**Signature Card**") certified by an authorized representative of the Passport Bank and containing the name and the signature of Shah who is authorized to operate the Russian Account and has the sole right of the first signature in respect of any Payment Orders or other instructions to be submitted in respect of the Russian Account pursuant to a power of attorney issued by the Company to Shah on the date of the signing of this Agreement in the form set out in Schedule 2.

валютных операциях), которые могут потребоваться по законодательству Российской Федерации для того, чтобы Паспортный Банк смог исполнить Платежное Поручение о Постоянных Платежах в соответствии с Разделом 4.03, и, в день подписания настоящего Договора Общество должно передать Паспортному Банку письмо по форме, приведенной в Приложении 4.

## СТАТЬЯ V – КАРТОЧКА ОБРАЗЦОВ ПОДПИСЕЙ

### Раздел 5.01. Оформление и действие Карточки Образцов Подписей

(a)    Работа с Российскими Счетами должна производиться по Карточке Образцов Подписей на условиях и положениях, указанных в настоящем Разделе 5.01. Карточка Образцов Подписей должна быть подготовлена в соответствии с требованиями законодательства и Паспортного Банка.

(b)    В течение одного (1) календарного дня с даты подписания настоящего Договора Общество оформит и передаст в Паспортный Банк карточку образцов подписей ("**Карточка Образцов Подписей**"), заверенную уполномоченным представителем Паспортного Банка, с указанием имени и подписи представителя Шах, который будет уполномочен на оперирование Российским Счетом и будет являться единственным обладателем права первой подписи в отношении любых Платежных Поручений или иных инструкций, передаваемых в отношении Российского Счета в соответствии с доверенностью, выданной Обществом компании Шах в дату подписания настоящего Договора по форме, приведенной в Приложении 2.

ARTICLE VI - RIGHTS, POWERS AND DUTIES OF SHAH

СТАТЬЯ VI – ПРАВА, ПОЛНОМОЧИЯ И ОБЯЗАННОСТИ ШАХ

**Section 6.01.    Shah's Rights in Respect of the Dollar Account**

**Раздел 6.01. Права Шах в отношении Долларового Счета**

(a)    In accordance with Articles 847(2) and 854 of the Civil Code of the Russian Federation the Company hereby instructs the Passport Bank to make withdrawals, payments and transfers from the Dollar Account, on written demand of Shah in the form as provided by applicable law or, if such form is not provided by applicable law, (each such demand, a **"Payment Demand"**) without any further consent, instruction or payment demand from the Company.

(a)    В соответствии со Статьями 847(2) и 854 Гражданского Кодекса Российской Федерации Общество настоящим дает указание Паспортному Банку совершать снятия средств, выплаты и переводы с Долларового Счета по письменному требованию Шах по форме, предусмотренной применимым законодательством, либо, если такая форма не предусмотрена применимым законодательством, (каждое такое требование именуется **"Платежным Требованием"**), без какого-либо дальнейшего согласия, указания или платежного требования со стороны Общества.

(b)    Shah may submit as many Payment Demands as he considers appropriate if the Company fails to comply with its payment obligations to Shah under any Transaction Documents. The Passport Bank hereby undertakes to comply with any and all Payment Demands submitted by Shah.

(b)    Шах может подавать такое количество Платежных Требований, которое сочтет уместным, если Общество не соблюдает свои платежные обязательства перед Шах по любым Документам о Транзакциях. Паспортный Банк настоящим обязуется исполнять все и всяческие Платежные Требования, направляемые ему компанией Шах.

(c)    On the date of the signing of this Agreement, the Company shall submit to Shah

(c)    В дату подписания настоящего Договора Общество должно передать компании Шах

(d)    a duly executed but undated currency operation certificate in respect of a transfer of funds to be made under a Payment Demand in the form required by law (the **"Currency Certificate for Payment Demand"**).

(d)    должным образом оформленную без проставленной даты справку о валютных операциях в отношении перевода средств, который должен быть осуществлен по Платежному Требованию в форме, предусмотренной законодательством (**"Справка о Валютных Операциях для Платежного Требования"**).

(e)    The Company hereby authorizes the Passport Bank to do all actions and to execute all documents and instructions (including, but

(d)    Общество настоящим уполномочивает Паспортный Банк совершать все действия и подписывать

which may be required under applicable law in order to enable Shah to exercise his rights to make withdrawals, payments, conversions and transfers from the Dollar Account.

среди прочего, справки о валютных операциях), которые могут требоваться согласно применимому законодательству, для того, чтобы Шах мог осуществлять свои права на снятие средств, выплаты, конвертации и переводы с Долларового Счета.

(f)    The Company shall, on the date of this Agreement and promptly upon any and each request of Shah or the Passport Bank, provide the Passport Bank with all necessary information and documents in form and substance satisfactory to the Passport Bank to enable Shah to exercise its rights to make withdrawals, payments and transfers from the Russian Accounts.

(е)    В день подписания настоящего Договора и безотлагательно по подаче любого и каждого запроса со стороны Шах или Паспортного Банка, Общество должно предоставить Паспортному Банку все необходимые сведения и документы, удовлетворяющие Паспортный Банк по форме и содержанию, с тем, чтобы Шах мог осуществлять свои права на совершение снятий средств, выплат и переводов с Российских Счетов.

### Section 6.02.    Power of Attorney

### Раздел 6.02.    Доверенность

(a)    The Company hereby appoints Shah as its representative and grants to it full authority and rights to do all acts and things and sign all documents which the Company would otherwise be entitled to do or sign in relation to the Russian Accounts, the money at any time deposited in the Russian Account or the Company's rights under the Bank Account Agreements or in connection with any of the other matters provided for in this Agreement, and to receive from all government bodies, including tax authorities of the Russian Federation, the Central Bank of the Russian Federation and any other person, information regarding the Russian Accounts.

(а)    Общество настоящим назначает Шах своим представителем и предоставляет ему все права и полномочия совершать все действия и подписывать все документы, которые в ином случае Общество имело бы право совершать или подписывать в отношении Российских Счетов, денежных средств, в любое время зачисленных на Российский Счет, либо прав Общества по Договорам Банковского Счета, либо в связи с любыми другими вопросами, предусмотренными настоящим Договором, а также получать во всех государственных органах, включая налоговые органы Российской Федерации, Центральный Банк Российской Федерации и любое иное лицо, сведения о Российских Счетах.

(b)    Shah may delegate to others all or part of the authority and rights granted to him by the Company to the extent permitted by applicable law. Any such delegation shall be promptly notified to the Company and the Passport Bank.

(b)    Шах может передоверять другим лицам все или некоторые из полномочий и прав, предоставленных ему Обществом, в той степени, в которой это разрешено применимым законодательством. О любом таком передоверии безотлагательно сообщается Обществу и Паспортному Банку.

Agreement and promptly upon any and each request of Shah, grant to Shah a power of attorney in the form set out in Schedule 1 to exercise the above rights. The Company agrees that it shall, whenever reasonably requested by Shah, issue to Shah a replacement power of attorney in form and substance satisfactory to Shah. The Company shall, at its own expense, do or permit to be done every act or thing and sign and deliver every document or instrument that Shah or the Passport Bank may from time to time require in order to give effect to any power of attorney or a replacement power of attorney granted pursuant to this Section 5.02.

подписания настоящего Договора и незамедлительно по любому и всяческому запросу Шах, предоставить Шах доверенность по форме, содержащейся в Приложении 1, для осуществления вышеуказанных прав. Общество выражает согласие с тем, что по любому обоснованному запросу Шах Общество выдаст Шах заменяющую доверенность, по форме и содержанию удовлетворительную для Шах. Общество за свой собственный счет должно совершить или допустить совершение каждого акта или действия, и подписать и вручить каждый документ или инструмент, который Шах или Паспортный Банк могут периодически затребовать для придания действительности любой доверенности или заменяющей доверенности, предоставленной в соответствии с настоящим Разделом 5.02.

## ARTICLE VII - ACCESS TO RUSSIAN ACCOUNT RECORDS

## СТАТЬЯ VII – ДОСТУП К ОТЧЕТНОСТИ ПО РОССИЙСКОМУ СЧЕТУ

### Section 7.01.    Documents Relating to the Russian Accounts

### Раздел 7.01. Документы, относящиеся к Российским Счетам

(a)    The Company shall promptly provide Shah with copies of all agreements, documents and instruments evidencing the opening of the Russian Account in form and substance satisfactory to Shah.

(a)    Общество должно незамедлительно предоставлять Шах копии всех договоров, документов и инструментов, подтверждающих открытие Российского Счета, по форме и содержанию удовлетворяющие Шах.

(b)    The Company hereby authorizes the Passport Bank, in accordance with Article 857 of the Civil Code of the Russian Federation, to provide and disclose to Shah all information with respect to the Russian Account contemplated in this Agreement or the Existing Loan Agreement. The Company undertakes to promptly take all such steps as necessary to give effect to the above authorizations, including the issuance of the power of attorney to Shah as provided in Section 5.02.

(b)    Общество настоящим уполномочивает Паспортный Банк, в соответствии со Статьей 857 Гражданского кодекса Российской Федерации предоставлять и раскрывать Шах всю информацию в отношении Российского Счета, предусмотренную в настоящем Договоре или в Существующем Договоре Займа. Общество обязуется безотлагательно совершать все те действия, которые необходимы для придания действительности вышеуказанным полномочиям включая выдачу

Разделе 5.02.

(c)     The Company and the Passport Bank shall, at the Company's cost and expense, provide Shah with such other information relating to the Russian Account or any transactions effected or to be effected in respect of the Russian Accounts as Shah may from time to time request.

(d)     The Passport Bank shall provide such information regarding the Russian Accounts to any Authority as any such Authority may from time to time request (within the scope of the competence of such Authority) and shall promptly advise the Company and Shah in writing when any such information is so requested or provided.

(e)     The Passport Bank and the Company shall permit representatives of Shah (including, without limitation, any consultants engaged by Shah) to have access to their records where Shah has requested such access in writing no less than one (1) Business Day in advance. If an event of default under the Bridge Loan has occurred, then access to the records of the Passport Bank and the Company may take place without notice and at any time which Shah considers appropriate in the circumstances.

ARTICLE VIII - RIGHTS, POWERS AND DUTIES OF THE PASSPORT BANK

Section 8.01.    Compliance    by    the Passport Bank with Payment Orders and Payment Demands

(a)     The Passport Bank shall at all times act only in accordance with this Agreement, any Payment Order or Payment Demand conforming to the requirements of this Agreement, the Bank Account Agreements and applicable law and shall promptly follow

(c)     Общество и Паспортный Банк предоставляют Шах за счет Общества такую иную информацию, относящуюся к Российскому Счету или любым операциям, совершенным или подлежащим совершению в отношении Российских Счетов, которую Шах может периодически затребовать.

(d)     Паспортный Банк предоставляет ту информацию в отношении Российских Счетов любому Органу, которую такой Орган может периодически запрашивать (в пределах сферы компетенции такого Органа), и безотлагательно письменно извещает Общество и Шах о фактах запросов или предоставления такой информации.

(e)     Паспортный Банк и Общество предоставляют представителям Шах (включая, кроме прочего, любых консультантов, нанятых Шах) доступ к своим документам в случае, когда Шах письменно обратился за предоставлением такого доступа заранее, не менее чем за один (1) Рабочий День. В случае наступления события неисполнения по Промежуточному Займу, доступ к документам Паспортного Банка и Общества может быть осуществлен без уведомления и в любое время, которое Шах сочтет уместным в данных обстоятельствах.

СТАТЬЯ VIII – ПРАВА, ПОЛНОМОЧИЯ И ОБЯЗАННОСТИ ПАСПОРТНОГО БАНКА

Раздел 8.01. Исполнение Паспортным Банком Платежных Поручений и Платежных Требований

(a)     Паспортный Банк неизменно действует исключительно в соответствии с настоящим Договором, любым Платежным Поручением или Платежным Требованием, согласующимися с требованиями настоящего Договора,

Demands properly given and at all times credit the Russian Account, make deposits into and payments, conversions and transfers from the Russian Account only as required by this Agreement, the Bank Account Agreements, the Standing Payment Order or Payment Demand and applicable law. The Passport Bank shall not perform (unless required by applicable law) any request from the Company that is not made or issued in conformity with the requirements of this Agreement and shall immediately inform Shah and the Company, respectively, of any such non-conforming request.

применимого законодательства, и безотлагательно исполняет все и всяческие Платежные Поручения и Платежные Требования, изданные должным образом, и неизменно зачисляет средства на Российский Счет, помещает депозиты и совершает платежи, конвертацию и переводы с Российского Счета только в соответствии с требованиями настоящего Договора, Договоров Банковского Счета, Платежного Поручения о Постоянных Платежах или Платежного Требования и применимого законодательства. Паспортный Банк не выполняет (если только того не требует применимое законодательство) какое-либо поручение со стороны Общества, которое не выдано или не издано в соответствии с требованиями настоящего Договора, и безотлагательно извещает Шах и Общество соответственно о любом таком поручении, не согласующемся с требованиями.

(b)    In the event that the Passport Bank is unsure as to the application of any provision of this Agreement, the performance under any Payment Order or Payment Demand or as to any action to be taken by it under this Agreement (including without limitation any action to be taken after an event of default under the Bridge Loan has occurred and is continuing), it may request and rely upon (and the Company hereby expressly confirms that the Passport Bank may request and rely upon) written clarification of Shah.

(b)    В том случае, если у Паспортного Банка появляются сомнения в отношении применения любого положения настоящего Договора, совершения действий по любому Платежному Поручению или Платежному Требованию, или в отношении любого действия, которое ему надлежит совершить по настоящему Договору (включая, кроме прочего, любое действие, подлежащее совершению после наступления и во время продолжения события неисполнения по Промежуточному Займу), он вправе запросить и полагаться (а Общество настоящим прямо подтверждает, что Паспортный Банк вправе запросить и полагаться) на письменное разъяснение Шах.

(c)    In the event the Passport Bank is unable to effect any operation or transaction required under this Agreement or any Payment Order or Payment Demand or to refuse performance of any non-conforming

(c)    В том случае, если Паспортный Банк не способен осуществить какую-либо операцию или сделку, которую надлежит осуществить по настоящему Договору или любому Платежному

applicable law, it shall as promptly as possible but in any event no later than on the Moscow Business Day following the date of the occurrence of the relevant event, notify in writing Shah and the Company of such event.

Требованию, или если он не может отказаться от выполнения какого-либо не отвечающего требованиям поручения в силу обязательного для исполнения требования применимого законодательства, он, в кратчайшие возможные сроки, но в любом случае не позднее Московского Рабочего Дня, следующего за днем наступления соответствующего события, письменно уведомляет Шах и Общество о таком событии.

(d)    Except as expressly permitted by this Agreement or as may be required by applicable law, the Passport Bank agrees that it shall not, without the prior written consent of Shah (and if the Passport Bank is required to do so by any mandatory requirement of applicable law, it shall immediately notify Shah and the Company):

(d)    Паспортный Банк выражает согласие с тем, что, за исключением случаев когда настоящим Договором прямо разрешается иное, или когда иное может потребоваться в соответствии с применимым законодательством, он не будет без предварительного письменного согласия Шах (а если от Паспортного Банка потребуется сделать это согласно любому обязательному для исполнения требованию применимого законодательства, он незамедлительно предоставит соответствующее уведомление Шах и Обществу):

(i)    encumber, transfer or release all or any part of the funds credited to the Russian Account maintained by it in any manner not in accordance with this Agreement or any Payment Order or Payment Demand issued during the Term;

(i)    обременять, передавать или выдавать все или любую часть денежных средств, зачисленных на Российский Счет, поддерживаемый им, любым образом, не соответствующим настоящему Договору или любому Платежному Поручению или Платежному Требованию, выданному в течение Срока.

(ii)    recognize any interest of any person in or in respect of the Russian Account other than arising out of operation of any mandatory requirement of applicable law and pursuant to the terms of this Agreement; or

(ii)    признавать любое право собственности любого лица на, или в отношении Российского Счета, кроме права собственности, возникшего в силу действия обязательного для исполнения требования применимого законодательства и согласно условиям настоящего Договора; либо

(iii)    take any other action or otherwise deal

(iii)    предпринимать любые другие

Account.

операции по всему Российскому Счету или по любой его части.

**Section 8.02.    Notification of Shah by the Passport Bank**

**Раздел 8.02.    Уведомление    Шах Паспортным Банком**

The Passport Bank shall, at the Company's cost and expense, no later than on the Moscow Business Day following the date when the Passport Bank became aware of any of the following, notify Shah if:

Паспортный    Банк    предоставит соответствующее уведомление Шах, (с отнесением    соответствующих    расходов на    счет    Общества),    не    позднее следующего Московского Рабочего Дня, следующего за днем, когда Паспортному Банку· станет известно о наступлении любого из следующих обстоятельств:

(i)    the Company attempts to amend in any way any provision of, or terminate the Bank Account Agreements, or close the Russian Account;

(i)    Общество    попытается    изменить каким-либо    образом    любое положение Договоров Банковского Счета или расторгнуть Договоры Банковского Счета, либо закрыть Российский Счет;

(ii)    any person other than the Company requests to withdraw, or becomes entitled to withdraw, moneys standing to the credit of any of the Russian Account    pursuant    to    any    debt authority,    payments    instruction, withdrawal agreement, enforcement order,    court    judgment,    arbitration award or otherwise;

(ii)    любое    лицо,    кроме    Общества, попытается    снять    или    получит право    на    снятие    денежных средств,    находящихся    на Российском    Счете,    согласно любому решению о взыскании задолженности,    платежному поручению, договору о снятии средств,    приказу    о принудительном осуществлении в судебном порядке, решению суда, арбитражному решению или на ином основании;

(iii)    an injunction, suspension order or similar arrangement is imposed on the Russian Account, which leads to the restrictions of any nature on the withdrawal or transfer of all or any moneys from or into the Russian Account, including as a result of the application of any normative acts or court practice which adversely affect (or may adversely affect) any rights of Shah under this Agreement;

(iii)    в отношении Российского Счета будет наложен судебный запрет, выдано    предписание    о приостановке    операций,    или приняты аналогичные меры, что приведет    к    возникновению ограничений любого характера по снятию с Российского Счета или перечислению на Российский Счет всех или любой части денежных средств, в том числе в результате применения любых нормативных актов    или    судебных    процедур, оказывающих    негативное воздействие    (или    способных

(iv) the Company grants (or purports to grant) an Encumbrance over the Russian Account, moneys standing to the credit of the Russian Account, or rights relating thereto, in favor of any person; or

(iv) Общество предоставит (или будет намереваться предоставить) Обременение в отношении Российского Счета, денежных средств, находящихся на Российском Счете, или относящихся к нему прав, в пользу любого лица; или

на любые права Шах по настоящему Договору;

(v) any court or enforcement proceedings (or any other proceedings or bringing a suit or claim which may lead to a court proceeding) are initiated with respect to any of the Russian Account,

(v) в отношении любого из Российских Счетов будет начато судебное разбирательство или исполнительное производство (или будет начато любое другое разбирательство, или подан иск или претензия, которые могут привести к судебному разбирательству),

except, in each case, in accordance with this Agreement.

кроме как, в каждом случае, в соответствии с настоящим Договором.

### Section 8.03.    Waiver of Rights of Set-Off and Other Rights

### Раздел 8.03.  Отказ от прав на зачет и иных прав

The Passport Bank agrees that it shall not have, and undertakes not to claim or exercise, any Encumbrance, right of set-off, combination of the account or other right, remedy or security against or with respect to the Russian Account (whether arising by law or otherwise).

Паспортный Банк выражает согласие с тем, что он не будет использовать и обязуется не требовать использования и не использовать любое Обременение, право зачета, сочетание счетов или иное право, средство правовой защиты или обеспечение по, или в отношении Российского Счета (возникающее как по закону, так и иным образом).

### Section 8.04.    Compensation and Fees

### Раздел 8.04.  Компенсация и оплата услуг

(a) The Company shall pay to the Passport Bank such transaction charges, currency exchange fees and other fees and charges in accordance with the tariffs established by the Passport Bank.

(a) Общество выплачивает Паспортному Банку комиссии за проведение операций, конвертаций или любые иные комиссии в соответствии с тарифами, установленными Паспортным Банком.

(b) The Passport Bank agrees that it shall have no right against Shah for any fees and charges in respect of any of the Russian

(b) Паспортный Банк выражает согласие с тем, что у него не будет каких-либо прав в отношении Шах на любую

Account.

(c)    The Passport Bank may withdraw its charges from any accounts other than the Russian Account opened and maintained by the Company with the Passport Bank.

## ARTICLE IX - LIMITATION OF LIABILITY

**Section 9.01.    Limitation of Liability**

(a)    To the extent permitted by applicable law, the parties acknowledge and agree that:

(i)    each of Shah and the Passport Bank will not in any way be liable or responsible to the Company for any loss or liability arising from the exercise or purported exercise of any of its rights, powers or discretions under this Agreement; and

(ii)    neither Shah nor the Passport Bank shall incur any liability in connection with any power of attorney granted pursuant to this Agreement or the rights transferred to Shah pursuant to this Agreement.

(b)    The Company hereby ratifies and confirms (and agrees that it will ratify and confirm, whenever reasonably requested by Shah) whatever Shah, persons appointed by Shah or any other person to which Shah properly delegates its authority does or purports to do under any power of attorney issued by the Company hereunder.

---

к любому из Российских Счетов.

(c)    Паспортный Банк вправе списывать причитающиеся ему комиссии с любых счетов Общества, открытых в Паспортном Банке, за исключением Российского Счета.

## СТАТЬЯ IX – ОГРАНИЧЕНИЕ ОТВЕТСТВЕННОСТИ

**Раздел 9.01.  Ограничение ответственности**

(a)    В той мере, в которой это разрешается применимым законодательством, стороны подтверждают и выражают согласие с тем, что:

(i)    как Шах, так и Паспортный Банк не будут каким-либо образом ответственны или нести обязательства перед Обществом за любой убыток или обязательство, возникшее в результате осуществления или намерения осуществить любое из его прав, полномочий или дискреционных прав на настоящему Договору; и

(ii)    ни у Шах, ни у Паспортного Банка не возникнет каких-либо обязательств в связи с любой доверенностью, предоставленной согласно настоящему Договору, или правами, переданными Шах согласно настоящему Договору.

(b)    Общество настоящим одобряет и утверждает (и обязуется одобрять и утверждать всякий раз при получении обоснованного запроса от Шах) любые действия, которые Шах, лица, назначенные Шах, или любое иное лицо, которому Шах надлежащим образом делегирует свои полномочия, предпринимают или намереваются предпринять на основании доверенности, выдаваемой Обществом в соответствии с настоящим Договором.

ARTICLE X - MISCELLANEOUS PROVISIONS

СТАТЬЯ X – ПРОЧИЕ ПОЛОЖЕНИЯ

Section 10.01.    Amendment and Waivers

Раздел 10.01. Внесение изменений и отказ от прав

Any amendment of any provision of this Agreement shall be in writing and signed by the parties.   To the extent permitted by applicable law of the Russian Federation, no failure or delay in exercising any power, remedy, discretion, authority or other rights under this Agreement and no course of dealing between Shah and the Company and/or the Passport Bank shall waive or impair that or any other right of Shah. No partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof and no exercise of any right, power or remedy shall preclude the exercise of any other right, power or remedy. All waivers or consents given under this Agreement shall be in writing and signed by each party granting the waiver.

Любое изменение к любому положению настоящего Договора оформляется в письменном виде и подписывается сторонами. В пределах, разрешенных применимым законодательством Российской Федерации, никакое неиспользование или задержка в использовании любого полномочия, средства правовой защиты, дискреционного права, правомочия или иных прав по настоящему Договору и никакая практика деловых отношений между Шах и Обществом и/или Паспортным Банком не будут являться отказом от любого данного или иного права Шах, или наносить ущерб любому иному праву Шах. Никакое частичное использование любого права, полномочия или привилегии по настоящему Договору не препятствует какому-либо иному или дальнейшему использованию таковых, и никакое использование любого права, полномочия или средства правовой защиты не препятствует использованию любого иного права, полномочия или средства правовой защиты. Все заявления об отказе от прав или согласии, предоставленные по настоящему Договору, оформляются в письменном виде и подписываются каждой стороной, предоставляющей отказ от права.

Section 10.02.    Release

Раздел 10.02. Передача прав

This Agreement shall automatically terminate upon expiry of the Term. Upon the termination of this Agreement, Shah shall, at the request and expense of the Company, release to the Company all the rights of Shah in respect to the Russian Account and give such instructions and directions as may be required in order to perfect such release. Shah shall also return to the Company (i) all powers of attorney issued to Shah or any of its representative in relation to any Russian

Настоящий Договор автоматически прекращает свое действие по истечении Срока. По прекращении действия настоящего Договора Шах, по просьбе и за счет Общества, передает Обществу все права Шах в отношении Российского Счета, и предоставляет такие инструкции и указания, которые могут потребоваться для осуществления такой передачи. Шах также возвращает Обществу (i) все доверенности, выданные Шах или

of the Company, any other document or instrument in Shah's possession that may give any rights or powers to, or in respect of, any Russian Account.

Section 10.03.    Notices

Any notice or request required or permitted to be given or made under the terms of this Agreement shall be in writing. Such notice or request shall be deemed to have been duly given or made when it shall be delivered by hand, mail or telefax to the party to which it is required or permitted to be given or made at such party's address specified below or at such other address as such party shall have designated by notice to the party giving such notice or making such request.

For Shah:

Bipin Shah
425 East 58th Street
Suite 43H
New York, New York 10022
United States of America
Fax No. (212) 832-5333

and

Andrew E. Lippmann, Esq
345 Park Avenue – 19th Floor
New York, N.Y. 10154-0037
United States of America
Fax No. (212) 202-7690

For the Company:

Limited Liability Company
"Investment Lottery company"

Attention: Dr. Atik Zamman
Yana Rainisa Boulevard, Building 1

---

любого из Российских Счетов и (ii) по требованию и за счет Общества – любой иной документ или инструмент, находящийся у Шах, согласно которому могут предоставляться любые права или полномочия на любой Российский Счет, или в отношении такового.

Раздел 10.03. Уведомления

Любое уведомление или запрос, требующиеся или допускаемые по условиям настоящего Договора должны оформляться в письменном виде. Такое уведомление или запрос будут считаться направленными должным образом, если они будут вручены лично, направлены почтой или телексом для стороны, которой их необходимо или допустимо направить, по адресу данной стороны, указанному ниже, или по другому адресу, который будет сообщен такой стороной той стороне, которая направляет соответствующее уведомление или запрос.

Для Шах:

Bipin Shah
425 East 58th Street
Suite 43H
New York, New York 10022
United States of America
Факс: (212) 832-5333

и

Andrew E. Lippmann, Esq
345 Park Avenue – 19th Floor
New York, N.Y. 10154-0037
United States of America
Факс: (212) 202-7690

Для Общества:

Общество с ограниченной ответственностью "Инвестиционная Лотерейная компания"

Вниманию: Доктора Атика Замана
Россия, г. Москва, 125363

125363 Moscow, Russia
Fax: +7 095 787 5221

бульвар Яна Райниса, д. 1
Факс: +7 095 787 5221

For the Passport Bank:

Obibank Ltd
Attention: _____
13 Donskaya Street, Building 1
119049 Moscow, Russia
Fax: _____

Для Паспортного Банка:

ООО КБ "Обибанк"
Вниманию: _____
Россия, г. Москва, 119049
улица Донская, дом 13, строение 1
Факс: _____

| Section 10.04.    English Language | Раздел 10.04. Английский язык |
|---|---|
| This Agreement has been made in both the English and Russian languages. In the event of a conflict in meaning between the English and Russian versions of the executed copy of this Agreement, the English version of the executed copy of this Agreement shall prevail, and such English version shall be the only version considered by any court or arbitration tribunal. All documents to be furnished or communications to be given or made under this Agreement shall be in the English language, or, if in another language, shall be accompanied by a translation into English certified by the Company or the Passport Bank, which translation shall be the governing version among the Company, the Passport Bank and Shah. At the request of the Passport Bank, Payments Orders and Payment Demands submitted to the Passport Bank in the English language should be accompanied by their translation into Russian, the original English version of the relevant document being the governing version among the Company, the Passport Bank and . | Настоящий Договор составлен на английском и русском языках. В случае расхождений между английской и русской версиями подписанной копии настоящего Договора английская версия подписанного экземпляра настоящего Договора будет иметь преобладающую силу, и только она подлежит принятию во внимание судебными органами или третейским судом. Все документы или сообщения, подлежащие предоставлению согласно настоящему Договору, составляются на английском языке или, если они составлены на ином языке, сопровождаются переводом на английский язык, заверенным Обществом или Паспортным Банком, и такой перевод будет иметь преобладающую силу для Общества, Паспортного Банка и Шах. По запросу Паспортного Банка Платежные Поручения и Платежные Требования, направленные Паспортному Банку на английском языке, должны сопровождаться переводом на русский язык, при этом английская версия соответствующего документа будет иметь преобладающую силу для Общества, Паспортного Банка и . |
| Section 10.05.    No Limitation of remedies | Раздел 10.05. Отсутствие ограничений в отношении средств правовой защиты |
| (a)    To the extent permitted by applicable law, Shah may enforce or request enforcement of any provision of this | (a)    В пределах, разрешенных применимым законодательством, Шах может осуществить принудительное |

Agreement and the rights granted under this Agreement without having first to exercise any other remedy available to Shah or to enforce any other security or rights that Shah may otherwise have against the Company or its property or assets.

применение или потребовать принудительного применения любого положения настоящего Договора и прав, предоставленных по настоящему Договору, без необходимости использования до этого любого иного средства правовой защиты, имеющегося у Шах, или в принудительном применении любого иного обеспечения или прав, которыми Шах может располагать на иных основаниях в отношении Общества либо его имущества или активов.

(b)    To the extent permitted by applicable law, each of the Company and the Passport Bank expressly agrees that it will not be entitled to any demand, protest or other notice of any kind prior to the taking of any action to enforce or request the enforcement of this Agreement, and that it will not be a defense to any enforcement proceeding that any demand, protest or other notice of any kind was not given to it.

(b)    В пределах, разрешенных применимым законодательством, как Общество, так и Паспортный Банк прямо выражают свое согласие с тем, что каждый из них не будет иметь права на предоставление любого требования, протеста или иного уведомления любого рода до осуществления каких-либо действий с целью обеспечения принудительного исполнения или с целью заявления требования о принудительном исполнении настоящего Договора, и тот факт, что какое-либо требование, протест или иное уведомление любого рода не было предоставлено кому-либо из них, не будет являться защитой против осуществления исполнительного производства.

(c)    This Agreement shall not be construed as limiting or in any way precluding the exercise by Shah of any rights and powers it may have under applicable law.

(c)    Настоящий Договор не должен истолковываться как договор, ограничивающий осуществление Шах или каким-либо образом препятствующий осуществлению Шах любых прав и полномочий, которые Шах может иметь в соответствии с применимым законодательством.

## Section 10.06.    Governing Law

This Agreement shall be governed by, and construed in accordance with, the laws of the Russian Federation.

## Раздел 10.06. Регулирующее право

Настоящий Договор регулируется и истолковывается в соответствии с законодательством Российской Федерации.

## Section 10.07.    Arbitration

(a)    Any dispute under this Agreement

## Раздел 10.07. Арбитраж

(a)    Все споры по настоящему

shall be referred to and finally resolved by arbitration in accordance with the Rules of Arbitration ("Rules") of the London Court of International Arbitration ("LCIA"), and such Rules are considered as part of this Section. The tribunal shall consist of three arbitrators appointed by LCIA as the nominating authority in accordance with the Rules. The seat of arbitration shall be London. The language of the arbitration proceedings shall be English.

(b)    Section 10.07(a) shall not prevent Shah from taking proceedings in any other court for enforcement of an arbitration award, or for interim or injunctive relief in connection with arbitration proceedings.

### Section 10.08.    Jurisdiction

This Agreement and any rights of Shah arising out of or relating to this Agreement may, at the option of Shah only, be enforced by it in the courts of the Russian Federation located in Moscow, the courts of England or in any other courts having jurisdiction.

### Section 10.09.    Successors and Assigns

(a)    This Agreement shall bind and inure to the benefit of the respective successors and assigns of its parties, except that the Company and the Passport Bank may not assign or transfer any of their respective rights and obligations under this Agreement without the prior consent of Shah.

(b)    Shah may at any time assign any of its rights under this Agreement to any other

---

Договору будут передаваться на рассмотрение и для окончательного разрешения в соответствии с регламентом ("Регламент") Лондонского международного арбитражного суда в Лондоне, Англия ("ЛМАС"). Данный Регламент считается составной частью настоящего Раздела. Споры будут рассматриваться тремя арбитрами, назначаемыми ЛМАС в соответствии с Регламентом. Местом арбитража будет Лондон. Споры будут слушаться на английском языке.

(b)    Условия Раздела 10.07(a) не препятствуют Шах инициировать разбирательство в любом другом суде для целей принудительного исполнения арбитражного решения, либо для целей принятия обеспечительных мер или судебного запрета в связи с арбитражным разбирательством.

### Раздел 10.08. Юрисдикция

Шах может, исключительно по своему усмотрению, обеспечить принудительное исполнение настоящего Договора и любых прав Шах, возникающих по, или в связи с настоящим Договором, в судах Российской Федерации, находящихся в г. Москве, судах Англии или любых других судах, имеющих соответствующую юрисдикцию.

### Раздел 10.09. Правопреемники и цессионарии

(a)    Настоящий Договор является обязательным для, и юридически действует в пользу соответствующих правопреемников и цессионариев сторон настоящего Договора, за тем исключением, что Общество и Паспортный Банк не могут уступать или передавать любые из своих соответствующих прав и обязательств по настоящему Договору без предварительного согласия Шах.

(b)    Шах может в любое время уступить любое из своих прав по

person.

настоящему Договору любому иному лицу.

Section 10.10.    Severability

Раздел 10.10. Делимость

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under applicable law of any jurisdiction, such illegality, invalidity or unenforceability shall not affect:

Если в какой-либо момент любое положение настоящего Договора окажется или станет незаконным, недействительным или неисполнимым в принудительном порядке в любом отношении согласно применимому праву любой юрисдикции, такая незаконность, недействительность или неисполнимость в принудительном порядке не отразится на:

(i)    the legality, validity or enforceability of the remaining provisions of this Agreement which shall be deemed severable; or

(i)    законности, действительности или исполнимости в принудительном порядке остальных положений настоящего Договора, которые считаются делимыми; либо

(ii)    the legality, validity or enforceability of such provision under applicable law of any other jurisdiction.

(ii)    законности, действительности или исполнимости в принудительном порядке такого положения согласно применимому праву другой юрисдикции.

The Company, the Passport Bank and Shah expressly agree that each provision and all provisions of this Agreement would have been concluded despite any invalidity or nullity of any other provision or provisions of this Agreement. The Company, the Passport Bank and Shah shall, in the case of any such invalidity or nullity, take all acts reasonably necessary in order to realize the intention of the invalid or null and void provision, including making any amendments or supplements to this Agreement, all the while adhering to any applicable laws or regulations.

Общество, Паспортный Банк и Шах прямо выражают свое согласие с тем, что каждое положение и все положения настоящего Договора были бы заключены, несмотря на любого рода недействительность или ничтожность любого другого положения или положений настоящего Договора. В случае любой такой недействительности или ничтожности Общество, Паспортный Банк и Шах предпримут все действия, обоснованно необходимые для реализации цели недействительного и ничтожного положения, включая внесение всех изменений и дополнений в настоящий Договор, однако при неизменном соблюдении любого применимого законодательства и норм.

Section 10.11.    Change of Circumstances

Раздел 10.11. Изменение обстоятельств

The Company, the Passport Bank and Shah hereby acknowledge and agree that a substantial change in circumstances shall not

Общество, Паспортный Банк и Шах настоящим подтверждают и выражают свое согласие с тем, что существенное

constitute a basis for modification or termination of this Agreement by the Company or the Passport Bank pursuant to Article 451 of the Civil Code of the Russian Federation.

изменение обстоятельств не является основанием для изменения или расторжения настоящего Договора Обществом или Паспортным Банком в соответствии со Статьей 451 Гражданского Кодекса Российской Федерации.

**Section 10.12. Number of Signed Originals**

**Раздел 10.12. Число подписанных оригиналов**

This Agreement may be signed in any number of signed originals, each of which will be considered to be an original, but all of which shall together constitute one and the same agreement.

Настоящий Договор может быть подписан в любом количестве оригинальных экземпляров, каждый из которых будет считаться оригиналом, а все они вместе будут составлять один и тот же договор.

The Company, Shah and the Passport Bank have caused by their duly authorized officers this Agreement to be signed in their respective names as of the date written in the Preamble of this Agreement.

Общество, Шах и Паспортный Банк обеспечили подписание настоящего Договора своими надлежащим образом уполномоченными должностными лицами, от их имени в дату, указанную в Преамбуле настоящего Договора.

**SIGNATURES OF THE PARTIES**

**ПОДПИСИ СТОРОН**

LIMITED LIABILITY COMPANY "INVESTMENT LOTTERY COMPANY"

ОБЩЕСТВО С ОГРАНИЧЕННОЙ ОТВЕТСТВЕННОСТЬЮ "ИНВЕСТИЦИОННАЯ ЛОТЕРЕЙНАЯ КОМПАНИЯ"

By:_____
Name:
Title:

Подпись:_____
Ф.И.О.:
Должность:

By:_____
Name:
Title: Chief Accountant
Seal

Подпись:_____
Ф.И.О.:
Должность: Главный бухгалтер
Печать

COMMERCIAL BANK "OB'EDINENNYI INVESTITSIONNYI BANK" (LIMITED LIABILITY COMPANY)

ОБЩЕСТВО С ОГРАНИЧЕННОЙ ОТВЕТСТВЕННОСТЬЮ КОММЕРЧЕСКИЙ БАНК "ОБЪЕДИНЕННЫЙ ИНВЕСТИЦИОННЫЙ БАНК"

By:_____
Name:
Title:

Подпись:_____
Ф.И.О.:
Должность:

By:_____
Name:
Title: Chief Accountant
Seal

Подпись:_____
Ф.И.О.:
Должность: Главный бухгалтер
Печать

BIPIN SHAH -- Lender

Name:
Title:

БИПИН ШАХ - Займодатель

Ф.И.О.:
Должность:

Exhibit D

FIRST EXTENSION AND MODIFICATION AGREEMENT (this "Modification Agreement" or "Agreement") dated and effective as of September 27, 2005 (the "Effective Date") by and among RLI PARTNERS, LIMITED ("RLI"), and LIMITED LIABILITY COMPANY, "INVESTMENT LOTTERY COMPANY"(collectively, "Borrower"); and BIPINCHANDRA SHAH ("Lender").

## Background

A.  Borrower and Lender entered into that certain Loan Agreement dated as of July 29, 2005 (as the same may be amended, modified or restated from time to time, the "Loan Agreement") pursuant to which Lender agreed to make a $3,000,000 Loan to Borrower.

B.  The Loan Agreement required that the Loan be repaid in full on the Termination Date of September 27, 2005, and Borrower was and has been unable to repay the Loan and an Event of Default has occurred with respect thereto.

C.  Borrower has requested that Lender extend the maturity date of the Loan and Lender has agreed to do so provided Borrower enter into this Modification Agreement.

## Agreement

The parties agree as follows:

1.  Defined Terms. Capitalized terms used herein without definition and which are defined in the Loan Agreement are used herein with the meaning given to such terms in the Loan Agreement.

2.  Modifications of Loan Agreement.

(a)  The Loan Agreement is hereby modified as follows:

(i)  The Base Rate as defined in Section 1.1 of the Loan Agreement is hereby amended to be fifteen percent (15%) per annum from and after the period commencing on September 27, 2005.  All interest under the Loan shall continue to accrue under the Loan at the Base Rate and shall be due and payable on the Termination Date, as extended pursuant to paragraph (ii) below.

(ii)  The Termination Date is extended to January 17, 2006, time of the essence as to such final date.  Borrower acknowledges and agrees that repayment of all Obligations due and owing under the Loan on such date is a material inducement to Lender agreeing to the extension and if Borrower fails to repay all amounts of principal, interest and other Obligations due and owing under the Loan on or before such final date, Borrower, in addition to all such other amounts due, shall pay an additional fee of three percent (3%) of all of such Obligations.

(iii)    Notwithstanding anything to the contrary contained in Section 9.4, Borrower shall pay to Lender within ten (10) days of the date hereof an amount equal to fifty percent (50%) of the attorneys fees of Lender's counsel incurred to date and paid by Lender, and one hundred percent (100%) of such attorney's fees (approximately $5,000) incurred with respect to the default by Borrower and the drafting, preparation and revision of this Modification Agreement.

(iv)    Borrower shall promptly furnish to Lender a bank statement, bank certificate or other proof acceptable to Lender from Commercial Bank "Ob'edinennyi Investitsionnyi Bank" (Limited Liability Company) ("Obibank") indicating that the proceeds of the Loan of USD$3,000,000 continue to be held in a separate account in the name of Borrower and not commingled with any other assets of any other party, have not been withdrawn and may continue to be withdrawn at any time by Lender pursuant to the Loan Documents, the Agreement Granting Rights To Debit the Russian Account dated July 29, 2005 between Lender, ObiBank and Investment Lottery Company, and the Framework Agreement dated July 18, 2005 between Lender, Borrower, ObiBank and certain other parties thereto.

3.    <u>Ratification of Loan Documents</u>. Except as modified hereby, all terms, covenants and conditions of the Loan Documents remain in full force and effect and are hereby ratified and confirmed by each of the parties hereto. Borrower hereby confirms that the outstanding principal balance of the Loan is $3,000,000 and that there is an Event of Default under the Loan Agreement. Borrower and each Guarantor hereby confirms that it, he or she has no offsets, defenses or counterclaims with respect to the Loan Documents to which it, he or she is a party and to the extent any such offset, defense or counterclaim exists without its, his or her knowledge, the same are hereby waived to the fullest extent allowed by law. The modification of the Loan Agreement specified herein is limited precisely as written and shall not be deemed (a) to be a consent to, or waiver of, or modification or amendment of, any other term or condition of the Loan Agreement or any other document referred to therein or (b) to prejudice any right or rights which Lender now has or may have in the future under, or in connection with, the Loan Agreement. Borrower acknowledges and agrees that they will each receive a substantial financial benefit from the execution of this Modification Agreement.

4.    <u>Successors and Assigns: No Waiver</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Any partial payment amounts made by the Borrower or any other party on the Borrower's behalf and accepted by Lender will not constitute a waiver of any default, waiver of demand, or waiver of any other right held by Lender under the Loan Documents including this Modification Agreement.

5.    <u>Jurisdiction, Venue, Service of Process</u>.    (a)  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY LOAN DOCUMENT SHALL BE BROUGHT, AT LENDER'S OPTION, IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN NEW YORK COUNTY, NEW YORK.

2

BORROWER HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. BORROWER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO BORROWER AT ITS ADDRESS FOR NOTICES PURSUANT TO SECTION 9.2 OF THE LOAN AGREEMENT. BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY LOAN DOCUMENT BROUGHT IN THE COURTS REFERRED TO ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY OTHER JURISDICTION.

6.    Counterparts. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart.

IN WITNESS WHEREOF, the parties hereto have caused this Modification Agreement to be duly executed and delivered as of the day and year first above written.

RLI PARTNERS, LIMITED

By:  _____
     Name:  Richard Olsen
     Title:   Chairman

LIMITED LIABILITY COMPANY,
"INVESTMENT LOTTERY COMPANY"

By:  _____
     Name:  Dr. Atik Zamman
     Title:   Director General

3

Bipinchandra Shah

4

Exhibit E



# AWARD

裁决

قرار التحكيم

## LCIA
Arbitration and ADR worldwide

LAUDO ARBITRAL    Arbitration No: 6827

SENTENCE ARBITRALE

АРБИТРАЖНОЕ РЕШЕНИЕ    www.lcia.org

LCIA CASE No 6827

BETWEEN:

BIPINCHANDRA SHAH

Claimant

v

(1) RLI PARTNERS, LIMITED

(2) LIMITED LIABILITY COMPANY "INVESTMENT LOTTERY COMPANY"

(3) LIMITED LIABILITY COMPANY "INVESTMENT FINANCIAL COMPANY 'METROPOL'"

(4) COMMERCIAL BANK "OBI" EDINENNYI INVESTITSIONNYI BANK" (LIMITED LIABILITY COMPANY)

Respondents

FINAL AWARD
7 April 2008

I.          The Parties

1.    The Claimant is Bipinchandra Shah ("Mr Shah" or "Claimant") who is an individual and a citizen of the United States of America. Mr Shah's address is 425 East 58th Street, Suite 43H, New York, New York 10022-2300, USA.

2.    The Claimant is represented in this arbitration by Salans, Rockefeller Center, 620 Fifth Avenue, New York, New York 10020-2457, USA (John Hay Esq, Henry Fieldman Esq, Randy Bregman Esq).

3.    The First Respondent is RLI Partners Limited ("RLI" or "1st Respondent") which is a limited liability company organized and existing under the laws of Gibraltar. Its address at the commencement of this arbitration was Suite 23, Portland House, Glacis Road, Gibraltar. On 22 August 2007, the Tribunal received a fax from Mr

Carl A Sax of Strategic Partners Group, Suite 23, Portland House, Glacis Road, Gibraltar in response to its letter of 22 August 2007 sent to RLI at this address and corresponding fax number. This fax stated that this fax number belonged to Strategic Partners Group. By letter of 24 August 2007, Richard Olsen informed the Tribunal that RLI *"no longer utilizes Fiduciary Management Limited in Gibraltar since all operations have been suspended pending new financing"* and that further correspondence should be addressed to Mr Olsen's contact addresses.

4.    The Second Respondent is Investment Lottery Company ("ILC" or "2nd Respondent") which is a limited liability company organized and existing under the laws of the Russian Federation. Its address at the commencement of this arbitration was Attn: Dr Atik Zamman, Yan Raynis Street, 125363 Moscow, Russian Federation. By a letter of 10 June 2007, Richard Olsen informed the Tribunal and the Claimant that Mr Maksim Shkondin of ILC had informed him that ILC had suspended operations and dismissed all its staff. By letter of 24 August 2007 Mr Olsen confirmed he was forwarding all documents to Dr Zamman's assistant.

5.    The 1st and 2nd Respondents are represented in this arbitration by Richard Olsen, Zeller & Associates, 10261 East Bay Harbor Drive, 11th Floor, Bay Harbor Island, Florida 33154, USA.

6.    The Third Respondent is Investment Financial Company Metropol ("Metropol" or "3rd Respondent"), which is a limited liability company organised and existing under the laws of the Russian Federation. Its address is 13 Donskaya Street, Building 1, 119049 Moscow, Russian Federation.

7.    The Fourth Respondent is Ob'edinennyi Investitsionnyi Bank ("ObiBank" or "4th Respondent") which is a commercial bank and a limited liability company organized and existing under the laws of the Russian Federation. Its address is 13 Donskaya Street, Building 1, 119049 Moscow, Russian Federation.

8.    The 3rd and 4th Respondent were represented by Richard Olsen, Zeller & Associates, 10261 East Bay Harbor Drive, 11th Floor, Bay Harbor Island, Florida 33154, USA until 7 August 2007. Mr Olsen described himself as 'interim counsel' pending the appointment of another representative. Since 7 August 2007, the Tribunal received three communications from Ms Natalia Okuneva, 'Legal Advisor' to Metropol and ObiBank, submitted materials in connection with this arbitration. On 24 December 2007, the Tribunal received a letter from Clifford Chance LLP, 10 Upper Bank Street, Canary Wharf, London E14 5JJ (Robert Lambert and Lukasz Rozdeiczer) stated they had just been instructed by the 3rd and 4th Respondents.

9.    The Claimant and all of the Respondents are collectively referred to as the "Parties".

## II.   The Contractual Documents

10.   This arbitration concerns the following contractual documents:

   i)   A Framework Agreement of 29 July 2005 between Mr Shah, RLI, Metropol and ObiBank (the "Framework Agreement");

   ii)   A Loan Agreement of 29 July 2005 between Mr Shah and RLI (the "Loan Agreement");

   iii)   An agreement of 29 July 2005, granting rights to debit the Russian Agreement (the "Withdrawal Agreement") between ILC, ObiBank and Mr Shah;

   iv)   The first Extension and Modification Agreement ("Extension Agreement") between RLI, ILC and Mr Shah of 27 September 2006.

## III.   Commencement of Arbitration

11.   This arbitration was commenced pursuant to Article 6.1(b) of the Framework Agreement (described more fully in §§ 94-101 below) which provides,

   *"Any dispute under this Agreement or any of the Transaction Documents shall be referred to and finally resolved by arbitration in accordance with the Rules of Arbitration ("Rules") of the London Court of International Arbitration ("LCIA") and such Rules are considered as part of this clause. The tribunal shall consist of three arbitrators appointed by LCIA as the nominating authority in accordance with the Rules. The seat of arbitration shall be London. The language of the arbitration proceedings shall be English."*

12.   An identical arbitration clause is contained in Article 9.7(b) of the Loan Agreement and in Section 10.07 of the Withdrawal Agreement.

13.   The Extension Agreement provides that the provisions of the Loan Agreement remain in full force and effect except as modified by the Extension Agreement. (These contracts are described more fully in §§ 112-116 and § 117 below.) The Extension Agreement includes in its Article 5 a dispute resolution clause, which offers the alternative option to submit disputes to the non-exclusive jurisdiction of any state or federal court in New York county, New York, but which leaves the choice of jurisdiction to the Claimant's discretion (this matter is described more fully in § 126 below).

14.   The Claimant's Request for Arbitration, dated 20 September 2006, with Exhibits A - D, was received by the London Court of International Arbitration ("LCIA") on 22

September 2006.

15. On 27 September 2006, the Claimant submitted an additional copy of the Framework Agreement and two pages that had been missing from the original submission.

16. On 1 November 2006, the LCIA received a Brief Reply to Claim of Bipinchandra Shah, dated 28 October 2006, from Mr Olsen on behalf of all the Respondents.

## IV.   Appointment of Tribunal

17. On 10 November 2006, the LCIA notified the parties that, pursuant to Articles 5.4 and 5.5 of the LCIA Rules, the LCIA Court had appointed, as the Tribunal, David Goldberg, (SJ Berwin LLP, 10 Queen Street Place, London EC4R 1BE), Christer Söderlund (Advokatfirman Vinge, PO Box 1703, SE-111 87 Stockholm, Sweden) and Dr Julian D M Lew QC (20 Essex Street, London WC2R 3AL), with Dr Lew as Chairman.

18. Following this letter of 10 November 2006, the LCIA notified the Parties that unless otherwise agreed or directed by the Tribunal, the Claimant should file a Statement of Case, pursuant to Article 15.2 of the LCIA Rules (or elect to treat the Request for Arbitration as its Statement of Case, pursuant to Article15.3) within 30 days of receipt of this notice.

## V.   Representation of the Respondents

19. Until 7 August 2007, Mr Olsen represented all four Respondents, but described himself as 'interim counsel' pending the appointment of another representative. By a letter of 7 August 2007, to the Claimant and the Tribunal, Mr Olsen withdrew his representation of the 3rd and 4th Respondents due, in part, to his having *"had little cooperation in my requests for the production of documents for the Arbitration Tribunal"*.

20. The Tribunal wrote to the Parties on 19 June and 30 July 2007 asking Mr Olsen to produce a duly executed power of attorney.

21. On 14 August 2007, the Tribunal wrote to the Parties requesting:

   i) A power of attorney from Mr Olsen confirming his authority to represent the 1st and 2nd Respondents by 21 August 2007;

   ii) Metropol and ObiBank to provide the Tribunal with the name of their new counsel, with a power-of attorney to follow by 21 August 2007.

22. On 24 August 2007, Mr Olsen wrote to the Tribunal saying the issue of him being 'interim counsel' was addressed when he notified ObiBank and Metropol that he would no longer represent them. He advised the Tribunal that since he is

> "*Director and Officer of both ILC and RLI, and have represented them from the outset of this Arbitration, I am advising the Tribunal that I have the authority to act in this capacity and believe a power of attorney is unnecessary.*"

23. On 5 September 2007, the Tribunal wrote to the Parties stating that it accepted Mr Olsen's assurance as to his authority as counsel and as a director of the 1st and 2nd Respondents. It noted there was no response from 3rd and 4th Respondents.

24. On 14 September 2007, the Tribunal received a letter signed by Natalia Okuneva, "Legal Advisor", thanking it for exceptionally allowing ObiBank and Metropol to file relevant documents late. Ms Okuneva advised that "*On August 7, 2007 we unexpectedly received Mr Olsen's withdrawal from representation of ObiBank Ltd, and started looking for a lawyer to represent ObiBank Ltd and IFC 'Metropol'.*" Two further letters were received from Ms Okuneva regarding document production and defenses on 21 September and 17 October 2007.

25. On 18 September 2007, the Tribunal wrote to Ms Okuneva acknowledging her letter, stating that the 3rd and 4th Respondents "*are now significantly out of time and the Tribunal has exceptionally extended the time on several occasions, the last of which expired yesterday.*"

26. On 2 October 2007, Procedural Order No 3 was issued, ordering that by no later than 15 October 2007, Mr Olsen should provide the Tribunal with proof he is an officer of RLI and ILC (Paragraph 5) and that Ms Okuneva should provide the Tribunal and the Parties with a power of attorney confirming she is authorised to represent the 3rd and 4th Respondents. (Paragraph 6). Neither of these orders were complied with.

27. By letter dated 31 October 2007 and an email on 13 November 2007 addressed to all the parties the Tribunal specifically sought confirmation from Mr Olsen and Ms Okuneva that they would be attending the hearing to represent the 1st and 2nd Respondents and 3rd and 4th Respondents respectively. No replies were received from Mr Olsen or Ms Okuneva and neither attended the hearing.

28. On 24 December 2007, the Tribunal received a letter from Clifford Chance stating they had just received instructions from the 3rd and 4th Respondents in this matter. This letter expressed concern that Mr Olsen had purported to represent the 3rd and 4th Respondents in his capacity as a member of Zeller & Associates LLC, whilst being a Director of ILC and the Chairman of RLI. The letter stated "*the interests of RLI and ILC are not aligned with those of our clients, neither Mr Olsen nor Zeller & Associates could properly represent our clients in this arbitration.*" Clifford Chance further stated that Ms Okuneva is not legal advisor to ObiBank and Metropol and is not authorised to represent them in these proceedings.

29.  The Tribunal considers that the Respondents were given every opportunity to participate fully and submit evidence in this arbitration. They filed legal submissions and documents. Mr Olsen participated in the first procedural hearing on behalf of all the Respondents. Ms Okuneva wrote to the Tribunal on three occasions advising the Tribunal that the 3rd and 4th Respondents would be appointing counsel, thanking the Tribunal for allowing an additional opportunity to file witness statements and submitted both a statement of 3rd and 4th Respondents' position and documents (sent through Mr Olsen because of bank secrecy.)

## VI.    Procedural Arrangements

### i)    The First Procedural Hearing

30.  By a letter of 24 January 2007, the Tribunal scheduled the first Procedural Hearing for 14 March 2007, a date stated to be convenient to the Parties by letter dated 24 January 2007 from Salans and a letter dated 29 January 2007 from Mr Olsen.

31.  On 13 March 2007, Mr Olsen wrote to the Tribunal, saying he had not heard from Moscow

> "as to whom, if anyone, is going to attend the Conference on March 15th at 2.00 pm. As you have been advised I was acting for all the parties as an interim counsel due to my relationship with RLI. It was my understanding, through Dr Zamman, that counsel for the bank and Metropol would be provided".

Mr Olsen suggested postponing the conference.

32.  On behalf of the Tribunal, the Chairman sent an email on 13 March 2007 informing Mr Olsen the meeting would go ahead and advised him to call in by telephone. The meeting was attended in person by the Tribunal and counsel for the Claimant. Mr Olsen did not call in, and the Tribunal called him on his mobile phone. Mr Olsen was in Washington D.C. but was able to participate by telephone for the whole meeting.

33.  Following the preliminary hearing on 14 March 2007, the Tribunal prepared and circulated to the Parties a Minute of the Preliminary Hearing on 13 March 2007. The Tribunal also issued Procedural Order No. 1 on 19 March 2007, providing for the timetable and procedure for submissions, document production procedure and fixing the hearing for 26 – 30 November 2007 at the International Dispute Resolution Centre, London.

34.  None of the Parties made any comments with respect to the content of the Minutes of the Preliminary Hearing on 13 March 2007.

### ii)    Document Production

35.  Paragraph 8 of Procedural Order No 1 provided that the Parties should exchange requested documents by 11 May 2007. On 8 May 2007, John Hay of Salans sent Mr

Olsen an email saying he had not received any response from Mr Olsen to his email of 4 May in which he proposed a procedure for exchanging objections and documents in accordance with the Procedural Order. Mr Olsen replied on 10 May explaining he was *"unable to provide you the documents by May 11th. I will forward them as soon as received."*

36.  By letter dated 20 April 2007, Mr Olsen on behalf of the Respondents wrote to the Tribunal seeking document production from the Claimant. This request was premature in light of paragraph 7 of Procedural Order No 1.

37.  On 28 May 2007, Mr Olsen sent to the Tribunal the Respondents' Request for document production, pursuant to paragraph 7 of Procedural Order No 1.

38.  By letter dated 31 May 2007 the Claimant wrote to the Tribunal opposing the Respondent's document production requests. Mr Olsen on behalf of the Respondents responded to the Salans letter by his letter dated 4 June 2007.

39.  On 5 June 2007, Salans submitted a request to the Tribunal for an order compelling the Respondents to produce certain documents by 1 July 2007.

40.  Mr Olsen wrote to the Tribunal on 10 June 2007 responding to Salans' letter of 5 June. Respondents stated that

  i)  *"On April 21, 2007, I eMailed Mr. Maksim Shkondin, my contact in Russia for ILC, Metropol and ObiBank, a copy of Claimant's request for production. My request identified the documents required. What I received has been produced to Claimant in the "Respondents Response To Claimant's Document Request" previously filed herein. I determined all of the documents requested were not sent so I, again, called Mr. Shkondin. He advised me more documents would be forth coming but there were delays in translations and Russian holidays were in progress. No one was working. I am still waiting for additional documents from the bank and ILC and will submit them when received."*

  ii)  *The specific documents requested had either been produced to the Claimant or there were none.*

41.  There then followed an exchange of correspondence including letters dated 12, 14 and 18 June 2007 from Salans and 13 and 15 June 2007 from Mr Olsen. Mr Olsen was waiting for documents from 3rd and 4th Respondents and sought an extension of time until 31 August 2007 to complete filings because Dr Zamman of ILC was travelling on government business. This delay was opposed by the Claimant.

42.  On 19 June 2007 the Tribunal wrote to the Parties with its decision on their document production requests, and issued Procedural Order No 2 ordering:

  i)  that the Respondents produce by no later than 15 July 2007 all documents responsive to the Claimant's Document Request in point 1 of Salans' letter of 5 June 2007, namely all documents *"from the files of*

*each Respondent, i.e. Mr Olsen, RLI, ObiBank, ILC or Metropol, concerning the Agreements or their negotiation or execution, or related to the various bank accounts referenced in Respondents' defenses".*

ii)    that the Claimant produce, by no later than 15 July 2007, *"copies of the complaint, Supporting Affidavit of Bipinchandra Shah and any other documents or papers filed or submitted to the Russian Central Bank; Dynamo; the Ministry of Finance or any other Russian Federation Ministry, Governmental Body, quasi governmental body and the Federal Prosecutor, including the names of the parties receiving the documents and the date of submission during the year 2006".*

43.    On 24 July 2007, Salans wrote to the Tribunal stating

i)    on 15 July the Respondents had produced certain documents but that they were *"in Russian and only included certain overdraft and loan agreements, none of which appear to be referenced in Respondents' Defences"*;

ii)    the Respondents had not produced any documents from the files of any of the Respondents concerning *"the Agreements or their negotiation or execution"* in violation of the Procedural Order;

iii)    Mr Olsen had not responded to emails from Salans requesting the missing documents.

Salans requested an order precluding the Respondents from introducing or relying on any documents in response to paragraph 1 of Procedural Order No 2 that were not produced as of 15 July 2007.

44.    On 25 July 2007 Mr Olsen wrote to Salans stating there were no further documents and all relevant documents had been produced. However, Mr Olsen stated that the allegation of Respondents' failure to produce *"will be more fully explained at the final hearing in November".*

45.    On 30 July 2007 the Tribunal wrote to the Parties stating that it would not order the production of documents which it was advised by the Parties do not exist. The Tribunal further stated that

> *"the parties cannot expect to rely on documents which they have previously stated do not exist. Accordingly, documents which are not produced to the parties prior to the hearing will not be admitted in to evidence at the hearing or at a later stage in the arbitration without the Tribunal's permission".*

iii)    <u>Filing of Documents and Witness Statements</u>

46.    Paragraph 20 of Procedural Order No 1 provided that the Parties were to file and exchange, by no later than 31 July 2007

> *"all documents on which they rely, all arguments of law together with
> the specific legal texts... which they consider relevant witness evidence
> in the form of witness statements from each witness and any expert
> report on which the Parties rely".*

47.   On 9 August 2007, Salans wrote to the Tribunal saying they had not received any
      documents or statements from the Respondents and attempts to contact the
      Respondents and Mr Olsen had failed. Salans requested that the Hearing be based
      solely on the evidentiary submittal made by the Claimant on 31 July 2007.

48.   On 14 August 2007, (following the withdrawal of Mr Olsen from representing the
      3rd and 4th Respondents) the Tribunal wrote to the Parties reminding them that none
      of the Respondents had at any time objected to the timetable in Procedural Order
      No 1 and that it had been given no explanation by the Respondents for their failure
      to file as provided for in this Procedural Order. In the circumstances, the Tribunal
      stated that exceptionally it would allow the Respondents until 21 August 2007 to
      file witness statements.

49.   On 14 August 2007, Mr Olsen wrote to the Tribunal stating *"the only witness
      anticipated, on behalf of ILC and RLI is Dr. Zamman and possibly myself."* He also
      said he did not *"anticipate any additional filings"* of documents since his contact
      with Dr Zamman had been limited.

50.   On 28 August 2007, Salans wrote to the Tribunal objecting to

> *"any attempt by Respondent to offer any evidence at the hearing since
> they have not provided any witness statements or documents to
> Claimant and the Tribunal as mandated by Procedural Order No. 1"*

      and requesting the hearing proceed solely upon the Claimant's submittal of 31
      July 2007.

51.   On 5 September 2007 the Tribunal wrote to the Parties stating that while it
      sympathised with Salans, so that there *"can be no complaints about not having an
      opportunity to present their case"*, it would amend Procedural Order No. 1 and
      exceptionally allow:

      i)     the Respondents to file any relevant documents and witness statements
             on which it seeks to rely by 17 September 2007; and

      ii)    the Claimant to file any rebuttal evidence by 1 October 2007.

52.   On 14 September 2007, the Tribunal received a letter from Natalia Okuneva, Legal
      Advisor to ObiBank and Metropol, stating *"we are in process of preparing the
      witness statement and are ready to file certain relevant documents for the
      Tribunal."* Ms Okuneva asked whether the Tribunal had received certain listed
      documents   *"provided by ObiBank Ltd in the beginning of July 2007 to its client
      'ILC' upon ILC's request for Arbitration."* She stated that under Russian law,
      ObiBank could not disclose information considered "bank secrecy" including
      information concerning its clients. Accordingly, documents concerning ILC's

accounts could only by produced by ILC.

53.    On 18 September 2007, the Tribunal wrote to Ms Okuneva giving one final extension, until 25 September, for the filing of the 3rd and 4th Respondents' witness statements. It also confirmed that the documents listed in her letter of 14 September had not been received and asked for them to be sent immediately to all the Parties, the Tribunal and the LCIA.

54.    On 21 September 2007, Ms Okuneva wrote to the Tribunal stating that ObiBank could not disclose this information but that she had sent the documents to Mr Olsen for him to submit them to the Tribunal.

55.    On 22 September 2007, Mr Olsen sent electronic copies of half the documents on the list. On 25 September 2007, Mr Olsen sent another email with the remaining documents.

56.    On 17 October 2007, the Tribunal received a letter from Ms Okuneva describing events relevant to the Claimant's claim and stating the position of the 3rd and 4th Respondents.

57.    On 24 December 2007, the Tribunal received a letter from Clifford Chance advising that it had just been instructed by the 3rd and 4th Respondents and requesting permission to file a post-hearing submission. By letter of 31 December 2007, the Tribunal agreed to allow all Respondents to file post-hearing briefs by 11 Jan 2008, but no new evidence would be accepted in to the record.

58.    In its letter dated 11 January 2008 submitting the Post-Hearing Brief, Clifford Chance stated that had the 3rd and 4th Respondents "had the benefit of independent legal advice regarding the evidence they should submit in support of their defence... they would undoubtedly have adduced further documentary and/or witness evidence to support their position." On this basis the Tribunal was asked to allow the submission of new evidence by the 3rd and 4th Respondents.

59.    Following receipt from Clifford Chance of the Post-Hearing Brief on behalf of 3rd and 4th Respondents on 11 January 2008, the Tribunal received a letter from Salans dated 14 January 2008 asking for the right to respond on behalf of the Claimant to the Respondents' Post-Hearing Brief.

60.    On 17 January 2008, the Tribunal wrote to the Parties allowing the Claimant and the 1st and 2nd Respondents to respond to the 3rd and 4th Respondents' Post-Hearing Brief by no later than 31 January 2008. The Tribunal also stated that after these submissions "no further submissions would be accepted by the Tribunal". The Tribunal further refused the 3rd and 4th Respondents' request to submit new evidence.

61.    On 30 January 2008, the Claimant filed its Reply to the 3rd and 4th Respondent's Post-Hearing Brief. No response was received from 1st and/or 2nd Respondents.

62.    By letter dated 7 February 2008 Clifford Chance sought to file a response to the Claimant's Reply of 30 January and again requested that the Tribunal admit

testimony for Mr Udaltsov.

63. By letter dated 8 February 2008 the Tribunal informed the Parties that it would accept no further submissions and would not reopen the evidence.

    iv)    Witnesses

64. Under paragraph 24 of Procedural Order No 1, every witness and expert from whom a witness statement or expert report was presented would be expected to attend the hearing for examination unless expressly released.

65. By a letter of 9 October 2007, Salans asked the Respondents' counsel to confirm which witnesses they wished to cross-examine. There was no response.

66. By an email of 13 November 2007, Salans informed the Respondents and the Tribunal that one witness, Ms. Barbara Simmons, would not attend the hearing. The Claimant considered that her testimony i.e. that Claimant wired his $3 million loan to the Russian Account as per ObiBank's wire instructions in accordance with the Agreements, could be proved by the documents presented by both Claimant and Respondents.

    v)    The Pre-Hearing Conference

67. On 24 September 2007, the Tribunal wrote to the Parties confirming that the pre-hearing conference would take place on 26 September 2007 by telephone. The Tribunal and Mr Hay and Mr Bregman of Salans participated. Attempts were made to telephone Mr Olsen and Ms Okuneva but neither could be reached.

68. Following the pre-hearing conference, the Tribunal prepared and circulated to the Parties a Minute of the pre-hearing conference on 26 September 2007. The Tribunal also issued Procedural Order No 3 on 2 October 2007 which provided in pertinent part:

    i)    the Claimant may file any further documents in rebuttal by 12 October 2007, but no other evidence would be admitted to the record without the Tribunal's permission in exceptional circumstances.

    ii)    Only 3 days would be required for the hearing, 26-28 November 2007. (By letter of 11 October 2007, Salans requested that this be changed to 27-29 November due to the availability of their expert witness. Mr Olsen and Ms Okuneva did not offer any comment to this request and on 31 October 2007 the Tribunal agreed to the change of dates.)

    iii)    Pre-Hearing submissions to be filed by 19 October 2007.

VII.    **Submissions and Evidence received from the Parties**

69.    The following written submissions, witness statements and expert reports were filed on behalf of the Parties and considered by the Tribunal for the purpose of this Award

  i)  The Claimant's Request for Arbitration dated 20 September 2007.

  ii)  The Brief Reply to Claim of Bipin Shah dated 28 October 2006 from Mr Olsen on behalf of all four Respondents.

  iii)  The Claimant's Statement of Case, with Exhibits A-G on 7 December 2006.

  iv)  The Claimant's Application to Dismiss Counterclaim on 7 December 2006.

  v)  The Respondents' Reply to Claimant (including a withdrawal of the counterclaim) of 7 January 2007;

  vi)  Russian Statutes on which the Respondent Relies were filed on 13 February 2007 in Russian, and a translation was provided on 9 March 2007.

  vii)  The Response of ObiBank and Metropol was filed on 9 March 2007;

  viii)  The Claimant's Reply to Respondents' Defenses was submitted on 5 April 2007;

  ix)  The Claimant filed the following witness statements:

  x)  Witness Statement of Claimant Bipinchandra Shah dated 30 July 2007

  xi)  Witness Statement of Barbara A. Simmons dated 24 July 2007

  xii)  The Claimant filed a Memorandum of Legal Authorities containing Exhibits C-1 to C-10 on 31 July 2007;

  xiii)  On 22 and 25 September 2007, ObiBank filed 13 documents (1) – (13);

  xiv)  The Claimant filed an Expert Report of Professor Peter B. Maggs dated 5 October 2007 with Exhibits A, B and C;

  xv)  A Letter of Defense from Ms Okuneva on behalf of ObiBank and Metropol was filed on 17 October 2007;

  xvi)  The Claimant filed its Pre-Hearing Memorandum on 19 October 2007.

  xvii)  The Claimant filed its Rebuttal Memorandum on 12 November 2007;

  xviii)  The Claimant filed its Updated Statement of Amounts Claimed and

Statement of Specific Relief Sought on 7 December 2007.

xix) The 3rd and 4th Respondents filed their Post-Hearing Brief on 11 January 2008.

xx) The Client filed a Reply to the 3rd and 4th Respondents' Post-Hearing Brief on 30 July 2008.

xxi) Letter from Clifford Chance dated 7 February 2008. responding to Claimant's reply. (This letter was submitted notwithstanding the Tribunal instructing the Parties that no further submissions would be accepted by the Tribunal.)

xxii) Letters dated 10 March 2008 from Salans and Clifford Chance (in respect of Tribunal's letter dated 3 March 2008), advising on the legal costs and expenses of the Claimant and 3rd and 4th Respondents respectively. No statement of costs was received from 1st and 2nd Respondents.

## VIII.  The Hearing

70. The Hearing took place on 27 November 2007 at the International Dispute Resolution Centre, 70 Fleet Street, London EC4Y 1EU.

71. The Claimant attended in person together with his counsel, John Hay Esq.

72. The Respondents did not attend and were not represented.

73. Accordingly, Mr Hay was invited by the Tribunal to, and did, present the Claimant's case, including answering questions raised by the Tribunal. Mr Shah was asked to and he did formally confirm his witness statement dated 30 July 2007, and that everything in it was true to the best of his knowledge and belief. Mr Shah also answered questions put to him by the Tribunal.

## IX.  Factual Background

74. There is little dispute on the facts. These are described in the witness statement of Mr Shah, the Respondents' Reply and in the letter of Defense filed by Ms Okuneva on 17 October 2007. (Whilst this is more in the form of a pleading it has not denied the essential facts in this arbitration). The facts as set out in the Statement of Case were, in material part, accepted in the Respondents' Reply to Claimant. These facts are also confirmed in large part in the 3rd and 4th Respondents' Post-Hearing Brief.

75. Thus the facts appear as follows. Prior to July 2005, the Ministry of Finance of the

Russian Federation issued a license to the State Joint Venture Physical Culture and Sports "Dinamo" ("Dinamo") to be the organiser of the All-Russian Lottery, pursuant to certain lottery laws of the Russian Federation.

76.    Dinamo (through its management company) appointed ILC as the operator of the All-Russian Lottery. To demonstrate to the Ministry and Dinamo that it had sufficient assets to act as operator of the All-Russian Lottery, ILC entered into what was referred to as an unfunded $60 million loan with RLI dated May 27 2005 (and defined in the Framework Agreement as the "Existing Loan").

77.    Mr Shah met Mr Olsen at a friend's party in July 2005. At that party Mr Olsen told Mr Shah about this Russian project and how he was looking to finalise arrangements for the US$60 million Existing Loan. Mr Olsen explained he was looking for a short term loan of US$5 million to help show Dinamo that RLI and ILC had sufficient assets to act as operator of the All-Russian Lottery. There then followed various discussions between Mr Olsen and Mr Shah following which Mr Shah agreed to provide the short term loan but for only US$3 million (the Bridge Loan or the Loan).

78.    Essentially Mr Shah and Mr Olsen agreed the following arrangement:

    i)    Mr Shah would make a Bridge Loan of US$3,000,000 for two months; the Loan was to be made on 29 July 2005 and repaid on 27 September 2005.

    ii)    It was agreed that interest would be payable on the Loan calculated at 10% per annum; if repayment was not made on time the interest rate would be increased to 15%.

    iii)    As security for the Bridge Loan, a dedicated account in the name of ILC would be established at ObiBank into which the moneys were deposited. To this end ObiBank would become a party to the arrangement. The account would be blocked so that ILC could not drawdown on the account. These funds could not be commingled with any other assets, and could not be withdrawn under any circumstances, except by Shah.

    iv)    Metropol, the majority shareholder of ObiBank, agreed to standby and otherwise fulfil the obligations of ObiBank in this transaction.

79.    In the pre-contractual discussions, Mr Olsen made proposals and reached agreement on behalf of RLI, ILC, ObiBank and Metropol.

80.    This arrangement was reflected in three inter-connected agreements concluded between Mr Shah on the one part, and variously RLI, ILC, Metropol and ObiBank on the other part: (i) the Framework Agreement (Mr Shah and all Respondents); the Withdrawal Agreement" (Mr Shah, ILC and ObiBank); and (iii) the Loan Agreement (Mr Shah, RLI and ILC). (The relevant provisions of these agreements are described in greater detail in §§ 94-117 below.)

81.  In accordance with the aforementioned contracts, on 29 July 2005, a dedicated bank account was opened at ObiBank with the number 40702840800061002265 into which Mr Shah wired the US$3 million Loan to ILC.

82.  RLI and ILC did not repay the Loan on or by 27 September 2005.

83.  Subsequently, Mr Shah agreed to extend the Loan until 17 January 2006. This was recorded in the Extension Agreement between Mr Shah, RLI and ILC. In early October 2005, Mr Shah visited Moscow to meet with Respondents' representatives to discuss the status of his Loan and the funds he had deposited with ObiBank.

84.  The effect of the Extension Agreement was that from 27 September 2005 the interest payable on the Loan would be 15% per annum; an additional 3% would become payable on the Loan if the Loan was not repaid by 17 January 2006. RLI and ILC were also to pay 50% of Mr Shah's legal costs incurred in agreeing the overall arrangement and 100% of the legal costs incurred as a result of the default.

85.  RLI and ILC did not repay the Loan and all other outstanding amounts by 17 January 2006, as required by the Extension Agreement.

86.  Thereafter, Mr Shah notified RLI and ILC that they were in default of the Loan Agreement because they had failed to repay the US$3,000,000 plus interest, fees and expenses, and demanded payment thereof. He also notified RLI and ILC of their breaches under the Framework Agreement, the Loan Agreement and the Extension Agreement and demanded immediate payment of the Loan, along with interest, fees and expenses which were all overdue.

87.  In addition, Mr Shah notified Metropol and ObiBank that RLI and ILC were in default on the Loan and that ObiBank was in default of its obligations to pay the amount of the Loan to Mr Shah. He also demanded that ObiBank and Metropol comply with their obligations under the Framework Agreement to immediately pay the Loan amount to it; that ObiBank comply with its obligations under Article 2.3 of the Framework Agreement to provide immediately, a current account statement concerning the Bridge Loan Account; and that ObiBank immediately transfer the Loan amount plus interest and fees from the Loan Account to Mr Shah, as required by Section 6.01 of the Withdrawal Agreement, and immediately provide a statement relating to the Loan Account pursuant to Section 7.07 of the Withdrawal Agreement.

88.  There is dispute as to events following Mr Shah's notification of default to the Respondents. The Claimant alleges the Respondents did not respond to any of the Claimant's requests for repayment of the Loan plus interest and expenses. The Respondents allege that Dr Zamman of ILC was in constant touch with Mr Shah through emails and telephone conversations, during which Mr Shah agreed to accept, in lieu of repayment of the Loan, a secured promissory note and in return the Respondents agreed to promote Mr Shah's business programs in the Russian Federation and allow him to participate in other projects. Mr Shah has denied any such agreement was reached.

89.   It transpires that the Loan amount which was intended to be kept in a separate and unused account was in fact drawn on. From the record (Exhibit C9), from the US$2,999,995 received on 3rd August 2005, the following debits were made to the account:

- US$900,000 on 5th August 2005;

- US$50,000 on 8th August 2005;

- US$725,900 on 16th August 2005;

- US$1,324,095 on 20th October 2005.

90.   RLI and ILC have failed to repay the Loan. ObiBank failed to keep the Loan Account secure, allowed the US$3,000,000 to be withdrawn from the account by ILC and failed to warn Mr Shah that this money was being withdrawn. Further, ILC has failed to repay the Loan to Mr Shah on demand. ObiBank failed to repay the money deposited with it on the due dates. Metropol has also failed to repay the Loan when requested by Mr Shah.

91.   The Loan and all other outstanding amounts have still not been paid by RLI, ILC, ObiBank or Metropol.

X.    **Summary of Relevant Contracts**

92.   As noted above, to give effect to the Loan, the Parties entered into, and this arbitration concerns, four inter-related contracts:

    i)    The Framework Agreement.

    ii)   The Loan Agreement.

    iii)  The Withdrawal Agreement.

    iv)   The Extension Agreement.

93.   The provisions of these Agreements as relevant to this arbitration are summarised below.

    i)    The Framework Agreement

94.   The Framework Agreement was executed on 29 July 2005 between the Claimant and all four Respondents. Its purpose was to establish a bridge loan for the 2nd Respondent providing its making arrangements for a three year US$ 60,000,000 loan. This Agreement also set out the rights and obligations of the Parties with respect to the Loan and the supporting transaction documents.

95.    The Preamble stated the background to be as follows:

    i)    The 2nd Respondent had been appointed the operator of the All-Russian Lottery and wished to demonstrate to the Russian Ministry of Finance and State Joint Venture Physical Culture and Sports Dinamo that it had sufficient assets to be considered an operator of the lottery.

    ii)    There was *"an existing unfunded US $60 million three-year loan between RLI and ILC"*.

    iii)    The Claimant was willing to provide to RLI a bridge loan of US $3 million *"to be on-lent to ILC to enable ILC to demonstrate its possession of sufficient assets."*

    iv)    To this end a new account would be established in the name of ILC at ObiBank into which the Loan *"would be deposited and not commingled with any other assets and under no circumstances would the funds be withdrawn except by or to the benefit of Shah"*.

96.    Article 1.1 provided that Mr Shah would loan $3,000,000 to RLI until 27 September 2005 or such earlier date as provided in the Agreement. This money was to be on-lent to ILC.

97.    Article 1.2 defined Events of Default on the occurrence which the Loan was to be automatically repayable to Mr Shah. These included:

    i)    RLI or ILC failing to comply with any of its obligations under the Loan or any other Transaction Document or any other agreement between RLI or ILC and Shah.

    ii)    Any party to a Transaction Document (other than RLI or ILC) failing to comply with any of its obligations under that Transaction Document.

98.    Article 1.3 provided that the Bridge Loan Amount would be repaid by 27 September 2005 unless extended by Mr Shah or on the occurrence of certain events.

99.    Article 2 established the structure and security for the bank account into which the Loan would be paid. Accordingly:

    i)    it provided for the opening of an expressly numbered bank account (40702840800061002265) for ILC with ObiBank. (Article 2.1) into which Mr Shah was to pay the amount of the Loan.

    ii)    ObiBank, ILC and Mr Shah were to enter into a Withdrawal Agreement entitling Mr Shah to withdraw money from the ILC Account at any time upon submission to ObiBank of a Payment Demand. (Article 2.2)

    iii)    For that purpose ILC was to grant Mr Shah an irrevocable limited power of attorney authorizing Mr Shah to withdraw funds from and receive information in relation to the ILC Account. (Article 2.3)

iv)    ILC was to issue an irrevocable undated standing payment order to ObiBank to pay funds in the ILC account to Mr Shah and, upon a request by ILC to withdraw or transfer from the ILC Account, ObiBank would pay all funds in the ILC Account to Mr Shah. (Article 2.4)

v)    ObiBank was to provide a bank signature card for the ILC Account which required the signature of Mr Shah or his representative for any withdrawal from the ILC Account, except for automatic transfers to an account of Mr Shah. (Article 2.8)

vi)    It was agreed that this ILC Account would maintain a minimum balance equal to the amount of the Loan. (Article 2.9)

100.    Article 3 contained an undertaking from ObiBank and a guarantee from Metropol and ILC to protect the integrity of the Loan. Specifically:

i)    ObiBank undertook to pay to Mr Shah on the earlier of an Event of Default or 27 September 2005 the full amount of the Loan regardless of the amount in the ILC Account. Article 3.1 provided:

> *"ObiBank Undertaking. ObiBank undertakes to Shah to automatically wire to the Shah Account the full Bridge Loan Amount regardless of the amount in the ILC Account, without set-off or counterclaim without need of notice or receipt of notice, demand or request ("**ObiBank Undertaking**") on the earlier of:*
>
> *(a)    the date of occurrence of an Event of Default under the Bridge Loan or the termination date under Section 1.5 or;*
>
> *(b)    27 September, 2005 unless the Bridge Loan is extended by Shah under Section 1.4.*

ii)    Metropol undertook to fulfil the obligations undertaken by ObiBank if ObiBank failed or defaulted in its obligations. Article 3.2 provided:

> *"In the event of any failure or default on the part of ObiBank in fulfilling its obligations under the ObiBank Undertaking, Metropol (as majority shareholder of ObiBank) will stand by the obligations of ObiBank under the ObiBank Undertaking and will promptly fulfill the obligations of ObiBank under the ObiBank Undertaking."*

iii)    Under Article 3.3 ILC guaranteed to Mr Shah the performance of RLI's obligation under the Loan and that if RLI failed to repay the Loan, ILC promised to wire this amount to Mr Shah within two business days.

iv)    The obligations and undertakings of ILC, ObiBank and Metropol were to survive any breach or invalidity of the provisions of the Framework Agreement or any issue relating to the ILC Account. (Article 3.6)

v)    ObiBank, Metropol and ILC waived any immunity to which they might

have been entitled, including in respect of their assets. (Article 3.7)

    *vi)*    Article 3.8(c) provided that the rights of Mr Shah *"may be waived only in writing and specifically."*

101.    Article 6.1 provided that Metropol, ObiBank, ILC and RLI would *"jointly and severally indemnify and hold Shah harmless against any loss, expense, costs, claims, damages or liability including, without limitation, attorney's fees and costs, which Shah incurs"* due to various events including:

    i)    any Event of Default under the Loan Agreement or a breach of the Framework Agreement;

    ii)    *"any failure by any of ILC, RLI, Metropol and ObiBank to pay any amount due under a Transaction Document on its due date"* (Article 6.1(b));

    *iii)*    *"any litigation or arbitration due to or arising from any of the Transaction Documents"* (Article 6.1(e)).

    ii)    .The Withdrawal Agreement

102.    ILC, ObiBank and Mr Shah executed an Agreement Granting Rights to Debit the Russian Account ("the Withdrawal Agreement") dated 29 July 2005. This was done pursuant to Article 2.2 of the Framework Agreement.

103.    The Preamble referred to the Framework and Loan Agreements under which the Parties agreed to operate and maintain a bank account with ObiBank. The Preamble also recorded that ILC

    *"has issued a guarantee to the benefit of Shah in respect of RLI's obligation under the Loan Agreement and, therefore, Shah is entitled to claim from the Company [ILC] the funds in the amount of not less than three million US Dollars ($3,000,000) due from RLI to Shah pursuant to the terms and conditions of the Loan Agreement."*

104.    The Agreement provided that until the Loan was repaid, ILC and ObiBank would operate and maintain the Loan Account at ObiBank ("the Account")

    *"at all times during the Term in accordance with this Agreement and applicable law"* and obliged ILC to *"make any and all payments required to be made to Shah on the due date of such payment in accordance with the Transaction Documents."*(Article 2.01)

105.    Amounts held in the Account were to earn interest as set by ObiBank. (Article 2.03)

106.    The Agreement provided that the minimum balance in the Account should *"at all times be not less than three million US Dollars"* unless withdrawals were made as provided for under the Agreement. (Article 4.01) Certain withdrawals and transfers

from the Account were prohibited under the Agreement without the prior written consent of Mr Shah. (Article 4.02)

107. The Agreement provided for ILC to submit to ObiBank an undated payment order instructing ObiBank to withdraw funds in favour of Mr Shah. (Article 4.03(c)) Obibank was to hold this in escrow and perform this order by transferring US $3 million to Mr Shah's account if ILC or any other person attempted to deal with the account in a number of ways, such as attempts to withdraw money. (Article 4.03(e))

108. The Agreement provided that within one day of the date of the Agreement, ILC should prepare and submit to ObiBank a signature card *"certified by an authorized representative of [ObiBank] and containing the name and the signature of Shah"*. Mr Shah was to have the *"sole right of the first signature in respect of any Payment Orders or other instruction to be submitted"* in respect of the Account pursuant to the power of attorney issued pursuant to the Agreement. (Article 5.01)

109. ILC further agreed to grant Mr Shah a power of attorney *"as its representative and grants to it full authority and rights"* to do all acts which ILC would be otherwise entitled to do in relation to the Account, the money in the Account or the Account agreement and to receive information relating to the Account. (Article 6.02)

110. Mr Shah was entitled to demand repayment if ILC failed to comply with any payment obligation and ObiBank undertook to comply with any and all payment demands from Mr Shah. (Article 6.01)

111. The Agreement required:

    i)      ILC to provide Mr Shah with copies of documents relating to and information concerning the Loan Account. (Article 7.01(a)-(e))

    ii)      ObiBank was to notify Mr Shah if various events occurred, including:

        a. if anyone apart from ILC requests to withdraw or becomes entitled to withdraw funds from the Account, and

        b. if ILC attempts to amend or terminate any provision of the Bank Account Agreements. (Article 8.02)

    iii)      <u>The Loan Agreement</u>

112. The Loan Agreement was made between Mr Shah as Lender, and RLI and ILC as Borrower, and sets out the substantive terms of the Loan.

113. The Preamble stated that:

    i)      RLI and ILC had sought a loan of US$3 million and the Claimant was willing to make such funds available;

    ii)    there was "an existing unfunded $60 million three year loan between RLI and ILC on the one part, and ILC on the other part; and

    iii)    that there is the Framework Agreement between Mr Shah, RLI, ILC, Metropol and ObiBank.

114.    The Loan was to be made on 29 July 2005. (Article II, 2.2(a))

    i)    It was to be repaid in full, with interest, on 27 September 2005 or some earlier date if certain events occurred. (Article V, 1.1 and 2.3(a))

    ii)    Interest was to be calculated at 10% per annum with a step up of 5% per annum for amounts not paid when due. (Article 2.3(c))

115.    RLI and ILC were to *"be responsible for all reasonable costs and expenses"* of Mr Shah *"if there is an uncured Event of Default in connection with the administration, modification, amendment, restructuring or enforcement"* of the Loan Agreement. (Article 9.4(b))

116.    Events of Default included the failure of Borrowers to pay any principal or interest or other amount when due or to perform or observe any of various specified terms. (Article 8)

    iv)    <u>The Extension Agreement</u>

117.    RLI and ILC on the one part and Mr Shah on the other part executed the First Extension and Modification Agreement dated 27 September 2005. It modified the Loan Agreement in the following ways:

    i)    it increased the rate of interest on the Loan to be 15% per annum from 27 September 2005.

    ii)    the repayment date was extended to 17 January 2006.

    iii)    an additional 3% was to be paid on all amounts due if not repaid by 17 January 2006.

    iv)    RLI and ILC were to pay 50% of Mr Shah's attorneys fees incurred to date and paid, and 100% of such fees incurred with respect to the default by RLI and ILC and for the preparation of the Extension Agreement.

    v)    RLI and ILC were to provide Mr Shah with proof that ObiBank continued to hold and not commingle with any other assets the US $3,000,000 in a separate account in the name of RLI and ILC.

## XI.    Relief Sought by Parties

118.    The Claimant seeks the following relief[1]:

    i)    Against RLI, ILC, Metropol and ObiBank, jointly and severally, damages of US$5,221,227.25, plus interest of US$1250 per day from 7 December 2007 until the date of payment for breach of the Framework Agreement;

    ii)    Against RLI and ILC, jointly and severally, damages of US$5,650,701.21, plus daily interest of US$1,666.66 per day until the date of payment for breach of the Framework Agreement, Loan Agreement and Extension Agreement;[2]

    iii)    Against ObiBank and Metropol, jointly and severally, damages of US$3,718,333 plus daily interest of US$833.33 from 7 Dec 2007 until the date of payment, for breach of the Withdrawal Agreement.

119.    The Respondents seek the following relief[3]:

    i)    that the Tribunal deny an award against any of the Respondents in this matter and award Respondents such other relief that is just and proper.

120.    In the Post-Hearing Brief the 3rd and 4th Respondents seek the following relief:

    i)    An award dismissing the claim against each of the 3rd and 4th Respondents, and

    ii)    An award of costs against the Claimant to cover the legal fees incurred by the 3rd and 4th respondents in connection with this arbitration.

121.    By way of alternative the 3rd and 4th Respondents contend that their liability should be limited to repayment of the US$1,675,905 being the total Bridge Loan Amount

---

[1]    The Claimant's Statement of Relief dated 7 Dec 2007 pursuant to paragraph 1(a) of Procedural Order No 4. This is an update to relief sought in the Statement of Case § 24 – 32 which was for:
    a.    Against RLI and ILC, damages of US$3,915,092 for breach of the Framework Agreement, the Loan Agreement and the Extension Agreement, plus interest, and costs and expenses of the arbitration.
    b.    Against ILC, damages in excess of US$3,000,000 for ILC's breach of the Withdrawal Agreement, plus interest, and costs and expenses of the arbitration incurred.
    c.    Against ObiBank and Metropol, damages in excess of US$3,000,000 for ObiBank's breach of the Withdrawal Agreement, plus interest, and costs and expenses of the arbitration incurred after 30 June 2006.

[2]    These damages claimed include the legal fees and expenses sought by the Claimant incurred in this arbitration.

[3]    Respondents' Reply to Claimant.

less the amount remaining in the Claimant's deposit as at the effective date of the Extension Agreement, i.e. US$1,324,095 plus interest from 17 January 2006.

## XII.    Preliminary Issues for Tribunal

122.    Before considering the merits of the Claim and the Respondents' defenses for non-repayment of the Loan, the Tribunal has considered four preliminary issues:

    i)    Jurisdiction of the Tribunal in respect of the Claim;

    ii)    Applicable law;

    iii)    Loan Made; and

    iv)    Reopening of the evidentiary record.

    i)    Jurisdiction of the Tribunal in respect of the Claim

123.    The rights and obligations of the Parties to this arbitration are found in the provisions of the various Agreements. The Tribunal has considered whether it has jurisdiction to deal with these issues in view of the different arbitration/jurisdiction clauses.

124.    The Framework Agreement (at Article 9.2) and the Loan Agreement (at Article 9.7(b)) have an arbitration clause of identical wording. This provides for LCIA arbitration, with its seat in London, and for the arbitration to be conducted in the English language. The Extension Agreement contains a jurisdiction clause of different wording.

125.    The Withdrawal Agreement Article 10.07(b) also provided for LCIA arbitration, in London and in the English language. However, this clause does not contain the words *"or any of the Transaction Documents"* found in the Framework and Loan Agreements. The Tribunal considers these words go to the scope of the arbitration and the tribunal's jurisdiction.

126.    The Extension Agreement provided under the heading "Jurisdiction, Venue and Service of Process") (paragraph 5) that "ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY LOAN DOCUMENT SHALL BE BROUGHT, AT LENDER'S (CLAIMANT'S) OPTION, IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN NEW YORK COUNTY, NEW YORK". The 1st and 2nd Respondent irrevocably waived all objection "TO THE LAYING OF VENUE" OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY LOAN DOCUMENT

BROUGHT IN THE COURTS REFERRED TO ABOVE" or to claim that the proceeding have been brought in an inconvenient forum. It is further expressly provided that nothing in the Extension Agreement affects the Claimant's right "TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE BORROWER IN ANY OTHER JURISDICTION".

127.   The arbitration clause in the Framework and Loan Agreements is broad referring to *"any dispute under this Agreement or at any of the Transaction Documents...".* Transaction Documents are defined as those listed in Exhibit 1 to the Framework Agreement, which includes expressly the Framework Agreement, the Loan Agreement and the Withdrawal Agreement. The purpose of the Extension Agreement was to extend and modify the Loan Agreement under which the *"Borrower was and has been unable to repay".* In effect, the Tribunal considers that the Extension Agreement was a part of the Loan Agreement and subject to the arbitration clause. The jurisdiction clause in the extension agreement is non-exclusive and does not override the agreement to arbitrate in the other three agreements. Rather, the Tribunal considers that it applies, firstly, to disputes concerning the Extension Agreement itself, and secondly, allows an alternative non-exclusive jurisdiction option for certain issues without affecting the agreement to arbitrate. The arbitration clause remains effective and appropriate where the dispute involves the rights and duties arising out of or in connection with several contracts, i.e. in this case the Transaction Documents.

128.   For these reasons the Tribunal has concluded that it does have jurisdiction to deal with issues which arise out of the Transaction Documents as well as to the Extension Agreement.

129.   Furthermore, and in any event, under Article 23.2 of the LCIA Rules, any challenge to the jurisdiction of the Tribunal by a Respondent must be made by no later than the Statement of Defense. If no challenge is made within this period any right to challenge will have been "irrevocably waived". In this arbitration the Respondents have submitted statements on the substantive aspects of the dispute but have not lodged any objection or challenge to jurisdiction by the Respondents.

   ii)   Applicable law

130.   The Framework Agreement (Article 9.1) and the Loan Agreement (Article 9.7(a)) provide that they are to be *"governed by, construed, interpreted and enforced in accordance with the laws of England".* The Withdrawal Agreement (Article 10.06) provides that it is to be governed and construed in accordance with the laws of the Russian Federation. The Extension Agreement is silent on this issue.

131.   For the purpose of determining the entitlement of the Claimant to recover the Loan and interest in this arbitration as claimed the Tribunal is concerned primarily with English law. The Tribunal considers that the Extension Agreement is also governed by English law: it extended and modified the Loan Agreement which was governed by English law and therefore is part of the Loan Agreement. To the extent that the

various provisions of Russian law have been raised their application has been considered inapplicable to the issues in this arbitration for the reasons given within this Award.

    iii)       Loan Made

132.    No challenge has been made as to the money having been advanced by the Claimant to the 3rd Respondent. This is a pre-requisite of any claim for reimbursement. Evidence of proof of payment has been given in the witness statement of Barbara Simmons and the evidence of instruction and receipt of payment is contained in Exhibits C4, R5, R6 and R11. Movements of the money in this account or contained in a statement of account at exhibit C8.

133.    In their Post-Hearing Brief the 3rd and 4th Respondents have argued that because only US$2,999,995 was paid by the Claimant, instead of US$3 million, the Loan contemplated by the Agreements was not made and it should not be held liable. It states:

> "As the funds received from Claimant were less than the contracted-for amount of US$ 3 million and because the Claimant and the First and Second Respondents caused those funds to be deposited in an unprotected account ... these funds to not constitute the Bridge Loan or the Bridge Loan Amount, as defined in the Framework Agreement."

134.    The Tribunal considers this contention without merit. US$3 million was transferred by Mr Shah. This has not been denied before or during the discussions of the parties after the first or subsequent repayment dates. The fact that the sending or receiving bank – it does not matter which - deducted US$5.00 as a handling charge cannot undermine the nature of the Loan. The money was received in the designated bank account and has been used by the 1st and 2nd Respondents. In any event, US$5.00 in a loan of US$3,000,000 is *de minimis*.

135.    The Tribunal is satisfied that the Loan has been made by the Claimant in accordance with the Agreements.

    iv)       Reopening of evidentiary record

136.    The 3rd and 4th Respondents sought to reopen the evidentiary record after instructing Clifford Chance to advise in later December 2007. They have argued that prior to this time they had not had the benefit of independent legal counsel as to the evidence to submit. This request was made a month after the Hearing when the Tribunal's deliberations were well advanced. The Tribunal allowed the submission of a Post-Hearing Brief by the 3rd and 4th Respondents – which is what was requested in the Clifford Chance letter of 24 December 2007.

137.    The Tribunal considers that the late instruction of Clifford Chance by the 3rd and 4th Respondents cannot be the basis to reopen the whole of the arbitration. The 3rd

and 4th Respondents have had full knowledge of this arbitration from the outset and were aware of the filing and hearing dates since the preliminary hearing in March 2007. In fact, the 3rd and 4th Respondents made several submissions in this arbitration, i.e. on 9th March, 22-23rd September and 17th October, in addition to those made jointly with the 1st and 2nd Respondents. At no time did the 3rd or 4th Respondents disavow the defense filed on behalf of the Respondents by Mr Olsen.

138. Furthermore the Respondents had every opportunity to participate and file evidence in this arbitration. On two occasions the Tribunal "exceptionally" gave the Respondents additional time to file submissions and evidence. This was acknowledged by Ms Okuneva in her email to the Tribunal dated 14th September, which stated that Obibank and Metropol were in the process of pursuing Witness Statements. Ms Okuneva was stated to be the Legal Advisor to the 3rd and 4th Respondents No evidence was received from the 3rd and 4th Respondents despite the further opportunity given by the Tribunal's letter dated 18th September. In addition there were several other communications from Ms Natalia Okuneva on behalf of the 3rd and 4th Respondents (14 and 21 September and 17 October 2007).

139. The 3rd and 4th Respondents (and the 1st and 2nd Respondents) were given every opportunity to attend the hearing. The date was fixed and they were aware of it in March 2007; the Tribunal invited Respondents comments on the Claimants request for the Hearing starting on the 27th rather than the 26th November, no reply was received from Mr Olsen or Ms Okuneva. Prior to the Hearing on 31 October and 13 November, the Tribunal reminded the Respondents of the Hearing dates and sought confirmation of who would attend and represent the Respondents at the Hearing. Again, no response was received from either Mr Olsen or Ms Okuneva.

140. The Tribunal does not accept the claim, in Clifford Chance's letter of 24 December 2007, that in the absence of proper legal representation the 3rd and 4th Respondents "were under the impression that it was not necessary for them to attend the hearing in London". The 3rd and 4th Respondents are sophisticated commercial businesses. They had their own in-house counsel, Ms Okuneva, who wrote to the Tribunal that Witness Statements were being prepared and counsel would be appointed. The 3rd and 4th Respondents knew this should be done but for whatever reason it was not done.

141. The Tribunal considers it would be unfair to now reopen this matter and rehear this arbitration. The instruction of Clifford Chance at this late stage cannot change the process. Furthermore, and in any event, the Tribunal does not consider, on a prima facie basis, that the evidence which the 3rd and 4th Respondents now wish to adduce, as stated in Clifford Chance's letters of 11 January and 7 February 2008, would now change the Tribunal's conclusion on the merits as stated in this Award.

142. For all these reasons, the Tribunal confirms its decision not to reopen the evidentiary record in this arbitration.

### XIII.    Issues for Determination

143.    The issue for the Tribunal to determine is whether the Loan is repayable now by the Respondents jointly and severally or by any one or more of the Respondents.

144.    The Respondents have offered seven main defenses to justify non-repayment of the Loan:

      i)    oral agreement for non-repayment;

      ii)    entitlement to balance ILC Loan Portfolio;

      iii)    unenforceability of the Agreements;

      iv)    the Loan was not made in accordance with the Framework Agreement;

      v)    the Extension Agreement discharged the 3rd and 4th Respondents' obligations;

      vi)    the Claimant failed to provide an account signature card; and

      vii)    breach of mandatory Russian legislation.

These defenses are dealt with in turn below.

### XIV.    Tribunal's Analysis and Decision

      i)    Oral agreement for non-repayment

145.    In the Respondents' reply to Claimant (but not in the preceding "Brief Reply to Claim of Bipin Shah") the Respondents claim that an agreement had been reached between Mr Shah and Dr Zamman for payout of the Loan by the issuance of a secured promissory note.

146.    The Claimant has denied that any oral agreement, let alone one where he would accept a "secured promissory note" was ever made.

147.    The Respondents have not invoked any evidence to support the allegation that an Oral Agreement was entered into. Being questioned on this matter by the Chairman of the Tribunal at the Hearing, Mr Shah affirmed: *"No, there was no such agreement."*[4]

148.    Based on the above, the Tribunal cannot arrive at any other conclusion than that

---

[4] Transcript, p. 53, line 13

there is no support for the Respondents' allegation that there was an Oral Agreement to amend the terms for the Bridge Loan.

ii)    Entitlement to balance ILC Loan Portfolio

149.    The 3rd and 4th Respondents have also argued that they are subject to mandatory rules of Russian banking regulations requiring them to use credit balances in accounts belonging to a particular account holder to set off indebtedness in other accounts of such account holders. Mr Peter P Maggs testified - and the Tribunal accepts this testimony in the absence of any testimony to the contrary - there is no such banking regulation. More importantly, if that had been the case, it would still not have served as an excuse for 3rd and 4th Respondents to renege on their repayment obligation under the Framework Agreement.

150.    As Mr Maggs has further testified, if the Respondent had induced the Claimant into believing that the Withdrawal Agreement and actions taken in its implementation were legally binding because Claimant put faith in the Respondents' assurances, there would still be a duty under Russian law (the Withdrawal Agreement is governed by Russian law) on the part of the Respondents to refund the Claimant's US$ 3 million Bridge Loan under Article 178 of the Russian Civil Code.

iii)    Effectiveness of Agreements

151.    In their Response, the 3rd and 4th Respondents argued that the Framework and Withdrawal Agreements were not valid. There was no challenge to the validity of the Loan Agreement or the Extension Agreement. The effectiveness of the Agreements was challenged due to the

a.    failure to register the agreements under Russian law; and

b.    the Withdrawal Agreement signed by the Claimant not having been returned to 3rd and 4th Respondents.

a.    Failure to Register the Transaction

152.    Respondents assert that they are not liable because the Agreements are not valid or enforceable. They rely on certain Russian bank regulations pursuant to which, they say, agreements involving foreign currency must be registered with the Russian Central Bank to be effective and that the Agreements were not so registered.

153.    Respondents did not present any witness evidence, whether of fact or expert evidence, supporting this alleged defense. Moreover, although Respondents have provided copies of certain Russian statutes and regulations, as Claimant's Russian law expert testifies, and as is apparent from reading these statutes and regulations,

none of them supports the Respondents' contention. According to Mr Maggs, the disclosed extracts from the relevant Russian statutes and regulations provide that failure to file the required forms subjects the bank and the account holder to certain penalties. Such failure, however, appears to have no impact on the validity or enforceability of the loan or underlying transaction. They remain valid and enforceable.

154.    The Withdrawal Agreement requires the 2nd and the 3rd Respondents, not the Claimant, to file with the relevant Russian authorities any required documentation regarding the transaction. (Claimant Exhibit C-3 at Section 6.01(e) and Section 7.01(d)) If Respondents failed to comply with their statutory and contract obligations to file the appropriate documentation, they are prevented under Russian law from relying on their own failures as a means to avoid liability to Shah.

155.    In addition, as the Framework, Loan and Extension Agreements are governed by English law, not Russian law, Respondents' Russian law arguments are irrelevant to the validity and enforceability of those Agreements.

156.    Under English law a party cannot excuse itself from a contractual duty which it has voluntarily accepted by relying on legal impediments of which it was or should have been aware. Accordingly, the 3rd and 4th Respondents cannot invoke their own failure to register the transaction as a reason to avoid their repayment obligations under the Framework, Loan and Extension Agreements.    This principle is also enshrined in Article 401 of the Russian Civil Code.

157.    Any failure in this regard would constitute a breach of contract in its own right, specifically in respect of Article 5.1(b), Representations and Warranties of the Framework Agreement. This provides in pertinent part

> *"each Transaction Document has been, or will be, duly authorized and executed by such Party and constitutes, or will, when executed constitute, a valid and legally binding obligation of the Party, enforceable in accordance with its terms;"*

158.    In the 3rd and 4th Respondents' Post Hearing Brief the defense based on the failure to register the transaction is not pursued. The requirement to register the transaction is mentioned in the context of a new defense based on the alleged failure by the Claimant, the 1st and the 2nd Respondents to implement the Bridge Loan transaction. The Tribunal deals with this defense in §§ 166-169 below.

159.    In the absence of any expert evidence to the contrary, the Tribunal accepts the evidence provided by Mr Maggs and finds accordingly that the 3rd and 4th Respondents' defense based on the failure to register the transaction with the relevant Russian authorities should fail.

b.  Failure to provide executed copies of the Withdrawal Agreement

160.    The 3rd and 4th Respondents assert that, although each of the Parties executed the

Withdrawal Agreement and forwarded it to the 2nd Respondent for execution by the other Parties, the Withdrawal Agreement is not enforceable because a fully executed version was not returned to them (Response of 3rd and 4th Respondents, page 3). The 3rd Respondent claims that it asked the 2nd Respondent for the original executed version of the Withdrawal Agreement (12 months after it executed it) but never received it, leading it to believe that the Withdrawal Agreement did not exist. It further alleges that the funds sent by the Claimant were never credited to the Russian Account referenced in the Withdrawal Agreement. Rather, because no Withdrawal Agreement existed, the funds sent by the Claimant were credited to another ILC Loan Agreement, dated 27 May 2004. ObiBank also asserts that it was not required to repay Mr Shah his funds because Mr Shah had failed to execute a signature card for the account.

161. Respondents have not presented any evidence in support of their assertions, except a copy of the letter from ObiBank to ILC dated 10 August 2006 (more than 12 months after ObiBank and Metropol executed the Withdrawal Agreement) asking for an "original copy" of the Withdrawal Agreement. The 3rd and the 4th Respondents do not deal with this defense in their Post Hearing Brief of 11 January 2008 but for the sake of good order the Tribunal addresses this defense before proceeding to the defenses raised in the Post Hearing Brief.

162. As Professor Maggs explains, whether ObiBank had a copy of the Withdrawal Agreement in its files or not is irrelevant to the validity of that agreement under Russian law. Under Russian law, the Withdrawal Agreement is valid and enforceable even if ObiBank never received an executed copy.

163. Respondents' own documents show that the Claimant performed his obligations under the Withdrawal Agreements and Respondents accepted that performance, thereby acknowledging the existence and enforceability of that agreement, notwithstanding ObiBank's belated claim that it was unaware that any such Agreement existed. Specifically, Respondents' Document 6, the Swift Memo from International Moscow Bank to ObiBank dated 1 August 2005 confirms the transfer of Mr Shah's funds into the Russian Account at ObiBank, account no 40702840800061002265. This is the account number referenced in the Withdrawal Agreement, established by the 20 July 2005 Bank Agreement also referenced in the Withdrawal Agreement.

164. Claimant's witness Barbara A Simmons testified that Shah's funds were wired to the Russian Account, account number 40702840800061002265, which is the account number referenced in the Withdrawal Agreement. (Simmons Witness Statement at paragraph 2 and Claimant's Exhibit number C-4, and Claimant Exhibit C-3 at pages 1-4) Respondents' Document 6 (the Swift Memo from International Moscow Bank to ObiBank dated 1 August 2005) confirms the transfer of Mr Shah's funds into the Russian Account. Respondents' Document 9 (the Bank Statement for the Russian Account) shows that Shah's funds were credited to the correct account - the Russian Account. Thus, contrary to ObiBank's allegations, the evidence shows that both ILC and ObiBank established the Russian Account and accepted Claimant's funds into that account.

165. For these reasons, the Tribunal finds that whether the 3rd and 4th Respondents received back the executed copies of the Withdrawal argument is irrelevant and does not provide them with an excuse from their contractual obligations under it.

    iv)    <u>The Loan was not made in accordance with the Framework Agreement</u>

166. In the Post-Hearing Brief the 3rd and 4th Respondents state that

> "... their obligations as Guarantors never accrued, as the Claimant and First and Second Respondent failed to implement the Bridge Loan transaction contemplated by the Framework Agreement and other Transaction Documents. Accordingly, the conditions on which the Third and Fourth Respondents agreed to guarantee repayment of the Bridge Loan -- namely the remittance by the Claimant of a sum of US$ 3 million by way of a Bridge Loan corresponding to the so-called Existing Loan and the deposit of that amount into a specially protected account -- were never fulfilled." (Paragraph 3.6)

167. The reasons for this contention were the following

    i)    the Claimant did not deposit the Bridge loan amount of US$3,000,000 but the lesser sum of US$2,999,995;

    ii)    the Claimant did not properly identify in the remittance advice that the funds were related to the Bridge loan or to the Existing Loan;

    iii)    when the funds were received by ObiBank, the Claimant and the 1st and/or 2nd Respondents misrepresented that the funds related to a different transaction;

    iv)    the 1st and 2nd Respondents took none of the steps necessary to isolate and protect the funds.

168. The Tribunal considers that these arguments are without merit. None of them could possibly exempt the 3rd and 4th Respondents from their obligations under the Framework Agreement. In response to the above 4 points

    (i)    As noted in §164 above, the US$3 million was received by ObiBank from the Claimant. In fact the money was sent to the special purpose ILC Account established by ObiBank under Article 2.1 of the Framework Agreement.

    (ii)    There was no reason for the Claimant to have stated the purpose of the money. ObiBank knew the purpose of this account: Article 2.1 states expressly that this money should *"be considered to be an advance from RLI to ILC under the Existing Loan"*. For what other

reason could Mr Shah have paid this money in to the ILC Account – this was the Bridge Loan account.

(iii)    There is no evidence whatsoever of any representation by the Claimant, 1st or 2nd Respondents that the funds were for anything other than in respect of the Loan.

(iv)    Once the funds were received into the ILC account the 3rd and 4th Respondents knew that it was to remain at a minimum balance of US$3 million. The preamble to the Framework Agreement was clear: the intent was that the funds in the new account would not be *"commingled with any other assets and under no circumstances would the funds be withdrawn except by or to the benefit of Shah"*. If documents were required for the account ObiBank should have ensured that such documents were completed and not allowed any movement on the account until this was completed.

169.    As noted below (§§177-178) the Tribunal considers that the additional documents which the 3rd and 4th Respondents contend should have been and were not completed cannot exempt ObiBank from its obligations with respect to the money deposited by Mr Shah.  If they were not available, the Tribunal would have expected the 3rd and 4th Respondents to seek their completion. The Tribunal notes that Exhibit 1 to the Framework Agreement indicates that none of these documents were pending  -- which Claimant contends indicates that they had been prepared and executed.

v)    <u>The Extension Agreement discharged the 3rd and 4th Respondents' obligations</u>

170.    The 3rd and 4th Respondents contend (as an alternative defense) that they are discharged from any obligation to repay the Loan amount to Mr Shah due to the delay of the repayment date under the Extension Agreement. The argument is based on the 3rd and 4th Respondents being guarantors and the terms of their surety having been changed significantly by the Extension Agreement to which they are not a party and to which they did not agree.

171.    On the basis of the evidence in the record the 3rd and 4th Respondents did consent to the extension of time for repayment. Certainly, the Loan was not repaid by ILC on 27 September 2005 and they did not repay it in accordance with their undertakings under Articles 3.1 and 3.2 of the Framework Agreement. Furthermore Mr Shah stated that he went to Moscow from 2 -5 October 2005 where he met with representatives of the Respondents including Dr Zamman and Mr Udaltsov, the Chairman of Metropol, to discuss the status and repayment of the Loan. He was assured the loan was safe in its special account, it was intact and not used or touched by anyone "and that they consented to the short extension of the Bridge Loan, under terms to be agreed between Dr Zamman, as representative for all the

Respondents, and myself." (Shah witness statement, paragraph 20)    Mr Shah confirmed this at the Hearing.[5]

172.    On the basis of this conclusion there is no need to address here the legal question whether the obligation was a guarantee or indemnity and whether the repayment obligation was automatically discharged by the Extension Agreement. However, the Tribunal would note that in any event, the Extension Agreement did not prejudice the 3rd and 4th Respondents.  At worst, it delayed the time when they could be expected to repay the Loan for ILC.  Under Article 3.1 ObiBank had an absolute obligation to automatically wire to Mr Shah, the Loan amount, i.e. US$3 million, " *regardless of the amount in the ILC account"* on 27 September 2005 or some other date at which the Loan repayment may have been extended.  Under Article 3.2 Metropol undertook that if ObiBank failed or defaulted on its undertaking to repay the Loan amount to Mr Shah it would *"promptly fulfil the obligations of ObiBank under the ObiBank undertaking"*.  Clearly the possibility of an extension was considered in advance, or at least provision was made for it, and yet there was no requirement in the Framework Agreement that such extension be subject to the consent of the 3rd and 4th Respondents.  The undertaking to repay the Loan in Articles 3.1 and 3.2 took effect when ILC failed to repay the Loan, first on 27th October 2005 and then on 17 January 2006.

173.    Additionally, the Framework Agreement, in its Article 1.4 foresaw the possibility that the Bridge Loan Amount might be extended by Mr Shah, so such an event, when it actually transpired, cannot cause any discharge of the guarantees given by the 3rd and 4th Respondents.  The Tribunal finds that there is no basis for the suggestion that by signing the Extension Agreement the Claimant waived the Guarantee under the Framework Agreement.

174.    For these reasons the Tribunal rejects the argument that the 3rd and 4th Respondents are discharged from their repayment undertakings to the Claimant.

vi)    Absence of an account signature card.

175.    ObiBank and Metropol have also argued that the Framework Agreement and the Withdrawal Agreement are invalid as a consequence of the failure of the Claimant to complete the ObiBank Account Signature Card.  This they contend is one of the very essential documents, granting the right to manage and sign on the account (as a person, supposed to manage the account)".

176.    On the matter of the Account Signature Card, the Claimant gave the following testimony on the occasion of the Final Hearing (excerpt).[6]

> *"The Chairman: I have one or two questions. Did you ever sign a bank signature card with ObiBank?*

---

[5] Transcript, pages 55-56, lines 5-3.

[6] Transcript, pages 52-53 lines 12-5

> *A. Yes.*
>
> *The Chairman: And how did you get that?*
>
> *A. I signed it when I was in Moscow in early days of October.*
>
> *The Chairman: In October?*
>
> *A. 2005.*
>
> *The Chairman: So they have your signature?*
>
> *A. Yes, and prior to that, in fact just before 29th July agreement that was signed, they had asked me to provide my passport pages with my signature and my name to – in lieu of the signature card, because the transaction had to be done by 29th July, so they needed the funds, so I provided them, faxed them with the copies of my passport pages with my signature.. That was satisfactory to them in lieu of the signature card until my visit to Russia. "*

177.   In the materials before the Tribunal there were no documents indicating that the Claimant had, or would have if requested, failed to fulfill any formal or procedural requirement that would have been necessitated by Russian banking regulations. Quite the contrary, the Claimant's evidence that it received certain instructions from the Respondents before the Framework Agreement and the Withdrawal Agreement were signed is uncontroverted.   These Agreements were subsequently signed by all of the Respondents and the Claimant transferred the funds as required.

178.   For this reason the Tribunal has found that there was no failure on the part of the Claimant in completing the account signature card or any other requirement which it was requested to provide.  There is no impediment of a formal nature justifying the Respondent's failure to comply with the reimbursement obligations in Articles 3.1 and 3.2 of the Framework Agreement.

vii)   Mandatory Russian banking regulations[7]

179.   The 3rd and 4th Respondents argue that for reasons of mandatory Russian law and banking and currency regulations, ObiBank has not been at liberty to effect any payment in favour of the Claimant.

180.   In this regard, the 3rd and 4th Respondents invoke, firstly, Article 845 of Part II of

---

[7]   This matter was raised in the letter dated 17 October 2007 to the Tribunal from Ms Okuneva on behalf of the 3rd and 4th Respondents.

the Russian Civil Code. This they contend obliges the Bank to carry out dispositions in respect of a bank account in strict compliance with instructions from the account holder only; in this case, ILC. Any payment authorized by the Bank to the Claimant would therefore constitute a violation of Russian law.

181. Furthermore, under Article 20 of the Russian Federal law No. 173-FZ dated 12 December 2003 "On currency regulation and currency control" and Article 3.3 of the Instruction of the Central Bank of the Russian Federation No 117-I dated June 15, 1004, each contract (credit contract) between residents (Russian legal entities) and non-residents (foreign legal entities) must be recorded in a Transaction Passport.

182. Consistent with these requirements, the Russian "resident", i.e. ILC, submitted to ObiBank a "Currency Operations Certificate" dated 3 August 2005 for Transaction Passport 05030001/3185/0000/6/0. This provided:

> "From total amount of currency receipts 2999995.0
> USD Two million nine hundred and ninety nine thousand nine hundred ninety five 00 cent
> Under the transaction, conducted in accordance with following documents:
> Contract          N without number          dated May 27, 2004
> Transaction passport N 05030001/3185/0000/6 dated March 15, 2005

183. As a consequence of this situation, ObiBank contends that it was not in a situation where it controlled in what manner ILC disposed of its funds. In this regard reference was made to Article 845(3) of the Russian Civil Code, which reads as follows:

> "Article 845. Contract of bank account
>
> [---]
>
> 3. The bank does not have the right to determine and control directions of usage of the client's money funds and to establish limitations of the client's right to dispose of money funds at his discretion other than stipulated in law or in the contract of bank account.
>
> [---]"

184. As a consequence, Respondents argue there was no obligation of ObiBank to effect any payment to the Claimant, neither was there any standby obligation of Metropol to cover any purported failing of ObiBank to indemnify the Claimant.

185. The Tribunal accepts that even though the Framework Agreement and the Loan Agreement expressly provide that they are governed by English law (Article 9.1 and

9.7(a), respectively), the law and the regulatory regime at the place where the bank operates may be relevant for the assessment of the matter brought to arbitration. In such case, the local law – here Russian law – may play a role as part of the factual framework that may have to be considered by the Tribunal.

186.    Accordingly, the Tribunal has given serious consideration to the 3rd and 4th Respondents' arguments on the basis of Russian law and regulations briefly summarized above. For the reasons below the Tribunal has determined that they must fail.

187.    The Tribunal accepts, with respect to Article 845 of the Russian Civil Code, the general proposition (in Russia and elsewhere), that the bank cannot interfere in the dispositions undertaken by the account holder. Nor can it, on its own initiative, undertake dispositions with respect to any balance existing in the client's account. In this case, however, this question becomes quite academic as documentation in the form of records of movements on the relevant bank account – provided by the bank itself – shows that there was not – at the relevant times, i.e. beginning of October 2005 and later – any funds available on the account which could have been the object of any dispositions by anyone.

188.    Moreover, the 3rd and 4th Respondents fail to take into account the terms of the Framework Agreement according to which there are specific undertakings from these parties in Articles 3.1 (ObiBank) and 3.2 (Metropol). ObiBank undertook to automatically wire

> " to the Shah Account the full Bridge Loan Amount regardless of the amount in the ILC Account, without set-off or counterclaim without need of notice or receipt of notice, demand or request (**"ObiBank Undertaking"**) on the earlier of:
> (a)      the date of occurrence of an Event of Default under the Bridge Loan or the termination date under Section 1.5 or;
> (b)      27 September, 2005 unless the Bridge Loan is extended by Shah under Section 1.4.
>
> [---]
>
> 3.2 <u>Metropol undertaking</u>. In the event of any failure of default on the part of ObiBank in fulfilling its obligations under the ObiBank Undertaking, Metropol (as majority shareholder of ObiBank) will stand by the obligations of ObiBank under the ObiBank Undertaking and will promptly fulfill the obligations of ObiBank under the ObiBank Undertaking ".

189.    These undertakings have nothing to do with the Bank's obligations vis-à-vis its accounts holders. They also do not concern this matter. There are contractual undertakings directed to the Claimant which do not involve or compromise the Bank's relationship to its accounts holders or encroach on any mandatory provision

of Russian banking regulations.

190.    There is no argument offered by the Respondents based on Russian (or, for that matter, English) law that would vitiate their undertakings to the Claimant pursuant to the Framework Agreement. The Tribunal cannot derive any legal or contractual bar based on those sources against enforcing the Framework Agreement according to its terms, whether the undertakings of ObiBank or, as a consequence, Metropol.

191.    Although superfluous for the purpose of reaching a conclusion in this matter, the Tribunal notes the allegation of the 3rd and 4th Respondents that the amount transferred by the Claimant had – by the machinations of ILC – been allocated to a loan dated 27 May 2004 between ILC (as borrower) and RLI (as lenders) is not supported by the evidence.

192.    On the basis of the documentation available to the Tribunal the Respondents' factual assertions are not correct.

    a.  First, the bank account opened for the purpose of the Framework Agreement was allotted the account no. 4070 2840 8000 6100 2265 (Article 2.1 of the Framework Agreement). This account number was reiterated in the Withdrawal Agreement (Article 1.01, Definitions), where it was defined as the "Dollar Account" (which in its turn was defined as the "Russian Account" [*sic!*]).

    b.  Second, according to a wire transfer debit advice issued by Citigroup, the amount of US$ 3,000,000 was wired on 29 July 2005 to account no. 4070 2840 8000 6100 2265.

    c.  Third, this was done in careful observation of instructions given by ObiBank in an undated notice (exhibited as C-4 in the arbitration), also identifying this particular account number.

    d.  Fourth, consistent with these measures, there is also a statement of account provided by the bank that the US$ 3,000,000 (less five dollars) was credited to the account no. 4070 2840 8000 6100 2265 on 3 August 2005.

    e.  Last, it appears from the statement that various amounts have been withdrawn from this account at intermittent intervals – the first withdrawal taking place already on 5 August 2005, leaving the account empty by 20 October 2005.[8]

193.    In any event, in the Tribunal's view, the fact whether or not the funds were properly credited to the ILC Account (as defined in the Framework Agreement), does not

---

[8]    Mr Richard Olsen, whether on behalf of all of the Respondents or some of them, assured the Claimant in an email of 21 December 2005 that "the money is there".

affect the obligation of the 3rd and 4th Respondents to return the US$ 3,000,000 loan (with interests and costs) to the Claimant as they agreed to do under the Agreements.

## XV.    Claimant's Entitlement to Relief Sought

194.    In light of the Tribunal's conclusion as to liability on the part of the Respondents as determined above, the Tribunal turns now to the relief sought by the Claimant.

### i)    Amount of the Loan

195.    The Loan was for US$3,000,000. It was not repaid on the due dates: on 27 September 2005 under the Loan Agreement or by 17 January 2006 under the Extension Agreement. As at the date of this Award it still has not been paid and is overdue.

196.    As stated in §§134-135 above the argument of the 3rd and 4th Respondents that because US$2,999,995 rather than US$3,000,000 was received the Loan was not made is rejected.

197.    Accordingly, the Tribunal finds that this US$3,000,000 is due and payable and the Respondents shall repay this amount of capital to Claimant forthwith. It should have been repaid by the 1st and 2nd Respondents; it was not. The Loan amount should have been "automatically wired" by the 4th Respondent on 17 January 2006 and it was not. It should also have been paid by the 3rd Respondent as guarantor; it was not. The Tribunal considers the Respondents jointly and severally liable for this amount. This was expressly agreed in Article 6.1 of the Framework Agreement.

### ii)    Interest on the Loan

198.    Under the Loan Agreement interest was to accrue at 10% per annum (the "**Base Rate**") and was to be paid when the Loan was to be repaid on 27 September 2005 (Article 2.3(b)). However, if the Loan or any interest was not paid when due, such overdue amount was to bear interest at 5% above the agreed 10% rate. Article 2.3(c) provided:

> *"If all or a portion of the principal amount of the Loan or any interest payable thereon shall not be paid when due (whether at stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to five (5%) percent above the Base Rate."*

199.    The Extension Agreement increased the Base Rate of 15% per annum for the period

28 September 2005 to 17 January 2006. That would be the basis for calculating interest to be paid on the outstanding US $3,000,000 on 17 January 2006 and the interest outstanding since 27 September 2005. Accordingly, in accordance with the Loan Agreement that rate also increased by 5% if the Loan Agreement or any interest due was not paid when due, i.e. on 17 January 2006.

200.   The Tribunal has decided that interest is due and payable on the amount outstanding. The calculation of interest is as follows:

    i)    <u>29 July – 27 September 2005:</u>

        (US$ 3,000,000 x 10% x 61/365)     =    $50,136.99

    ii)    <u>28 September 2005 – 17 January 2006:</u>

        (US$ 3,000,000 x 15% x 112/365)    =    $138,082.19

    iii)    <u>18 January 2006 – 7 April 2008:</u>

        (US$ 3,000,000 x 20% x 811/365)    =    $1,333,150.68

201.   The 3rd and 4th Respondents are not party to the Extension Agreement. Their liability for interest on late repayment of the Loan from 18 January 2006 at 15% under the Framework Agreement, is US$999,863.01 (i.e. US$3,000,000 x 15% x 811/365).

202.   Accordingly, the Tribunal has decided that interest payable to the Claimant is :

    a.  by all the Respondents jointly and severally:    US$ 1,188,082.19

       and

    b.  by 1st and 2nd Respondents jointly and severally: US$333,287.67

iii)   <u>Additional Fee</u>

203.   Under the Extension Agreement, the 1st and 2nd Respondents agreed that if the Loan and outstanding interest were not repaid on 17 January 2006, they would pay an additional 3% on all these outstandings i.e. US$ 3,188,219.18 made up of US$3,000,000 plus interest of US$ 50,136.99 and US $138,082.19.

204.   The Loan and interest was not repaid on the due date and remains unpaid. Accordingly, the 1st and 2nd Respondents are jointly and severally to pay to the Claimant and additional fee of US $ 95,646.57.

iv)   <u>Attorney's fees regarding negotiation of the initial agreements and the Extension Agreement.</u>

205.    Under Article 9.4 of the Loan Agreement, RLI and ILC were to *"be responsible for all reasonable costs and expenses of [Mr Shah] ... if there is an uncured Event of Default in connection with the administration, modification, amendment, restructuring or enforcement...of this Agreement"*.

206.    This was amended by Article 2(a)(iii) of the Extension Agreement under which RLI and ILC undertook to pay within 10 days of the Extension Agreement, an amount equal to 50% of the legal fees incurred and paid by the Claimant and 100% of the fees *"(approximately US$5,000) incurred with respect to default by Borrower and the drafting, preparation and revision"* of the Extension Agreement.

207.    In this respect the Claimant seeks:

    i)    US $15,395.65, being 50% of the fees paid to Salans and to Loeb & Loeb in connection with the negotiation of the initial agreements; and

    ii)   US $83,997.24, being the legal fees paid to Salans and Loeb & Loeb in connection with the Extension Agreement.

208.    The Tribunal considers the first amount to be due and reasonable. The Tribunal only awards the Claimant US$5,000 in respect of the second head as this amount is expressly stated to be the Parties' expectation in Article 2(a)(iii). Accordingly the Tribunal orders that US$20,395.65 is due and payable by the 1st and 2nd Respondents to the Claimant.


v)    Costs and expenses of collection and arbitration

209.    The Claimant has sought to recover its legal costs and expenses and costs incurred seeking to enforce repayment of the Loan and in this arbitration. In accordance with paragraph 1(b) of Procedural Order No 4, the Claimant submitted a statement of its legal fees and costs by letter dated 12 December 2007 from Salans. These amount to US$ 1,116,418.25 (including US$ 18,317.68 expert witness, transcription, hearing room and travel expenses, and US$ 220,162.85 paid to the LCIA).

210.    Following the submission of the Post Hearing Brief and the Claimants Reply, on 3 March 2008 the Tribunal invited the Parties to advise as to their additional costs. By letters dated 10 March 2008 (i) Salans, on behalf of the Claimant, sought an additional US$ 72,985.62 for costs and disbursements (respectively US$ 70, 595 and 2,390.62), and (ii) Clifford Chance, on behalf of the 3rd and 4th Respondents, sought GB£ 47,500 in respect of its legal fees.

211.    The total amount of the costs of the arbitration, i.e. the arbitrators fees and the LCIA up to the date of this Award, have been determined by the LCIA Court, pursuant to Article 28.1 of the LCIA Rules, to be as follows:

Registration fee:                    £        1,500.00

| | | |
|---|---|---|
| LCIA's administrative charges | £ | 8,633.99 |
| Tribunal's fees and expenses | £ | 112.865.01 |
| Total costs of arbitration | £ | 122,999.00 |

212.    Under Article 28.3 of the LCIA Rules, the Tribunal is Tribunal is empowered to order, in its Award, that all or part of the legal or other costs incurred by a party be paid by another party to the arbitration unless the parties agree otherwise. (Article 28.3). The LCIA Rules further provide that, except where the parties agree otherwise, the Tribunal's decision on arbitration and legal costs should follow *"the general principle that costs should reflect the parties' relative success and failure in the award or arbitration, except when it appears to the Arbitral Tribunal that in the particular circumstances this general approach is inappropriate."* (Article 28.4)

213.    The Claimant has been successful in this arbitration. Accordingly, the Tribunal considers that the Respondents should reimburse the Claimant for all the legal and related costs it has incurred in connection with this arbitration. The Tribunal considers these costs to be reasonable. There are no mitigating factors to justify a reduction in the amount of costs to be reimbursed. The Tribunal notes that the conduct of this arbitration became more time consuming due to the failure of the Respondents to respond to Tribunal orders and requests on a timely basis, or at all, and to participate in the hearing or at least to advise of its non-attendance at the hearing. The Claimant, his counsel and one of the arbitrators travelled to London for the hearing as scheduled; all three arbitrators rearranged their timetables to be available for the agreed hearing dates. The late intervention of Clifford Chance on behalf of the 3rd and 4th Respondents also added significantly to the costs of this arbitration.

214.    Accordingly the Tribunal finds that Respondents are jointly and severally liable to pay to Claimant US$969,241.02 in respect of its legal fees and expenses, and to reimburse it for the sums paid to the LCIA in the amount of GB£107,840.05.

## XVI.    Final Award

215.    For the reasons given above, the Tribunal has decided and makes the following Final Award:

i.    The Respondents shall pay to the Claimant, on a joint and several basis, the Loan amount of US$ 3,000,000.

ii.  The Respondents shall pay to the Claimant, on a joint and several basis, an amount of accrued interest on the Loan amount as per the date of this Award of US$1,188,082.19.

iii. The 1st and 2nd Respondents shall pay to the Claimant, on a joint and several basis, an additional amount of accrued interest on the Loan amount as per the date of this Award of US$333,287.67.

iv.  The Respondents shall pay to the Claimant, on a joint and several basis, interest on the Loan amount of US$ 3,000,000 at a rate of 15% per annum from 8 April 2008 until full payment is effected

v.   The 1st and 2nd Respondents shall pay the Claimant, on a joint and several basis, additional interest on the Loan amount of USD 3,000,000 at a rate of 5% per annum from 8 April 2008 until full payment is effected.

vi.  The 1st and 2nd Respondents shall also pay to the Claimant, on a joint and several basis, US$116,042.22.[9]

vii. The Respondents shall also pay to the Claimant, on a joint and several basis, US$969,241.02 and GB£107,840.05 in respect of legal fees and the costs of this arbitration.

viii. Interest shall accrue on the items under sub-paragraphs vi and vii of this dispositive part of the Award at 6% per annum.[10]

Date    7 April 2008

David Goldberg          Julian D M Lew QC          Christer Söderlund

---

[9]   US$95,646.57 Additional Fee + US$20,395.65 attorneys' fees for negotiation of Agreements.
[10]  This interest rate is fixed by the Tribunal under its powers under Article 26(6) of the LCIA Rules at 6% which the Tribunal considers to be reasonable in the circumstances.

# EXHIBIT 3

**TO AFFIDAVIT OF JOHN J. HAY**
**DATED AUGUST 20, 2008**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BIPINCHANDRA SHAH,

                                    Petitioner,

                    -against-

RLI PARTNERS, LIMITED, LIMITED
LIABILITY COMPANY "INVESTMENT
LOTTERY COMPANY", LIMITED LIABILITY
COMPANY "INVESTMENT FINANCIAL
COMPANY 'METROPOL'", and COMMERCIAL
BANK "OBI'EDINENNYI INVESTITSIONNYI
BANK" (LIMITED LIABILITY COMPANY),

                                    Respondents.

Civil Action No.:  08 Civ. 4446 (JES)

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK  )

        CHRISTOPHER A. BLACKWELL, being duly sworn, deposes and says:

        1. That he is over eighteen years of age, resides in the State of New York and is not a party to the above-titled action.

        2. That he, on June 6, 2008, served by Federal Express overnight express mail service a true and correct copy of the following documents:

- Notice of Petition to Confirm Foreign Arbitral Award ("Notice");

- Petition to Confirm Foreign Arbitral Award ("Petition");

- Declaration of Bipinchandra Shah in Support of Petition to Confirm Foreign Arbitration Award ("Declaration");

- Civil Cover Sheet;

- Individual Rules and Procedures, the Honorable Judge John E. Sprizzo; and

- Third Amended Instructions for Filing an Electronic Case or Appeal.

The Notice, Petition and Declaration were all served in both their original language, English, and in Russian, with a certification of translation attached to each.

All six of the aforementioned documents are associated with Petitioner Bipinchandra Shah's Petition to Confirm Foreign Arbitral Award and Application for a Temporary Restraining Order and Pre-Judgment Order of Attachment.  These documents were served upon the following:

RLI Partners, Limited
Attn:  Richard H. Olsen
Suite 23, Portland House
Glacis Road, Gibraltar
   - and -
Richard H. Olsen
10261 East Bay Harbor Drive, 11th Floor
Bay Harbor, FL 33154

Investment Lottery Company
Attn:  Dr. Atik Zamman
1 Yan Raynis Street
125363 Moscow, Russia

"Investment Financial Company 'Metropol'"
13 Donskaya Street, Building 1
119049 Moscow, Russia

"Ob'edinennyi Investitsionnyi Bank":  ObiBank
13 Donskaya Street, Building 1
119049 Moscow, Russia

Lukasz Rozdeiczer, Esq.
Robert Lambert, Esq.
Clifford Chance LLP
10 Upper Bank Street
Canary Wharf, London E14 5JJ

Christopher A. Blackwell

Sworn to before me this 9th
day of June, 2008.

Notary Public

MARIANNE S. GUNN
Notary Public, State of New York
No. 01GU6703715
Qualified in New York County
Commission Expires 10/31/2010

- 2 -

**FedEx**

Español | Customer Support | FedEx Locations    Search    Go

| Package/Envelope | Freight | Expedited | Office/Print Services |
|---|---|---|---|

Ship ▸    Track ▸    Manage ▸    Business Solutions ▸

Track Shipments/FedEx Kinko's Orders
## Detailed Results

⊡ Printable Version  ⑦ Quick Help

| | | | |
|---|---|---|---|
| Tracking number | 911867955277 | Reference | 0211088-0003 |
| Signed for by | B.OSSINO | Department number | 3797 |
| Ship date | Jun 6, 2008 | Destination | GLACIS ROAD GI |
| Delivery date | Jun 9, 2008 3:00 PM | Delivered to | Receptionist/Front Desk |
| | | Service type | Priority Pak |
| | | Weight | 2.2 lbs. |

**Wrong Address?**
Reduce future mistakes by using FedEx Address Checker.

Tracking a FedEx SmartPost Shipment?
Go to shipper login

| | |
|---|---|
| Status | Delivered |
| Signature Image available | No |

| Date/Time | | Activity | Location | Details |
|---|---|---|---|---|
| Jun 9, 2008 | 3:00 PM | Delivered | GLACIS ROAD GI | |
| Jun 7, 2008 | 10:14 PM | In transit | POYLE GB | |
| | 5:39 AM | Departed FedEx location | INDIANAPOLIS, IN | |
| | 2:35 AM | Departed FedEx location | INDIANAPOLIS, IN | |
| Jun 6, 2008 | 11:24 PM | Left FedEx origin facility | NEW YORK, NY | |
| | 11:23 PM | Arrived at FedEx location | NEWARK, NJ | |
| | 9:13 PM | Left FedEx origin facility | NEW YORK, NY | |
| | 8:44 PM | Picked up | NEW YORK, NY | |
| | 8:28 PM | Package data transmitted to FedEx | | |

Find locations even easier.

| Signature proof | E-mail results | Track more shipments/orders | << Track summary |
|---|---|---|---|

**Subscribe to tracking updates (optional)**

Your name: [                ]    Your e-mail address: [          ]

| E-mail address | Language | | Exception updates | Delivery updates |
|---|---|---|---|---|
| | English | | ☐ | ☑ |
| | English | | ☐ | ☑ |
| | English | | ☐ | ☑ |
| | English | | ☐ | ☑ |

Select format: ◉ HTML ◯ Text ◯ Wireless

Add personal message:

Not available for Wireless or non-English characters.

Ref: 0211088-0003     Date: 06/06/2008     SHIPPING:     0.00
Dep: 3797     Wgt: 3.0 LBS     SPECIAL:     0.00
    CV:     1.00    HANDLING:     0.00
    # of Pkgs: 1     TOTAL:     0.00

Svcs: INTL PRIORITY PAK
TRCK: 9118 6795 5277

ORIGIN ID: NYCA (212) 632-5526     Ship Date: 06JUN08
JOHN J HAY     ActWgt: 3.0 LB MAN
SALANS     System#: 205330/CAFE2356
620 5TH AVENUE     Account: S 010078881
3RD FLOOR
NEW YORK, NY 10020 US
SIGN: JOHN J HAY     NO EEI 30.37(a)

TO **ATTN: RICHARD H. OLSEN**       01216328457

**RLI PARTNERS, LIMITED**       **FedEx**
          Express
**SUITE 23  PORTLAND HOUSE**

**GLACIS ROAD,**        **(GI)**    **E**

Ref: 0211088-0003
Dept: 3797



1

of

1

BILL SENDER

These commodities, technology, or software were
exported from the United States in accordance with the export
administration regulations. Diversion contrary to US law is prohibited.

## INTL PRIORITY PAK

TRK#   **9118 6795 5277**   Form
                    0430

**--GI**



Part # 156148-434 NRIT 04-06

# EXHIBIT 4

**TO AFFIDAVIT OF JOHN J. HAY**
**DATED AUGUST 20, 2008**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

)
BIPINCHANDRA SHAH,                              )
                                               )
                          Petitioner,          )
                                               )
      -against-                                )          Civil Action No.: 08 Civ. 4446 (JES)
                                               )
                                               )
RLI PARTNERS, LIMITED, LIMITED                 )
LIABILITY COMPANY "INVESTMENT                  )
LOTTERY COMPANY", LIMITED                      )
LIABILITY COMPANY "INVESTMENT                  )
FINANCIAL COMPANY 'METROPOL'",                 )
and COMMERCIAL BANK                            )
"OBI'EDINENNYI INVESTITSIONNYI                 )
BANK" (LIMITED LIABILITY                       )
COMPANY),                                      )
                                               )
                          Respondents.         )

---

## DECLARATION OF ARMINE G. MANASSYAN

I, Armine G. Manassyan, hereby state as follows:

1.      I am an associate in the Salans law firm, resident in the Moscow office in the Russian Federation.  I am an attorney qualified to practice law in the Russian Federation.  I have been engaged to effectuate service of process in this matter pursuant to Rules 4(f) and 4(h) of the Federal Rules of Civil Procedure.  I am fully familiar with the facts and circumstances set forth herein.  I submit this declaration as proof of service in this action.

2.      I was engaged by John J. Hay and Christopher A. Blackwell, counsels for the petitioner in this case, to effect service of process upon the respondents in this action

in the manner prescribed by the law of the Russian Federation for service in the Russian Federation in an action in any of its courts of general jurisdiction.

3.    The service procedure in an action in the Russian Federation's courts of general jurisdiction is governed by the Civil Procedure Code of the Russian Federation ("RF CPC"). Under Article 113.1 of the RF CPC, "the parties in the case, and also witnesses, experts, specialists and interpreters are notified or summoned to court by registered letter with delivery notification, subpoena with delivery notification, telephone message or telegram, by facsimile or using other means of communication or delivery, which ensure to fix the judicial notice or summons and its delivery to the addressee."

4.    According to the Russian Unified Register of Legal Entities, three respondents in this case are legal entities incorporated under Russian law with the following registered addresses:

-  Limited Liability Company "Investment Lottery Company" is registered at 1 Yan Raynis street, 125363 Moscow, Russia;

-  Limited Liability Company "Investment Financial Company 'Metropol'" is registered at 13 Donskaya street, building 1, 119049 Moscow, Russia;

-  Commercial Bank "Obi'edinennyi Investitsionnyi Bank" (Limited Liability Company) is registered at 13 Donskaya street, building 1, 119049 Moscow, Russia.

5.    Pursuant to the above cited provision of the RF CPC, on June 23, 2008 I personally delivered a copy of each of the following documents to (i) LLC "Investment Financial Company 'Metropol'", and (ii) Commercial Bank "Obi'edinennyi Investitsionnyi Bank" (LLC) at the addresses stated in the clause 4 above: Notice of Petition to Confirm Foreign Arbitral Award (together with Russian translation); Petition

2

to Confirm Foreign Arbitral Award (together with Russian translation); Declaration of Bipinchandra Shah in Support of Petition to Confirm Foreign Arbitration Award (together with Russian translation); Judge Johm E. Sprizzo's Individual Rules and Procedures; the U.S. District Court for the Southern District of New York's ("SDNY") 3rd Amended Instructions for Filing an Electronic Case or Appeal; the SDNY Civil Cover Sheet, - such delivery being confirmed by the handwritten inscription made on a plain copy of one of the served documents by the respective respondent' employee (attached as Exhibits A and B hereto).

6.      I failed to serve the documents LLC "Investment Lottery Company" due to the absence of the respondent's office at the said registered address.

7.      Such hand-delivery would be sufficient to accomplish service of process under the law of the Russian Federation if this action had been brought in one of the Russian Federation's courts of general jurisdiction.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: June 23, 2008
Moscow, Russian Federation

_____
Armine G. Manassyan

3

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BIPINCHANDRA SHAH,

Petitioner,

-against-

RLI PARTNERS, LIMITED, LIMITED
LIABILITY COMPANY "INVESTMENT
LOTTERY COMPANY", LIMITED LIABILITY
COMPANY "INVESTMENT FINANCIAL
COMPANY 'METROPOL'", and COMMERCIAL
BANK "OBI'EDINENNYI INVESTITSIONNYI
BANK" (LIMITED LIABILITY COMPANY),

Respondents.

Civil Action No.: 08 Civ. 4446 (JES)

NOTICE OF
PETITION TO CONFIRM
FOREIGN ARBITRAL AWARD

TO:    RLI PARTNERS, LIMITED, LIMITED LIABILITY COMPANY "INVESTMENT
       LOTTERY COMPANY", LIMITED LIABILITY COMPANY "INVESTMENT
       FINANCIAL COMPANY 'METROPOL'", AND COMMERCIAL BANK
       "OBI'EDINENNYI INVESTITSIONNYI BANK" (LIMITED LIABILITY
       COMPANY)

       PLEASE TAKE NOTICE that, pursuant to the Convention on the Recognition
and Enforcement of Foreign Arbitral Awards and 9 U.S.C. §§ 201 *et seq.*, petitioner
Bipinchandra Shah ("Shah") has filed a Petition to Confirm Foreign Arbitral Award (the
"Petition") in the above-captioned action. By his Petition, Shah seeks, *inter alia*, an Order
confirming the Arbitral Tribunal's final Award in the arbitration proceeding between Shah and
Respondents, and a judgment in conformity therewith. Shah's Petition is based on: (i) this
Notice; (ii) the Petition; (iii) the Declaration of Bipinchandra Shah in Support of Shah's Petition
to confirm Foreign Arbitration Award; and (iv) all arguments on Shah's behalf at oral argument,
if any.

       PLEASE TAKE FURTHER NOTICE that answering papers, if any, shall be
served within twenty (20) days from this Notice's date of service.

Получено   Помощник Генерального директора   Болотин
ИФК „МЕТРОПОЛЬ"
                                              23.06.08

Dated: New York, New York
      May 30, 2008

SALANS

By: _____
    John J. Hay
    Christopher A. Blackwell
Rockefeller Center
620 Fifth Avenue
New York, New York 10020
Tel. (212) 632-5500
Fax. (212) 632-5555
*Attorneys for Petitioner*
*Bipinchandra Shah*

-2-

ОКРУЖНОЙ СУД СОЕДИНЕННЫХ ШТАТОВ АМЕРИКИ
ЮЖНЫЙ ФЕДЕРАЛЬНЫЙ СУДЕБНЫЙ ОКРУГ НЬЮ-ЙОРКА

БИПИНЧАНДРА ШАХ,

Истец,

- против -

«RLI PARTNERS, LIMITED», ОБЩЕСТВА С
ОГРАНИЧЕННОЙ ОТВЕТСТВЕННОСТЬЮ
"ИНВЕСТИЦИОННОЙ ЛОТЕРЕЙНОЙ
КОМПАНИИ", ОБЩЕСТВА С
ОГРАНИЧЕННОЙ ОТВЕТСТВЕННОСТЬЮ
"ИНВЕСТИЦИОННОЙ ФИНАНСОВОЙ
КОМПАНИИ «МЕТРОПОЛЬ»», И
КОММЕРЧЕСКОГО БАНКА
«ОБЪЕДИНЕННЫЙ ИНВЕСТИЦИОННЫЙ
БАНК» (ОБЩЕСТВО С ОГРАНИЧЕННОЙ
ОТВЕТСТВЕННОСТЬЮ),

Ответчиков.

Гражданский иск № : 08 Civ. 4446 (JES)

**УВЕДОМЛЕНИЕ:
ХОДАТАЙСТВО О
ПОДТВЕРЖДЕНИИ
РЕШЕНИЯ ИНОСТРАННОГО
АРБИТРАЖНОГО СУДА**

**КОМУ:**   **«RLI PARTNERS, LIMITED», ОБЩЕСТВУ С ОГРАНИЧЕННОЙ
ОТВЕТСТВЕННОСТЬЮ "ИНВЕСТИЦИОННОЙ ЛОТЕРЕЙНОЙ
КОМПАНИИ", ОБЩЕСТВУ С ОГРАНИЧЕННОЙ
ОТВЕТСТВЕННОСТЬЮ "ИНВЕСТИЦИОННОЙ ФИНАНСОВОЙ
КОМПАНИИ «МЕТРОПОЛЬ»», И КОММЕРЧЕСКОМУ БАНКУ
«ОБЪЕДИНЕННЫЙ ИНВЕСТИЦИОННЫЙ БАНК» (ОБЩЕСТВО С
ОГРАНИЧЕННОЙ ОТВЕТСТВЕННОСТЬЮ)**

НАСТОЯЩИМ ПРОСИМ ПРИНЯТЬ УВЕДОМЛЕНИЕ о том, что в
соответствии с Конвенцией по признанию и принудительному применению решений
иностранного Арбитражного суда и Разделом 9 Кодекса законов США §§ 201 *и всех
последующих*, истец Шах Бипинчандра ("Шах") подал Ходатайство о подтверждении
решения иностранного Арбитражного суда ("Ходатайство") в вышеуказанном в заглавии
иске. Своим Ходатайством, *среди прочего*, Шах добивается судебного приказа,
подтверждающего заключительное решение, вынесенное по делу Арбитражным судом в
арбитражном разбирательстве между Шахом и Ответчиками, и немедленного
соответствующего судебного решения. Ходатайство Шаха основано на: (i) настоящем
Уведомлении; (ii) Ходатайстве; (iii) исковом заявлении Шаха Бипинчандры в поддержку
Ходатайства Шаха о подтверждении решения иностранного Арбитражного суда; и (iv)

всех аргументов от имени Шаха, приведенных в выступлении в суде, при наличии таковых.

ПОЖАЛУЙСТА, ПРИМИТЕ К СВЕДЕНИЮ, что ответные документы, если таковые есть в наличии, должны быть вручены в течение двадцати (20) дней со дня вручения настоящего Уведомления.

Дата:  Нью-Йорк, штат Нью-Йорк
30 мая 2008 года

САЛАНС

В
лице: _____
Джон Дж. Хэй
Кристофер А. Блэквел
Рокфеллеровский центр
Пятое авеню 620
г. Нью-Йорк, штат Нью-Йорк 10020
Тел. (212) 632-5500
Факс. (212) 632-5555
*Адвокат Истца*
*Бипинчандра Шаха*

- 2 -

**ASTA-USA TRANSLATION SERVICES, INC.**
6030 EL TORDO, SUITE A - BOX 462, RANCHO SANTA FE, CALIFORNIA 92067-0462 USA
Тел.: 858.756.7156 | Факс: 858.756.7155 | WWW.ASTA-USA.COM | WWW.LEGALTRANSLATIONSOLUTIONS.COM

## СЕРТИФИЦИРОВАННЫЙ ПЕРЕВОД

*Документы переведены для:*

| ФАМИЛИЯ: | ИМЯ: | ОТЧЕСТВО: |
|---|---|---|
| КОМПАНИЯ: Limited Liability Company «Investment Lottery Company». | ПОДРАЗДЕЛЕНИЕ: | |

*Список переведенных материалов, документов, форм, приложений, лицензий и т.д.*

| Shah Notice of Petition |
|---|
| |
| |
| |

| Язык оригинала: | Английский |
|---|---|
| Язык перевода: | Русский |

---

**САН-ДИЕГО, КАЛИФОРНИЯ**

ОТНОСИТЕЛЬНО ВЫШЕУКАЗАННЫХ МАТЕРИАЛОВ/ДОКУМЕНТОВ: мы, компания ASTA-USA Translation Services, Inc. – профессиональное агентство, осуществляющее перевод документов, данным подтверждаем, что перевод, выполненный сертифицированными профессиональными переводчиками компании ASTA-USA, представляет собой, по нашему убеждению, точное и правильное толкование терминологии/содержания оригинального документа (документов). Данным подтверждается исключительно корректность перевода. Мы не гарантируем, что оригинал является подлинным документом, а также что утверждения, содержащиеся в оригинальном документе (документах) являются достоверными.

В ПОДТВЕРЖДЕНИЕ ВЫШЕИЗЛОЖЕННОГО, должным образом уполномоченный официальный представитель (ли) компании ASTA-USA Translation Services, Incorporated подписал (ли) данный Сертификат.

Подпись: _____     Дата: 03 июня 2008 года

Alain J. Roy, Президент



Национальная ассоциация судебных переводчиков
(The National Association of Judiciary Interpreters & Translators)

ASTA-USA Translation Services, Incorporated – Членский №: 7031.
*Полноправный член*

F-C1206



CIVIL ACTION NO. 08 CIV. 4446 (JES)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF
NEW YORK

BIPINCHANDRA SHAH,

Petitioner,

-against-

RLI PARTNERS, LIMITED, LIMITED LIABILITY
COMPANY", LIMITED LIABILITY COMPANY
"INVESTMENT FINANCIAL COMPANY
"METROPOL", AND COMMERCIAL BANK
"OBIEDINENNYI INVESTITSIONNYI BANK"
(LIMITED LIABILITY COMPANY),

Respondents.

NOTICE OF PETITION TO CONFIRM
FOREIGN ARBITRAL AWARD

SALANS
Attorneys For Bipinchandra Shah
Rockefeller Center
620 Fifth Avenue
New York, NY 10020-2457
Tel 212 632 5500
Fax 212 632 5555

Case 1:08-cv-04446-JES Document 23-11 Filed 07/16/2008 Page 12 of 18

EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BIPINCHANDRA SHAH,

                   Petitioner,

     -against-

RLI PARTNERS, LIMITED, LIMITED
LIABILITY COMPANY "INVESTMENT
LOTTERY COMPANY", LIMITED LIABILITY
COMPANY "INVESTMENT FINANCIAL
COMPANY 'METROPOL'", and COMMERCIAL
BANK "OBI'EDINENNYI INVESTITSIONNYI
BANK" (LIMITED LIABILITY COMPANY),

                   Respondents.

Civil Action No.:  08 Civ. 4446 (JES)

NOTICE OF
PETITION TO CONFIRM
FOREIGN ARBITRAL AWARD

TO:    RLI PARTNERS, LIMITED, LIMITED LIABILITY COMPANY "INVESTMENT
        LOTTERY COMPANY", LIMITED LIABILITY COMPANY "INVESTMENT
        FINANCIAL COMPANY 'METROPOL'", AND COMMERCIAL BANK
        "OBI'EDINENNYI INVESTITSIONNYI BANK" (LIMITED LIABILITY
        COMPANY)

           PLEASE TAKE NOTICE that, pursuant to the Convention on the Recognition
and Enforcement of Foreign Arbitral Awards and 9 U.S.C. §§ 201 *et seq.*, petitioner
Bipinchandra Shah ("Shah") has filed a Petition to Confirm Foreign Arbitral Award (the
"Petition") in the above-captioned action. By his Petition, Shah seeks, *inter alia*, an Order
confirming the Arbitral Tribunal's final Award in the arbitration proceeding between Shah and
Respondents, and a judgment in conformity therewith. Shah's Petition is based on: (i) this
Notice; (ii) the Petition; (iii) the Declaration of Bipinchandra Shah in Support of Shah's Petition
to confirm Foreign Arbitration Award; and (iv) all arguments on Shah's behalf at oral argument,
if any.

          PLEASE TAKE FURTHER NOTICE that answering papers, if any, shall be
served within twenty (20) days from this Notice's date of service.

*Получено: Сотрудник охраны Шаргаб Николас
Тихонович [signature] 23.06.08г.*

Dated: New York, New York
     May 30, 2008

         SALANS

         By: _____
            John L. Hay
            Christopher A. Blackwell
         Rockefeller Center
         620 Fifth Avenue
         New York, New York 10020
         Tel. (212) 632-5500
         Fax. (212) 632-5555
         *Attorneys for Petitioner*
         *Bipinchandra Shah*

ОКРУЖНОЙ СУД СОЕДИНЕННЫХ ШТАТОВ АМЕРИКИ
ЮЖНЫЙ ФЕДЕРАЛЬНЫЙ СУДЕБНЫЙ ОКРУГ НЬЮ-ЙОРКА

---

БИПИНЧАНДРА ШАХ,

Истец,

- против -

«RLI PARTNERS, LIMITED», ОБЩЕСТВА С
ОГРАНИЧЕННОЙ ОТВЕТСТВЕННОСТЬЮ
"ИНВЕСТИЦИОННОЙ ЛОТЕРЕЙНОЙ
КОМПАНИИ", ОБЩЕСТВА С
ОГРАНИЧЕННОЙ ОТВЕТСТВЕННОСТЬЮ
"ИНВЕСТИЦИОННОЙ ФИНАНСОВОЙ
КОМПАНИИ «МЕТРОПОЛЬ»», И
КОММЕРЧЕСКОГО БАНКА
«ОБЪЕДИНЕННЫЙ ИНВЕСТИЦИОННЫЙ
БАНК» (ОБЩЕСТВО С ОГРАНИЧЕННОЙ
ОТВЕТСТВЕННОСТЬЮ),

Ответчиков.

---

Гражданский иск №: 08 Civ. 4446 (JES)

УВЕДОМЛЕНИЕ:
ХОДАТАЙСТВО О
ПОДТВЕРЖДЕНИИ
РЕШЕНИЯ ИНОСТРАННОГО
АРБИТРАЖНОГО СУДА

КОМУ:     «RLI PARTNERS, LIMITED», ОБЩЕСТВУ С ОГРАНИЧЕННОЙ
ОТВЕТСТВЕННОСТЬЮ "ИНВЕСТИЦИОННОЙ ЛОТЕРЕЙНОЙ
КОМПАНИИ", ОБЩЕСТВУ С ОГРАНИЧЕННОЙ
ОТВЕТСТВЕННОСТЬЮ "ИНВЕСТИЦИОННОЙ ФИНАНСОВОЙ
КОМПАНИИ «МЕТРОПОЛЬ»», И КОММЕРЧЕСКОМУ БАНКУ
«ОБЪЕДИНЕННЫЙ ИНВЕСТИЦИОННЫЙ БАНК» (ОБЩЕСТВО С
ОГРАНИЧЕННОЙ ОТВЕТСТВЕННОСТЬЮ)

НАСТОЯЩИМ ПРОСИМ ПРИНЯТЬ УВЕДОМЛЕНИЕ о том, что в
соответствии с Конвенцией по признанию и принудительному применению решений
иностранного Арбитражного суда и Разделом 9 Кодекса законов США §§ 201 *и всех
последующих*, истец Шах Бипинчандра ("Шах") подал Ходатайство о подтверждении
решения иностранного Арбитражного суда ("Ходатайство") в вышеуказанном в заглавии
иске. Своим Ходатайством, *среди прочего*, Шах добивается судебного приказа,
подтверждающего заключительное решение, вынесенное по делу Арбитражным судом в
арбитражном разбирательстве между Шахом и Ответчиками, и немедленного
соответствующего судебного решения. Ходатайство Шаха основано на: (i) настоящем
Уведомлении; (ii) Ходатайстве; (iii) исковом заявлении Шаха Бипинчандры в поддержку
Ходатайства Шаха о подтверждении решения иностранного Арбитражного суда; и (iv)

всех аргументов от имени Шаха, приведенных в выступлении в суде, при наличии таковых.

        ПОЖАЛУЙСТА, ПРИМИТЕ К СВЕДЕНИЮ, что ответные документы, если таковые есть в наличии, должны быть вручены в течение двадцати (20) дней со дня вручения настоящего Уведомления.

Дата:  Нью-Йорк, штат Нью-Йорк
        30 мая 2008 года

                    САЛАНС

                    В
                    лице: _____
                        Джон Дж. Хэй
                        Кристофер А. Блэквел
                    Рокфеллеровский центр
                    Пятое авеню 620
                    г. Нью-Йорк, штат Нью-Йорк 10020
                    Тел. (212) 632-5500
                    Факс. (212) 632-5555
                    *Адвокат Истца*
                    *Бипинчандра Шаха*

NewYork 1164399.1

**ASTA-USA TRANSLATION SERVICES, INC.**
6030 EL TORDO, SUITE A - BOX 462, RANCHO SANTA FE, CALIFORNIA 92067-0462 USA
Тел.: 858.756.7156 | Факс: 858.756.7155 | WWW.ASTA-USA.COM | WWW.LEGALTRANSLATIONSOLUTIONS.COM

# СЕРТИФИЦИРОВАННЫЙ ПЕРЕВОД

*Документы переведены для:*

| ФАМИЛИЯ: | ИМЯ: | ОТЧЕСТВО: |
|---|---|---|
| КОМПАНИЯ: Limited Liability Company «Investment Lottery Company» | ПОДРАЗДЕЛЕНИЕ: | |

*Список переведенных материалов, документов, форм, приложений, лицензий и т.д.*

| Shah Notice of Petition |
|---|
| |
| |

| Язык оригинала: | Английский |
|---|---|
| Язык перевода: | Русский |

**САН-ДИЕГО, КАЛИФОРНИЯ**

ОТНОСИТЕЛЬНО ВЫШЕУКАЗАННЫХ МАТЕРИАЛОВ/ДОКУМЕНТОВ: мы, компания ASTA-USA Translation Services, Inc. – профессиональное агентство, осуществляющее перевод документов, данным подтверждаем, что перевод, выполненный сертифицированными профессиональными переводчиками компании ASTA-USA, представляет собой, по нашему убеждению, точное и правильное толкование терминологии/содержания оригинального документа (документов). Данным подтверждается исключительно корректность перевода. Мы не гарантируем, что оригинал является подлинным документом, а также что утверждения, содержащиеся в оригинальном документе (документах) являются достоверными.

В ПОДТВЕРЖДЕНИЕ ВЫШЕИЗЛОЖЕННОГО, должным образом уполномоченный официальный представитель (ли) компании ASTA-USA Translation Services, Incorporated подписал (ли) данный Сертификат.

Подпись: _____     Дата: 03 июня 2008 года

Alain J. Roy, Президент



Национальная ассоциация судебных переводчиков
(The National Association of
Judiciary Interpreters & Translators)

ASTA-USA Translation Services, Incorporated – Членский №: 7031
*Полноправный член*



F-C1206

CIVIL ACTION NO. 08 CIV. 4446 (JES)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF
NEW YORK

BIPINCHANDRA SHAH,

Petitioner,

-against-

RLI PARTNERS, LIMITED, LIMITED LIABILITY
COMPANY", LIMITED LIABILITY COMPANY
"INVESTMENT FINANCIAL COMPANY
"METROPOL"', AND COMMERCIAL BANK
"OBTEDINENNYI INVESTITSIONNYI BANK"
(LIMITED LIABILITY COMPANY),

Respondents.

NOTICE OF PETITION TO CONFIRM
FOREIGN ARBITRAL AWARD

SALANS
Attorneys For Bipinchandra Shah
Rockefeller Center
620 Fifth Avenue
New York, NY 10020-2457
Tel 212 632 5500
Fax 212 632 5555

# EXHIBIT 5

**TO AFFIDAVIT OF JOHN J. HAY
DATED AUGUST 20, 2008**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BIPINCHANDRA SHAH,

                          Petitioner,

        - against -

RLI PARTNERS, LIMITED, LIMITED
LIABILITY COMPANY "INVESTMENT
LOTTERY COMPANY", LIMITED LIABILITY
COMPANY "INVESTMENT FINANCIAL
COMPANY 'METROPOL'", and COMMERCIAL
BANK "OBI'EDINENNYI INVESTITSIONNYI
BANK" (LIMITED LIABILITY COMPANY),

                          Respondents.

Civil Action No.:  08 Civ. 4446 (JES)

**NOTICE OF DISMISSAL**

        Pursuant to Fed. R. Civ. P. 41(a)(1)(i), Petitioner Bipinchandra Shah, through his

attorneys, Salans, hereby dismisses his action against Respondent Limited Liability Company

"Investment Lottery Company" ("ILC") only, without prejudice and without costs.

Dated:  New York, New York
        August 18, 2008

                                        SALANS

                                        By:
                                            John J. Hay
                                            Christopher A. Blackwell
                                        Rockefeller Center
                                        620 Fifth Avenue
                                        New York, New York 10020
                                        Tel. (212) 632-5500
                                        Fax. (212) 632-5555
                                        *Attorneys for Petitioner Bipinchandra Shah*

TO:    Richard H. Olsen, Esq.
       10261 E. Bay Harbor Drive, 11th Floor
       Bay Harbor Island, FL 33154

RLI Partners, Limited
Attention: Richard H. Olsen
Suite 23, Portland House
Glacis Road, Gibraltar

Limited Liability Company "Investment Financial Company 'Metropol'"
(Attn: Alexander Valentinovich Udaltsov)
13 Donskaya Street, Building 1
119049 Moscow, Russia

Commercial Bank "Ob'edinennyi Investitsionnyi Bank" (Limited Liability Company)
(Attn:   Alexei Vladimirovich Kichaev)
13 Donskaya Street, Building 1
119049 Moscow, Russia

Investment Lottery Company
Attention: Dr. Atik Zamman
1 Yan Raynis Street
125363 Moscow, Russia

- 2 -

# EXHIBIT 6

**TO AFFIDAVIT OF JOHN J. HAY**
**DATED AUGUST 20, 2008**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BIPINCHANDRA SHAH,

                Petitioner,

      - against -

RLI PARTNERS, LIMITED, LIMITED
LIABILITY COMPANY "INVESTMENT
LOTTERY COMPANY", LIMITED LIABILITY
COMPANY "INVESTMENT FINANCIAL
COMPANY 'METROPOL'", and COMMERCIAL
BANK "OBI'EDINENNYI INVESTITSIONNYI
BANK" (LIMITED LIABILITY COMPANY),

                Respondents.

---

Civil Action No.: 08 Civ. 4446 (JES)

**CLERK'S CERTIFICATE**

I, J. MICHAEL MCMAHON, Clerk of the United States District Court for the

Southern District of New York, do hereby certify that this action, commenced on May 12, 2008,

with the filing of a notice and petition, a copy of the notice, petition and accompanying papers

was served on Respondent RLI Partners, Limited ("RLI") by Federal Express overnight mail on

June 6, 2008, pursuant to the Hague Convention on the Service Abroad of Judicial and Extra-

Judicial Documents in Civil and Commercial Matters, 20 U.S.T. 361, and Fed. R. Civ. P. 4(h)(2)

and 4(f)(1), and proof of such service thereof was filed on June 9, 2008;

That copies of the notice and petition were served on Respondents Limited

Liability Company "Investment Financial Company 'Metropol'" ("IFC Metropol") and

Commercial Bank "ObiEdinennyi Investitsionnyi Bank" (Limited Liability Company)

("ObiBank") by hand-delivery on June 23, 2008, pursuant to Fed. R. Civ. P. 4(h)(2) and

4(f)(2)(A) and the Civil Procedure Code of the Russian Federation, Article 113.1, and proof of

such service thereof was filed on July 16, 2008; and

I further certify that the docket entries indicate that Respondents RLI, IFC Metropol and ObiBank have not filed an answer or otherwise moved with respect to the petition herein. The defaults of Respondents RLI, IFC Metropol and ObiBank are hereby noted.

Dated: New York, New York
      August _18_, 2008

**J. MICHAEL MCMAHON**
Clerk of the Court

By: _____
Deputy Clerk

NewYork 1202904.1

# EXHIBIT 7

**TO AFFIDAVIT OF JOHN J. HAY
DATED AUGUST 20, 2008**

## John J. Hay

| | |
|---|---|
| **From:** | Mihalik, Mary B [mary.b.mihalik@citi.com] |
| **Sent:** | Monday, July 07, 2008 10:28 AM |
| **To:** | John J. Hay |
| **Cc:** | Nelson, Rebecca J |
| **Subject:** | OBIBANK BALANCE |

**Importance:**     High

**Attachments:**     Fax from - 2126325555



Fax from -
2126325555

            Dear Mr. Hay,

The balance in Obibank's account 36253085 is $1,150,946.37 as of
07/07/08 at  09:43:47

Best regards,

Mary B. Mihalik, VP | GCO Litigation
Citi Markets & Banking | 388 Greenwich Street | 17th Floor / Zone 1 | New York, NY 10013
Phone: 212-816-6182 | Fax: 866-560-0633 | Email: mary.b.mihalik@citi.com

# EXHIBIT 8

**TO AFFIDAVIT OF JOHN J. HAY**
**DATED AUGUST 20, 2008**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BIPINCHANDRA SHAH,

                         Petitioner,

        - against -

RLI PARTNERS, LIMITED, LIMITED
LIABILITY COMPANY "INVESTMENT
LOTTERY COMPANY", LIMITED LIABILITY
COMPANY "INVESTMENT FINANCIAL
COMPANY 'METROPOL'", and COMMERCIAL
BANK "OBI'EDINENNYI INVESTITSIONNYI
BANK" (LIMITED LIABILITY COMPANY),

                         Respondents.

---

Civil Action No.:  08 Civ. 4446 (JES)


**PROPOSED
ORDER GRANTING
SUMMARY JUDGMENT**

---

THIS ACTION having been commenced by the filing of the Petition to Confirm

Foreign Arbitral Award on May 12, 2008; Respondents RLI Partners, Limited ("RLI"), Limited

Liability Company "Investment Financial Company 'Metropol'" ("IFC Metropol") and

Commercial Bank "Obi'edinnyi Investitsionnyi Bank" (Limited Liability Company)

("ObiBank") (RLI, IFC Metropol and ObiBank hereafter collectively referred to as "Served

Respondents") having been properly served on or about June 6, 2008 (RLI) and June 23, 2008

(IFC Metropol and ObiBank); Served Respondents having not appeared, answered or made any

motion with respect to the Petition; the time for Served Respondents to appear, answer or make

any motion with respect to the Petition having expired; the Clerk of this Court having duly

entered the annexed certificate of entry of default of Served Respondents,

NOW, upon review of Petitioner Bipinchandra Shah's ("Shah") Motion for

Summary Judgment ("Motion"), Petitioner's Memorandum of Law in Support, Rule 56.1

Statement of Undisputed Facts, the Affidavit of John J. Hay, Esq. sworn to on August 20, 2008

and the Exhibits thereto, and all prior pleadings and proceedings herein, and for good cause

shown on the motion of Salans, attorneys for Shah, said Motion is hereby granted in its entirety,

and it is hereby

    ORDERED AND ADJUDGED:  that the Arbitral Award be recognized and

confirmed, pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral

Awards, codified at 9 U.S.C. § 201 et seq., and under Fed. R. Civ. P. 56; and it is further

    ORDERED AND ADJUDGED:  that the Court finds, pursuant to the Arbitral

Award, that Shah is due from Served Respondents additional interest from the date of said award

until August 20, 2008, the date of Shah's motion for summary judgment, in the following

amounts:

    i. against Served Respondents, jointly and severally, the amount of
      $195,376.05; and

    ii. against Respondent RLI, an additional amount of $58,861.35; and it is
      further

    ORDERED AND ADJUDGED: judgment be entered in favor of Shah and against

Served Respondents for the following amounts:

    i. against Served Respondents, jointly and severally, in the amount of
      $5,566,823.17; and

    ii. against Respondent RLI, in the additional amount of $508,191.24; and
      it is further

    ORDERED AND ADJUDGED:  that Shah's request for attorneys' fees has been

voluntarily withdrawn without prejudice; and it is further

ORDERED AND ADJUDGED:  that all costs taxable pursuant to Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920 be awarded Shah as against Served Respondents; and it is further

ORDERED AND ADJUDGED:  that Service of a copy of this Order and the papers upon which it was based, upon Served Respondents via facsimile, electronic transmission, overnight courier, express mail, or personal delivery, shall be deemed sufficient service thereof; and it is further

ORDERED AND ADJUDGED, that there being no just cause for delay, the Clerk of this Court is directed to enter judgment forthwith.

SO ORDERED.

_____
JOHN E. SPRIZZO
UNITED STATES DISTRICT JUDGE

Dated:    New York, New York
            _____ ___, 2008

# EXHIBIT 9

**TO AFFIDAVIT OF JOHN J. HAY**
**DATED AUGUST 20, 2008**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BIPINCHANDRA SHAH,

                        Petitioner,

        - against -

RLI PARTNERS, LIMITED, LIMITED
LIABILITY COMPANY "INVESTMENT
LOTTERY COMPANY", LIMITED LIABILITY
COMPANY "INVESTMENT FINANCIAL
COMPANY 'METROPOL'", and COMMERCIAL
BANK "OBI'EDINENNYI INVESTITSIONNYI
BANK" (LIMITED LIABILITY COMPANY),

                        Respondents.

Civil Action No.:  08 Civ. 4446 (JES)

**PROPOSED ORDER**
**DIRECTING PAYMENT**

---

THIS ACTION having been commenced by the filing of the Petition to Confirm

Foreign Arbitral Award on May 12, 2008; Respondents RLI Partners, Limited ("RLI"), Limited

Liability Company "Investment Financial Company 'Metropol'" ("IFC Metropol") and

Commercial Bank "Obi'edinnyi Investitsionnyi Bank" (Limited Liability Company)

("ObiBank") (RLI, IFC Metropol and ObiBank hereafter collectively referred to as "Served

Respondents") having been properly served on or about June 6, 2008 (RLI) and June 23, 2008

(IFC Metropol and ObiBank); an ex parte Order of Attachment as against IFC Metropol and

ObiBank having been entered on May 15, 2008; the Order of Attachment having been served on

certain garnishees and one such garnishee, Citibank, N.A. ("Citibank") having identified certain

funds in its possession belonging to Respondent ObiBank; an order to show cause requesting

confirmation and modification of the order of attachment having been entered on July 11, 2008;

Served Respondents having not appeared, answered or made any motion with respect to the

Petition or Order of Attachment; the time for Served Respondents to appear, answer or make any

motion with respect to the Petition or Order of Attachment having expired; and this Court

contemporaneously entering judgment against Served Respondents, including ObiBank, for

$5,566,823.17,

NOW, upon the motion of Salans, attorneys for Petitioner, said motion requesting

an order directing payment to Shah of the funds held by Citibank belonging to ObiBank is

hereby granted in its entirety, and it is hereby

ORDERED AND ADJUDGED:  that Citibank immediately pay all funds

belonging to ObiBank under its possession and/or control to Petitioner by payment of such funds

to Salans, as attorneys for Petitioner; and it is further

ORDERED AND ADJUDGED:  that Service of a copy of this Order and the

papers upon which it was based, upon all Respondents and Garnishee Citibank, N.A. via

facsimile, electronic transmission, overnight courier, express mail, or personal delivery, shall be

deemed sufficient service thereof.

SO ORDERED.

_____
JOHN E. SPRIZZO
UNITED STATES DISTRICT JUDGE

Dated:    New York, New York
          _____ ___, 2008

- 2 -